## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STEAMFITTERS LOCAL #449 RETIREMENT SECURITY FUND, WEST PALM BEACH POLICE PENSION FUND, and THE POLICE RETIREMENT SYSTEM OF ST. LOUIS, derivatively on behalf of Nominal Defendant Walgreen Co., | ) ) ) ) ) ) | C.A. No._____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| JAMES A. SKINNER, GREG D. WASSON, JANICE M. BABIAK, DAVID J. BRAILER, STEVEN A. DAVIS, WILLIAM C. FOOTE, MARK P. FRISSORA, GINGER L. GRAHAM, ALAN G. McNALLY, DOMINIC MURPHY, STEFANO PESSINA, NANCY M. SCHLICHTING, and ALEJANDRO SILVA, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WALGREEN CO., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Steamfitters Local #449 Retirement Security Fund ("Steamfitters #449"), West Palm Beach Police Pension Fund ("West Palm Beach Police"), and the Police Retirement System of St. Louis ("St. Louis Police") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby make the following allegations in their Verified Derivative Complaint (the "Complaint") on behalf of Walgreen Co. ("Walgreens" or the "Company"), as the nominal defendant, against the directors (the "Board" or "Defendants") of Walgreens. The allegations herein are based upon Plaintiffs' personal knowledge as to their own acts, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## INTRODUCTION

1. This is a shareholder derivative action arising out of an unlawful plan and scheme in which the Board, in breach of its fiduciary duties to the Company and its stockholders, allowed Walgreens' pharmacies in Florida, and potentially elsewhere, to push sales of prescription painkillers, including oxycodone, in violation of federal drug regulations. The fallout from the scheme led to Walgreen recently agreeing to an $80 million payout, the largest fine ever in a Drug Enforcement Administration ("DEA") enforcement action.

2. Prescription painkillers are responsible for more deaths than from motor vehicles and illegal street drugs such as cocaine, heroin, and amphetamines. Oxycodone, an opioid-class narcotic analgesic used medically as a prescription painkiller to control moderate to severe pain, chronic pain, and pain related to cancer and other debilitating and terminal conditions, is one of the most potent of these prescription drugs. In fact, the DEA warns on its website that "Oxycodone is a powerful addictive narcotic that is one of the most abused prescription medications … throughout the United States." "Addicts and abusers like [it] because when

consumed, via injecting, swallowing or inhaling, the pills can release a heroinlike high." *See* Timothy W. Martin, *Walgreen in $80 Million Settlement Over Painkillers*, *Wall St. J.* (June 11, 2013). Accordingly, oxycodone carries an Food and Drug Administration ("FDA") "Black Box Warning"—the most severe warning to medical personnel and consumers—that the drug has an "abuse liability similar to morphine."

3. Although oxycodone abuse is an epidemic throughout the United States, Florida has been hit particularly hard. U.S. Attorney for the Southern District of Florida Wifredo A. Ferrer stated, "Prescription drug abuse is a tremendous problem in Florida and throughout the country. Every day, individuals die from prescription drug overdoses." According to the DEA, "Since at least 2009, the State of Florida has been the epicenter of a notorious, well documented epidemic of prescription drug abuse. In July 2011, the Florida Surgeon General declared a Public Health Emergency based on the prescription pill epidemic which results in an average of seven overdose deaths per day in Florida."

4. As alleged further below, in 2009 to 2011, federal and state statutes were enacted to curb "diversion," the act of "diverting" prescription drugs such as oxycodone for recreational use rather than their original purposes. Drugs like oxycodone are diverted many ways, such as through doctor shopping, prescription forgery, pharmacy theft, and overprescribing.

5. As a side effect of these statutes, users were unable to get prescriptions filled at so-called "pill mills" and were forced to legitimate pharmacies. Thus, Walgreens' pharmacies in Florida experienced explosive growth in oxycodone sales. As alleged below, in 2010, only 3 Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida. In 2011, 38 Walgreens pharmacies made the top 100 and 6 were in the top 10. Through May 2012, 44 Walgreens pharmacies were in the top 100 oxycodone purchasers. All of these retail

pharmacies were supplied by Walgreens' Jupiter distribution facility (the "Jupiter Center"), which supplies oxycodone and other prescription drugs to the more than 850 Walgreens pharmacies in Florida and surrounding states.

6.     By late 2010 through mid-2011, sixteen of the top 25 largest Walgreens retail oxycodone purchasers, including the top six purchasers, were in Florida and supplied by the Jupiter Center.  No fewer than 43 Walgreens pharmacies in Florida purchased in excess of 500,000 dosage units of oxycodone in 2011.  As alleged below, the top six stores each averaged more than 1.6 million dosage purchases of the strongest oxycodone dosage (30 mg) in 2011.  By comparison, the average U.S. retail pharmacy purchased only 73,000 dosage units of *all formulations* of oxycodone (15 mg and 30 mg) during that same period.  These large sales sufficiently raised red flags such that the DEA sent its Diversion Investigators to investigate.

7.     In 2012, the DEA conducted a six month investigation into the practices of the Jupiter Center and several of its retail pharmacies in Florida.  On September 13, 2012, the DEA concluded that continued distribution of controlled substances by the Jupiter Center posed an "imminent danger to the public health and safety," and issued an immediate suspension order and order to show cause why its drug registration should not be revoked.  Similar orders to show cause were issued to six other Florida Walgreens retail pharmacies on November 26, 2012 (three pharmacies),  February 4, 2013 (one pharmacy), February 11, 2013 (one pharmacy), and February 19, 2013 (one pharmacy).  Among other things, the DEA found that certain actions by pharmacists and the most senior leaders of the Company were taken in "staggering disregard" to Walgreens' obligations under the Controlled Substances Act ("CSA").

8.     On June 11, 2013, Walgreens announced it had reached an $80 million settlement with the DEA, which, among other things, resulted in the Jupiter Center and all six of these retail

pharmacies being banned from distributing and dispensing oxycodone and other similar controlled substances until 2014 (the "2013 Settlement"). The 2013 Settlement also resolved similar open civil investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the CSA.

9.     As part of the 2013 Settlement, Walgreens admitted, among other things, that it had not upheld its obligations as a DEA registrant, which requires the Company to report suspicious orders of prescription painkillers like oxycodone. The $80 million fine was the largest in DEA history and is expected to negatively affect Walgreens' stock price by 4 to 6 cents per share in the third quarter 2013, without taking into account investigative and defense costs.

10.     A majority of the Board was aware of these improper sales of prescription painkillers since at least 2010 and appears to have either condoned the practices or done nothing to prevent them. As alleged further below, in connection with a prior settlement, the Company entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") in 2008 (the "2008 CIA"). The 2008 CIA required Walgreens' Audit Committee and the Board to review and oversee matters related to compliance with the obligations of the 2008 CIA on a quarterly basis. One of these obligations required Walgreens to enforce and enhance its policies and reporting procedures involving "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The 2008 CIA also required that the Company have procedures and mechanisms in place to alert the Board of any dispensing issues and compliance (or lack thereof) with federal and state laws, such as those found by the DEA.

4

11.      The Board also knew or should have known that specific actions taken by the Company contributed to the exponential increases in sales and distribution of oxycodone at the Company's Florida pharmacies and the Jupiter Center.  According to publicly available DEA documentation, in July 2010, Walgreens' corporate headquarters analyzed oxycodone dispensing for its Florida stores, ranking each pharmacy by the number of such prescriptions dispensed in June of that year and effectively told them to pick up sales.  Walgreens' supervisors got the message.  For example, the Walgreens store in Oviedo, Florida was ranked 444th on that list, filling on average only four oxycodone prescriptions per day in June 2010.  In June 2011, it purchased 169,700 pills—*an increase of 2,471 percent* over the 6,600 pills it bought in June 2010.  Additionally, one of the Walgreens under investigation by the DEA in Fort Myers, Florida went from selling 95,800 units of oxycodone in 2009 to more than 2.1 million units in 2011, which was *67 percent of all the oxycodone purchased by pharmacies in that same zip code in 2011*.  The Board knew or should have known that the sheer volume of these sales and prescription fills indicated that a large portion of them may have been diverted.

12.      The Board also ignored, or was deliberately kept in the dark about, concerns raised by the manager of the Jupiter Center that diversion may have been occurring.  In an email to Walgreens' corporate manager of "Rx Inventory Drug Stores" at Walgreens' headquarters, the Jupiter Center's manager (with overall responsibility for Schedule II drug operations) stated that she felt that three Florida pharmacies needed "to justify the large quantity" of the orders being filled.  In particular, that manager noted that the Jupiter Center had supplied one pharmacy with 3271 bottles in a single day period, and wondered how the store managed to "even house this many bottle[s]."  She even asked, "How do we go about checking the validity of these orders?"  The DEA found that the Company did absolutely nothing to investigate these concerns.  Instead,

they continued to process the orders rather than conduct any due diligence or further investigation.

13.     The Board then ignored pleas from the Chief of Police whose jurisdiction included two of the Walgreens pharmacies in question.  In March 2011, the chief separately wrote identical letters to the Chairman of Walgreens, Alan McNally, and the CEO, Greg Wasson, alerting them to the more than 120 arrests he had made for illegal distribution of oxycodone and informing them that the parking lots of the Walgreens pharmacies in Oviedo, Florida have "become a bastion of illegal drug sales and drug use."  McNally and Wasson—and through them the entire Board—ignored these letters.  Notably, these letters came *after* the chief had written several other letters to the individual pharmacies detailing his concerns and also after he had met with senior members of Walgreens' management, including its Market Loss Prevention Manager to discuss these same problems.  According to the DEA, the chief's concerns led Walgreens to "take a look at this market . . . and see if we have an increase in dispensing"—further evidence showing that it is reasonable to infer that the Board knew or should have known of the possible instances of diversion the DEA later investigated.

14.     A month later, in April 2011, the Company settled similar allegations of wrongdoing brought by the DEA regarding one of its retail pharmacies in San Diego, California. Among other things, as part of this settlement, the Company agreed to maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations.  This program was supposed to include procedures to identify the common signs associated with the diversion of controlled substances (such as doctor-shopping and requests for early refills) and also routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of

the compliance program and their responsibilities under the CSA. Particularly, the Company agreed that the compliance program mandated by this settlement would apply to all current and future Walgreens walk-in, retail pharmacies registered with the DEA in the United States and its territories and possessions. The DEA found that actions taken by the Company following this settlement showed that the Company deliberately structured its anti-diversion measures to avoid learning about diversion, a fact the DEA regarded as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." Given the DEA findings, it is surely reasonable infer that the Board was aware of this settlement, the allegations of misconduct, and the subsequent actions taken by the Company.

15. Finally, in August 2011 several DEA officials met with Walgreens personnel to discuss Walgreens' sales of oxycodone in Florida. At least ten Walgreens employees were present, including the corporate in-house counsel. At that meeting, the DEA told the Walgreens employees, among other things, that Walgreens pharmacies, and particularly the ones located in Florida, sold more oxycodone than most other pharmacies in the United States. Nonetheless, as alleged further below, the Board failed to take any steps to address these issues, leading to the DEA investigations, $80 million fine and additional resulting damages.

16. Plaintiffs therefore bring this stockholder derivative action to recover damages and other relief on behalf of nominal defendant Walgreens against the Defendants for breach of fiduciary duty related to the actions and inactions that violated the law and that ultimately caused the Company substantial harm.

## JURISDICTION AND VENUE

17. This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional

amount of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. Moreover, a substantial portion of the occurrences complained of herein occurred in this District. In addition, one or more of the Defendants either reside in, or maintain offices in, this District, and nominal defendant Walgreens is headquartered in this District.

## THE PARTIES

### A.      Plaintiffs

19.      Plaintiff Steamfitters #449 currently holds 9,800 shares of the Company and has held Walgreens shares continuously since at least January 1, 2009. Plaintiff Steamfitters #449 is a citizen of Pennsylvania.

20.      Plaintiff West Palm Beach Police currently holds 11,000 shares of the Company and has held Walgreens shares continuously since March 2012. Plaintiff West Palm Beach Police is a citizen of Florida.

21.      Plaintiff St. Louis Police currently holds 13,350 shares of the Company and has held Walgreens shares continuously since December 2011. Plaintiff St. Louis Police is a citizen of Missouri.

### B.      The Nominal Corporate Defendant

22.      Nominal defendant Walgreens is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreens is the nation's largest drug store chain, serving more than 6.3 million customers each day. It operates more than 8,000 retail pharmacies across the United States, employing roughly 27,000 pharmacists and filling nearly 800 million prescriptions

8

each year. Walgreens has approximately $44 billion in market capitalization, and its stock trades on the New York Stock Exchange under the ticker symbol "WAG."

### C. **The Board of Directors**

23. Defendant James A. Skinner ("Skinner") is Walgreens' Chairman of the Board. Skinner has served as a director of the Company since 2005, and has served as Chairman since July 2012. Upon information and belief, Skinner is a citizen of Illinois.

24. Defendant Greg D. Wasson ("Wasson") is President and Chief Executive Officer ("CEO") of Walgreens. He has served as a director of the Company since 2009, and became its President in 2007 and CEO in February 2009. Upon information and belief, Wasson is a citizen of Illinois.

25. Defendant Janice M. Babiak ("Babiak") has been a member of the Board since 2012. Upon information and belief, Babiak is a citizen of Tennessee.

26. Defendant David J. Brailer, M.D. ("Brailer") has been a member of the Board since 2010. Upon information and belief, Brailer is a citizen of California.

27. Defendant Steven A. Davis ("Davis") has been a member of the Board since 2009. Upon information and belief, Davis is a citizen of Ohio.

28. Defendant William C. Foote ("Foote") has been a member of the Board since 1997. Upon information and belief, Foote is a citizen of Wisconsin.

29. Defendant Mark P. Frissora ("Frissora") has been a member of the Board since 2009. Upon information and belief, Frissora is a citizen of New Jersey.

30. Defendant Ginger L. Graham ("Graham") has been a member of the Board since 2010. Upon information and belief, Graham is a citizen of Colorado.

31. Defendant Alan G. McNally ("McNally") has been a member of the Board since 1999. Upon information and belief, McNally is a citizen of Illinois.

32.     Defendant Dominic Murphy ("Murphy") has been a member of the Board since 2012.  Upon information and belief, Murphy is a citizen of London, United Kingdom.

33.     Defendant Stefano Pessina ("Pessina") has been a member of the Board since 2012.  Upon information and belief, Pessina is a citizen of Monaco.

34.     Defendant Nancy M. Schlichting ("Schlichting") has been a member of the Board since 2006.  Upon information and belief, Schlichting is a citizen of Michigan.

35.     Defendant Alejandro Silva ("Silva") has been a member of the Board since 2008. Upon information and belief, Silva is a citizen of Illinois.

## THE DUTIES OF THE INDIVIDUAL DEFENDANTS

## I.      FIDUCIARY DUTIES

36.     By reason of their positions as officers and/or directors of Walgreens and because of their ability to control the business and corporate affairs of Walgreens, the Individual Defendants owed the Company and its stockholders fiduciary obligations of trust, loyalty, good faith and due care, and were required to use their utmost ability to control and manage Walgreens in a fair, just, honest, and equitable manner including, without limitation, by instituting and maintaining appropriate systems of oversight and controls and exercising their responsibility to oversee management in its performance of risk management functions.  The Individual Defendants were required to act in furtherance of the best interests of Walgreens and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

37.     The 2008 CIA also imposes additional duties to Walgreens directors and officers and required specific compliance changes and regular reporting to the Walgreens Board and its Audit Committee of certain activity.

38.     Specifically, Walgreens' Policies and Procedures are to be reviewed to ensure that the Company complied with the requirements of the 2008 CIA.  This included "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization," which encompass the misconduct that the Company acknowledged in the 2013 Settlement Agreement.  To the extent the Policies and Procedures did not have these features, the 2008 CIA required them to be added and implemented within 120 days of the effective date of the 2008 CIA, which means they would have been in place by January 2009—and to and through the time of the misconduct alleged in the 2013 Settlement Agreement.

39.     Walgreens management, including members of the Board, were to receive these updated policy changes as well as regular updates on compliance with the 2008 CIA and during the entirety of the five year term of the 2008 CIA.

### A.    Additional Fiduciary Duties of the Audit Committee Members

40.     The Board's Audit Committee is responsible for assisting in the oversight of, among other things, ***compliance by the Company with legal and regulatory requirements***. From 2010 to 2012, Defendants Babiak, Brailer, Schlichting, Silva, and Skinner served on the Audit Committee at various times.[1]  The Audit Committee is currently composed of Defendants Babiak, Brailer, Schlichting, and Silva.  Defendant Babiak has been the Chair of the Audit Committee since 2012.

41.     The Audit Committee Charter describes the following responsibilities, among others, incumbent upon the Audit Committee members: "review policies and processes with respect to enterprise risk assessment and risk management and, as delegated by the full Board,

---

[1] Defendant Skinner served on the Audit Committee prior to his appointment as Chairman of the Board on July 11, 2012.

review status of key enterprise risks on a quarterly basis, and obtain periodic updates from management regarding compliance matters."

42.     As alleged further below, the CIA also imposed additional duties on the Audit Committee and the Board, including oversight of compliance with the terms of the CIA, and the committee, which the Company's Compliance Officer (who was responsible for developing and implementing policies, procedures, and practices pursuant to the CIA) reported to on at least a quarterly basis.

43.     Specifically, the Audit Committee is expressly responsible for review and oversight of the obligations of the 2008 CIA and is also required to meet and review and oversee the Company's Compliance Program at least quarterly.  The review required pursuant to the 2008 CIA further provides a reasonable basis to infer that the Board should have been aware of the misconduct described in the 2013 Settlement Agreement.

44.     According to Walgreens' public filings, the Audit Committee met eight times in 2012, eight times in 2011, and eight times in 2010—a total of 24 times since 2010.

## SUBSTANTIVE ALLEGATIONS

45.     Under the supervision and direction of the Individual Defendants, Walgreens management embarked on a systematic program to push sales of oxycodone and other prescription drugs and evade requirements of federal and state law.  In fostering and condoning this illegal conduct, the Defendants breached their fiduciary responsibilities to the Company's shareholders.

### Requirements Under the Controlled Substances Act

46.     The CSA imposes a number of obligations and reporting requirements on distributors like Walgreens.  First, distributors must devise and implement an effective system to

identify suspicious orders and report suspicious orders to DEA as they are discovered. Second, distributors must determine the legitimacy of any order it identifies as suspicious prior to fulfilling that order. Third, distributors must exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific and industrial channels and that the exercise of this obligation requires a distributor to confirm the legitimacy of all orders prior to filling.

47.     In response to the exponential increase in prescription drug abuse, the DEA sent letters to Walgreens, on September 27, 2006, February 7, 2007, and December 27, 2007. Those letters explained that Walgreens, as a distributor registrant, is obligated to maintain effective controls against diversion and report suspicious orders as part of its duties within the closed system established by the CSA and particularly 21 C.F.R. §1301.74(b) (the suspicious order requirement) and 21 U.S.C. §§ 823(b)(l) & 823(d)(1) (obligating all distributors to maintain effective controls against diversion of controlled substances).

48.     Instead of abiding by the law and following the DEA's directives, as alleged further below, Walgreens admitted in the 2013 Settlement Agreement that its suspicious ordering reporting for distribution for certain pharmacies did not meet the standards articulated in the DEA's three letters and that certain Walgreens retail pharmacies did dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA (21 U.S.C. §§ 801 et seq.) and its implementing regulations (21 C.F.R. Part 1300 et seq.).

**The War on Prescription Drugs**

49.     The federal government and the DEA have long sought to prevent the abuse of prescription painkillers. For example, the Ryan Haight Online Pharmacy Consumer Protection Act ("Ryan Haight Act"), which took effect in April 2009, sought to curb abuses by internet

pharmacies and the illegal diversion of prescription drugs through the internet. With the passage of this act, there was a "sharp increase" in rogue pain clinics, particularly in Florida, where practitioners would prescribe and dispense millions of dosages of controlled substances, such as oxycodone. In fact, more oxycodone was being prescribed and dispensed in Florida than in all other states combined, and Florida became the observed epicenter of diversion of controlled substances. In response, the DEA increased its enforcement efforts, targeting the primary distributors that supplied the rogue clinics in Florida.

50.     Due to the high demand for medical services from Florida's unique demographic population, specialty clinics dedicated to helping patients manage severe pain have long operated there. In 2008 and 2009, coinciding with the passage and timing of when the Ryan Haight Act took effect, there was a significant rise in the number of pain management clinics registered in Florida.  In July 2011, the Florida Surgeon General declared a statewide Public Health Emergency based on the prescription pill epidemic which was causing an average of seven overdose deaths per day in Florida. Among other things, the press release accompanying this emergency declaration stated that in 2010, "98 of the top 100 doctors dispensing Oxycodone nationally were in Florida"; and that "126 million oxycodone pills were dispensed through the top 100 dispensing pharmacies in Florida."

51.     The drugs most commonly associated with this epidemic are typically prescribed at unscrupulous pain clinics—also known as "pill mills"—by physicians acting outside the usual course of professional practice and include Schedule II pain relievers, such as oxycodone, Schedule IV benzodiazepines such as alprazolam, and Schedule IV muscle relaxers, such as carisoprodol. Frequently, these drugs are prescribed in large amounts and in combination with each other as "cocktails" popular with drug seeking individuals. According to the 2010 Florida

14

Medical Examiner's Commission Drug Report, the drug that caused the most deaths in the state of Florida for 2010 was oxycodone (1,516 deaths), followed by benzodiazepines (1,304 deaths of which 981 were caused by alprazolam.)

52.     In response to the boom in prescription drugs being dispensed at these "pill mills," in 2010 and 2011, the Florida legislature enacted several laws increasing regulation of pain clinics generally, and effectively eliminated the authority for doctors at pain clinics to directly dispense controlled substances from their clinics and offices.  The stated purpose of this legislation was to stem the overwhelming tide of controlled substances being diverted from pill mills and into illicit channels for sale and recreational abuse.  As a result, the wholesale distribution of oxycodone to doctors and clinics plummeted from over 8 million dosage units in May 2010 to roughly 200,000 units by October 2010, as seen from the chart below.



53. As a side effect of these laws, drug abusers wanting their prescriptions filled had to take their prescriptions to a retail pharmacy. Pharmacies like Walgreens promptly experienced a significant corresponding increase in the volume of requests for controlled substances because patients, who could no longer rely on their doctors or clinics to supply their medications directly, would take their prescriptions to be filled at pharmacies. As put by the DEA in one of its pre-hearing statements against Walgreens, the "epidemic of controlled substance drug abuse and diversion has now shifted to pharmacies."

**Walgreens' Increase in Oxycodone Prescriptions**

54. Walgreens' pharmacies "were no exception to this growth in demand" for prescriptions being filled in Florida. The Company has maintained more than 8000 pharmacies throughout the United States since fiscal year 2010. More than 10% of its pharmacies are in Florida, far more than in any other state. Specifically, in fiscal year 2012, there were 878 Florida locations (10.5%), 864 in fiscal year 2011 (10.5%), and 850 in fiscal year 2010 (10.6%). As alleged further below, management took several actions in connection specifically with its Florida operations, of which it is reasonable to infer that the Board was aware given the Company's large presence in Florida and unique Florida demographic.

55. Prescription sales constitute a large portion of the Company's business. In fiscal 2012, prescriptions accounted for 63.2% of sales compared to 64.7% in fiscal year 2011 and 65.2% in fiscal year 2010. Total sales during this same period were approximately $71.6 billion in fiscal year 2012, $72.2 billion in fiscal year 2011, and $67.4 billon in fiscal year 2010. This means that prescription sales were approximately $46.7 billion in fiscal years 2012 and 2011 and $42.6 billion in fiscal year 2010. In other words, prescription sales accounted for more than $42 billion of Walgreen's income in each of these years. Given the significant impact of prescription

sales on the Company's bottom line, the Board was almost certainly well aware of and would have questioned any significant increases in any particular market, including its biggest one (Florida).

56.     According to the DEA, the Jupiter Center has been the single largest distributor of oxycodone products in Florida since 2009.  The Jupiter Center is one of 12 Distribution Centers owned and operated by Walgreens and supplies drugs to more than 850 Walgreens pharmacies in Florida and surrounding states.  Collectively, these pharmacies dispensed almost one third of all prescription drugs in Florida.

57.     At about the same time as the abuse of prescription drugs became an epidemic in Florida, Walgreens' Florida retail pharmacies, supplied by the Jupiter Center, commanded an increasingly large percentage of the state's growing oxycodone business.  In 2010, only 3 Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida.  In 2011, 38 Walgreens pharmacies made the top 100 and 6 were in the top 10.  Through May 2012, 44 Walgreens pharmacies were in the top 100 oxycodone purchasers.  All of them were supplied by the Jupiter Center.

58.     From late 2010 through mid-2011, many of Walgreens' pharmacies received growing numbers of prescriptions for oxycodone, almost all of which were supplied by Jupiter Center.  Sixteen of the top 25 largest Walgreens retail oxycodone purchasers, including the top six purchasers, were in Florida and supplied by the Jupiter Center.  The following table, taken from publicly available DEA documentation, shows these six stores (all of which were investigated and would later have their registrations suspended as part of the 2013 Settlement Agreement) and their yearly oxycodone purchases for 2009 through 2011:

**Oxycodone Purchases By Dosage Unit (by Year) (by Store)**

| Walgreen Store # | Location | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| 03629 | Hudson, FL | 388,100 | 913,900 | 2,211,700 |
| 03099 | Ft. Myers, FL | 95,800 | 496,100 | 2,165,900 |
| 06997 | Oviedo, FL | 80,900 | 223,500 | 1,684,900 |
| 03836 | Port Richey, FL | 344,000 | 849,000 | 1,406,000 |
| 04391 | Ft. Pierce, FL | 250,000 | 881,400 | 1,329,600 |
| 04727 | Ft. Pierce, FL | 153,500 | 507,100 | 1,192,000 |
| Average | | 218,717 | 645,167 | 1,665,017 |

59.     The below chart also illustrates the increase in oxycodone sales at these six Florida Walgreens pharmacies.  *See* Amy Pavuk, *DEA: Walgreens Was Pushing Oxycodone Sales Amid Rx-Drug Epidemic*, *Orlando Sentinel* (June 29, 2013).



60.     The Jupiter Center supplied controlled substances to more than 800 Florida pharmacies and was the single largest distributor of oxycodone products in Florida.  The following chart shows the trends at eight Florida Walgreens pharmacies dispensing high volumes of oxycodone.

18



**Corporate Drug Dealing: Walgreens Created Financial Incentives to Sell More Oxycodone**

61.     Pushing prescriptions to pump sales was actively encouraged by Walgreens'

management.  According to an article in the *Orlando Sentinel* and documentation from the DEA,

Walgreens implemented compensation programs for pharmacy employees in which bonuses

were based on the number of prescriptions filled at the pharmacy.  DEA documentation from one

of the Walgreens' Order to Show Cause and Immediate Suspension of Registration reveals that

"[t]his bonus program, combined with a concerted, corporate directed effort to increase

oxycodone sales, served as an incentive for pharmacists and pharmacy technicians to ignore the

'red flags' of diversion presented by these prescriptions, many of which, in the proper exercise of

the pharmacist's corresponding responsibility under 21 C.F.R. § 1306.04(a), should have resulted

in a refusal to fill."

62. Documentation from the DEA provides three specific examples of pharmacists ignoring prescription drug diversion and generating more revenue for the Company and in turn, themselves (through the bonus program).

63. The first, according to the DEA, arose out of an incident on September 27, 2010, where a pharmacist working at Walgreens pharmacy # 04727 in Ft. Pierce reported to law enforcement that he mistakenly provided an extra 120 dosage units of 15 mg oxycodone to a customer. When the pharmacist tried to call the customer to request he return the mistakenly dispensed oxycodone, he was told by the customer's girlfriend that the customer was an addict who sells his pills and views the extra oxycodone as a "pot of gold" which he would not return. Despite this incident, Walgreens pharmacy # 04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011.

64. The second, according to the DEA, occurred on November 4, 2010, when a Walgreens pharmacy # 04727 pharmacist reported to police that she dispensed a prescription for 60 dosage units of 15 mg oxycodone to a twenty-four year old male who she then witnessed transfer the drugs to a female in the store. The female entered the pharmacy restroom, leaving behind evidence indicating she had smoked the oxycodone. Despite this incident, Walgreens pharmacy # 04727 continued to fill the same customer's oxycodone and alprazolam prescriptions on several occasions in November and December 2010 and January 2011.

65. The third occurred on December 21, 2010, when a pharmacist employed by Walgreens pharmacy # 03629 in Hudson, Florida reported to the Pasco County (Florida) Sheriff's Office that an individual had attempted to fill a prescription for 270 dosage units of 30 mg oxycodone, but ran from the pharmacy after learning the pharmacy had contacted law enforcement, suspecting the prescription was a forgery. Despite this incident, the same

pharmacy that reported this customer to the Sheriff's Office in December continued to fill the same customer's oxycodone prescriptions in February, March, April, May and October of 2011.

**Management's Additional Push to Increase Prescriptions**

66.     Bonuses for filling prescriptions were not the only directive or program implemented by Walgreens to pump sales.  In July 2010, management at Walgreens' corporate headquarters analyzed oxycodone dispensing for its Florida stores, ranking each pharmacy by the number of such prescriptions dispensed in June 2010.  According to the DEA, an 11-page spreadsheet containing this information was sent to Walgreens' supervisors with the admonition: "look at the stores on the bottom end . . . .  We need to make sure we aren't turning legitimate scripts away.  Please reinforce."  A corporate market director of pharmacy operations reinforced this message to Florida market pharmacy supervisors, highlighting that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions per day, yet "We also have stores doing about 1 a day.  Are we turning away good customers?"

67.     That message was not lost on the Company's Florida stores.  For example, DEA documentation shows that one of the Walgreens pharmacies in Oviedo, Florida was ranked 444th on that list, filling on average only four oxycodone prescriptions per day and buying 6,600 pills in June 2010.  Just one year later, in June 2011, the same store purchased 169,700 pills—an increase of *2,471 percent*.  Additionally, one of the Walgreens pharmacies under investigation in Fort Myers, Florida went from selling 95,800 units of oxycodone in 2009 to more than 2.1 million units in 2011, which represented 67 percent of all the oxycodone purchased by pharmacies in that same zip code in 2011.  *Report: DEA Investigating Walgreens Store & Distribution Center*, *CBS Miami* (Apr. 6, 2012), *available at*

http://miami.cbslocal.com/2012/04/06/report-dea-investigating-florida-Walgreens-store-distribution-center/ (last visited July 8, 2013).

68.     Additionally, in the first two months of 2012, 53 Walgreens pharmacies were listed in the DEA's top 100 purchasers of oxycodone.  In 2009, none were on the list.

**Notice of Diversion Given to Upper Walgreens Management and to the Board**

69.     Walgreens' corporate officers and the Board ignored internal calls to investigate the increased volume of oxycodone shipments and orders.  The DEA investigation found several examples, which provide a reasonable basis for concluding that the Board was aware or should have been on notice of these "red flags."

**Notice Given From Within the Company**

70.     According to the DEA, in January 2011, the Jupiter Center's manager with overall responsibility for Schedule II drug operations (known as the "CII Function Manager") raised concerns about the volume of oxycodone being shipped to three Florida pharmacies, including one of the six shown in the charts and tables above.  In an email to the corporate manager of "Rx Inventory Drug Stores" at the Company's headquarters (Barbara Martin) and Distribution Center Manager Rob Varno, she stated that she felt the stores needed "to justify the large quantity" of the orders being filled.  The CII Function Manager noted that the Jupiter center had supplied one pharmacy with 3271 bottles (327,100 dosage units) in a single 40 day period, and wondered how the store managed to "even house this many bottle[s]."  She also asked, "How do we go about checking the validity of these orders?'"

71.     The DEA investigation found that the Jupiter Center did not go about checking the validity of the increasingly frequent and large orders for highly abused controlled substances and that there was "no evidence of any due diligence conducted" by Walgreens or "anyone else

within the corporation to verify the legitimacy of these orders in order to fulfill their obligation to maintain effective controls against diversion." Additionally, the DEA found that "none of these orders [reported by the CII Function Manager] were reported [to the DEA] as suspicious and there appears to have been no other inquiry conducted into the circumstances of [these worrisome orders]." In fact, the Jupiter Center continued to ship large quantities of oxycodone to these pharmacies long after management was made aware of the potentially illegal problem.

**<u>Notice Given From Local Police to Management and the CEO and Chairman</u>**

72. Two of the pharmacies the Jupiter Center shipped to were located in Oviedo, Florida. Beginning in late 2010, these pharmacies became the site of multiple arrests by the local police for drug offenses. According to the DEA, the local Chief of Police of the City of Oviedo, Jeffrey Chudnow ("Chief Chudnow") began writing letters to the pharmacies after each of these arrests as a matter of practice. These letters informed the pharmacy of the circumstances of the arrest and that the dispensed drugs were not being used for treatment. They further provided the pharmacy with the name and date of birth of not only the person whose prescription they filled, but also of others associated with the illegal distribution of the dispensed drugs. These letters then concluded with a request for the pharmacy's help in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.

73. According to the DEA, Chief Chudnow's letters reached the highest levels of Walgreens' Loss Prevention Operations, which provides a reasonable basis to infer that the Board knew or should have known about them. Specifically, the Director of Divisional Loss Prevention noted in an email on January 28, 2011 that "[e]vidently the Chief of Police is concerned that we are filling too many C2 prescriptions . . . . From what I've been told, he is referencing 100 plus incidents/arrests in his jurisdiction." Walgreens' response was to "take a

23

look at this market . . . and see if we have an increase in dispensing." It is reasonable to infer that the reporting mechanisms and procedures put in place by the 2008 CIA would have reported this issue up to the Board.

74.     On February 10, 2011, Chief Chudnow met with Ed Lanzetti, Walgreens' Market Loss Prevention Director, and another Walgreens official. At the meeting, Chief Chudnow presented Lanzetti with numerous statistics and facts regarding controlled substance arrests related to the two Walgreens pharmacies in Oviedo. These statistics included numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests. Despite being given this information, these pharmacies continued to fill prescriptions for these associated doctors subsequent to Chief Chudnow's meeting.

75.     On March 15, 2011, after the meeting with Walgreens' upper management, Chief Chudnow wrote identical letters to Walgreens Chairman and Defendant McNally and Walgreens CEO and Defendant Wassan regarding the illegal diversion at these pharmacies. These letters notified them that the parking lots of the Ovieda Walgreens pharmacies had "become a bastion of illegal drug sales and drug use" where once the prescriptions are filled, "the drugs are sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies." Chief Chudnow also notified them that his department had made over 120 arrests for illegal distribution of oxycodone and other Schedule 2 drugs, and that the majority of those arrests had taken place at the two Walgreens retail stores in their jurisdiction. Specifically, Chief Chudnow asked for Walgreens' "cooperation by allowing your pharmacist not to fill suspected illicit prescriptions from doctors who have shown a propensity to prescribe large quantities of these drugs in multiple prescriptions, 180 pills per

prescription of one strength and 180 pills of another strength, per visit." Additionally, Chief Chudnow noted, "These types of prescriptions overtly denote misuse and possible street sales of these drugs." Chief Chudnow's pleas were ignored.

76.     Despite Chief Chudnow's letter writing campaign, the meetings he had with senior leaders of the Company, and the letters he sent to two Board members, the DEA found that large quantifies of oxycodone continued to be shipped to Walgreens pharmacies in Oviedo. Specifically, documentation from publicly available DEA records shows that following quantities of oxycodone were shipped to one of the Oviedo Walgreens pharmacies during the same six month period where Chief Chudnow's complaints had been elevated up the management chain to the Board:

**Oxycodone Dosage Units (30 mg formulations) Shipped to Walgreens From Jupiter Center**

| Month | Dosage Units |
|--------|--------------|
| Feb-11 | 75,300 |
| Mar-11 | 72,900 |
| Apr-11 | 101,700 |
| May-11 | 133,900 |
| Jun-11 | 115,200 |
| Jul-11 | 145,300 |

77.     Additionally, the DEA found that records for both Oviedo Walgreens pharmacies showed that on multiple occasions, they each dispensed additional prescriptions of commonly diverted narcotics to the same individuals who they knew had been previously arrested for drug offenses at their pharmacies.

78.     Bearing in mind that the average U.S. retail pharmacy in 2011 purchased only 73,000 dosage units of *all formulations* of oxycodone for *the entire year*, the DEA Administrator found that Walgreens demonstrated a "staggering disregard" for its obligations under the CSA in light of the information provided by Chief Chudnow.

79.     Chudnow's letters reasonably put McNally and Wasson, and thus the entire Board, on notice.  For example, while the average U.S. retail pharmacy in 2011 purchased 73,000 pills of all formulations of oxycodone for the entire year, the Jupiter Center shipped 145,300 oxycodone pills to the Oviedo pharmacy in July 2011 alone.  *DEA: Walgreens Was Pushing Oxycodone Sales Amid Rx-Drug Epidemic*, *supra*.  Given the impact of prescription sales on the Company's bottom line, it is reasonable to infer that the Board knew or should have known about this information.

**Notice Given to Corporate Counsel and to Upper Management**

80.     Additionally, according to publicly available DEA documentation, the DEA Administrator found that in or about March 2011, corporate officials at Walgreens initiated a Florida pharmacy store review initially titled "Focus on Profit."  Notably, the review's title was later changed to "Focus on Compliance."  The purpose of this review was to address the "significant increase in the number of [Schedule II controlled substance] prescriptions we are filling in [Florida]" after the October 2010 change in Florida law regarding pain clinics.

81.     Documents summarized by the DEA in publicly available records provide that the initial pilot survey asked the following questions, among others: "Do pain management clinic patients come all at once or in a steady stream?" and "Do you see an increase in pain management prescriptions on the day the warehouse order is received?"  These same publicly available records show that on May 17, 2011, in an email with the subject heading "Florida Focus on Profit," a Walgreens corporate attorney reviewed the survey and regarding these two questions, stated "If these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance."

82.     According to the DEA's records, the surveys ultimately used in the "Focus on Compliance" initiative did not contain those questions.  By omitting these questions to avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion, the DEA concluded that the program appeared to have been, in part, "intentionally skewed to avoid actually detecting certain evidence of possible diversion."  Additionally, the DEA concluded that "the Walgreens Corporation and Respondent as a corporate subsidiary, ignored its statutory and regulatory obligation to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels.  *See* 21 U.S.C. § 823(b) and (e)."  The DEA also concluded that the selective edits to that survey were made "for the explicit purpose of avoiding evidence of its own non-compliance" and showed that "Walgreens appears to have deliberately structured certain of its anti-diversion measures to avoid learning about and/or documenting evidence consistent with diversion."  The DEA also noted that it regarded this as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant."

83.     DEA documentation also shows that on August 19, 2011, Susan Langston (a DEA Diversion Investigator, Diversion Group Supervisor, and Diversion Program Manager) met with Walgreens personnel at the DEA Miami Field Division offices in Weston, Florida to apprise them of relevant DEA generated information about Walgreens' sales of oxycodone in Florida. Present from Walgreens were Dwayne Pinon (corporate in-house counsel), Ed Forbes (Market Loss Prevention Director), Wesley Rohn (Pharmacy District Supervisor), Joan Bustelo (Pharmacy District Supervisor), Anne-Marie Aldrich (Pharmacy District Supervisor), Cesar Cedeno (Pharmacy District Supervisor), Georgia Lehoczky (Market Pharmacy Director), Robert Espinosa (Pharmacy Supervisor), Lakeisha Axem (Pharmacy Supervisor), Sandra Vazquez

(Pharmacy Supervisor) and Susan Thompson Loss Prevention Manager.  The Walgreens officials at this meeting were told, among other things, that 20 Florida Walgreens pharmacies were in the top 300 of oxycodone purchasers in the United States for the first half of 2011, and within the State of Florida over the same time frame, 100 of the top 300 pharmacy oxycodone purchasers were Walgreens retail pharmacies.  Moreover, Florida Walgreens pharmacies purchased more than double the average amount of oxycodone purchased by other Florida pharmacies.  It is reasonable to infer that the Board knew or should have known that this meeting was taking or took place and of the discussions given the participants from the Company who were there.

84.     According to publicly available DEA documentation, following this meeting and as part of its "Focus On Compliance," Walgreens sought to develop and implement "Oxycodone Action Plans" within its districts in Florida in an attempt to reduce the volume of oxycodone Walgreens pharmacies were dispensing.  For example, at one store in Hudson, Florida, the plan devised by District Pharmacy and Loss Prevention supervisors in a memo dated August 23, 2011 included "contacting the Jupiter warehouse and designating order limits for Oxycodone."  The plan, effective immediately, was to "limit" the Hudson store to orders of no more than 100 bottles of 100 count 30 milligram oxycodone.  Notwithstanding the memo and the plan to limit that store's purchases to no more than 100 bottles, the DEA found that the Jupiter Center shipped the following orders to that store:

| Date | Bottles | Dosage Units |
|------|---------|--------------|
| 9/26/2011 | 331 | 33,100 |
| 10/10/2011 | 371 | 37,100 |
| 11/29/2011 | 200 | 20,000 |
| 12/6/2011 | 113 | 11,300 |
| 12/13/2011 | 150 | 15,000 |

85. Using this data as an example, the DEA concluded that Walgreens' "inability to enforce a very simple, modest limitation on this one pharmacy is further evidence of its failure to maintain effective controls against diversion, even in the rare instance when it tried to do so."

86. According to publicly available DEA documentation, in April 2012, Walgreens revised its "order" policy, but made this policy retroactive to January 1, 2012. The policy states, in pertinent part, that "Effective calendar year 2012, the Controlled Substance Order Monitoring and Prevention System prevents suspicious control drugs from being shipped to the stores. In calendar year 2012, because of the program mentioned, suspicious control drug reports are no longer generated as their shipment is prevented by the system." The DEA found that this policy "ignores the fact that the reporting requirement of 21 C.F.R. § 1301.74(b) applies to *orders*, not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement."

87. DEA documentation also shows that on June 14, 2012, a DEA Group Supervisor conducted a telephone interview with Dwayne Pinon, an in-house corporate counsel for Walgreens. As alleged above, Pinon was also at the August 19, 2011 meeting with Susan Langston. According to the DEA, during the June 14, 2012 interview, Pinon stated that Walgreens' prior suspicious order reporting system was based on a formula for Pseudoephedrine reporting in the DEA Chemical Handlers Handbook. Pinon stated that the old system automatically reported any orders for quantities above the algorithm's threshold limit. He stated that DEA had informed Walgreens that this algorithm reporting system was outdated and that Walgreens needed to establish their own system for reporting suspicious orders. Pinon stated that the old reports were not suspicious orders, but were in fact just orders that "bounced off" the

old reporting system. Pinon informed Federico that Walgreens had implemented a new system which they hoped to present to the DEA at some point. The new system set limits on a pharmacy ordering controlled substances based on their sales history, and any order over the set limit would trigger an alert to Walgreens Loss Prevention. Loss Prevention would then resolve the order. Pinon stated that any orders that Loss Prevention could not resolve would be reported to DEA. However, he stated that initial implementation of this new version of the Suspicious Order Monitoring System had produced "thousands" of allegedly suspicious orders, and was thus still being adjusted to produce different results. This shows that the Company's reporting systems, imposed by the 2008 CIA and, as alleged below, other settlement agreements, were admittedly outdated and ineffective. It is therefore reasonable to infer that the Board knew or should have known the same regarding these existing policies.

88.     In short, given these high level meetings with senior management and corporate counsel, in addition to the modified memos circulated from management to Walgreens pharmacies designed to avoid creating any awareness of potential failures to comply with applicable law, it is reasonable to infer that the Board knew or should have known that the Company was violating the applicable provisions of the CSA in exchange for higher prescriptions fills and profit, and that the Board did nothing to remedy these issues.

**The 2012 DEA Investigation and Findings**

89.     In 2012, the DEA began conducting a six month investigation into the Jupiter Center and Walgreens pharmacies in Florida. Many of the DEA's findings are summarized and alleged above.

90.     On September 13, 2012, the DEA Administrator concluded that continued distribution of controlled substances by the Jupiter Center posed an "imminent danger to the

public health and safety," and issued an immediate suspension order ("ISO")[2] and an order to show cause why the Jupiter Center's registration to manufacture, distribute or dispense controlled substances should not be revoked.

91. Among other things, as alleged in more detail above, the DEA Administrator's investigation revealed several "red flags" including:

- Walgreens had a systematic failure to take steps needed to ensure the safe distribution of controlled substance prescription drugs.

- Walgreens failed to recognize "readily identifiable orders and ordering patterns that, based on the information available . . . , should have been obvious signs of diversion [taking drugs out of legitimate channels and into channels for illicit use] occurring at [Walgreens'] customer pharmacies."

- Despite well-known concerns about the diversion and abuse of controlled substances and specific guidance from the DEA, Walgreens did not implement an effective system for detecting suspicious orders and reporting them to the DEA. Suspicious orders (those where there are grounds for suspecting diversion) repeatedly went unreported to the DEA for investigation or monitoring.

- There were "systematic shortcomings" in the detection, treatment, and reporting of suspicious orders affecting the distribution of controlled substances to more than 800 pharmacies in Florida from the Jupiter Center, including inadequate due diligence protocols and the failure to train employees to conduct due diligence.

- In an "abdication of its responsibilities as an individual registrant," Walgreens neglected to inform the DEA of the orders as required by federal law.

- Even when managers recognized that orders plainly raised suspicions, they continued to make shipments without conducting inquiries.

- Even where Walgreens' systems identified orders as suspicious, Walgreens did not act to protect the public.

- Steps that Walgreens had taken after the DEA began its investigation, such as voluntary dispensing restrictions at eight stores and a reduction from peak levels in the quantity of oxycodone being shipped to Walgreens' other highest-volume Florida pharmacies, did not establish that Walgreens had "recognized and adequately reformed" the Jupiter Center's "systematic shortcomings" as a registered distributor of controlled substances.

---

[2] An ISO affects an entity's ability to manufacture, distribute, or dispense controlled substances. It does not affect the entity's ability to manufacture, distribute, or dispense other pharmaceuticals.

**Prior Settlements With the DEA**

92.     The 2013 Settlement Agreement is not the first settlement the Company has entered into with the DEA.

93.     Less than two years earlier, on April 7, 2011, Walgreens entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA (the "2011 DEA Settlement Agreement").  This settlement resolved similar claims of improper drug dispensing and prescription filling at a Walgreens retail pharmacy in San Diego, California.  Among other things, as part of the 2011 DEA Settlement Agreement, Walgreens pledged to enact and maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and other DEA regulations, which included procedures to identify the common signs associated with the diversion of controlled substances, at all of its retail pharmacies.  Walgreens was also required to implement and maintain policies and procedures to ensure that prescriptions for controlled substances were only dispensed to authorized individuals pursuant to federal and state law and regulations.  On behalf of Walgreens, the 2011 DEA Settlement Agreement was signed by Richard Ashworth, Divisional Vice President, Pharmacy Services and John A. Gilbert, Jr., one of its attorneys.

94.     The manipulation of the compliance survey sent to its Florida pharmacies, as alleged in more detail above, took place in May 2011, one month after the 2011 DEA Settlement Agreement.  In its Order to Show Cause, the DEA found that the active effort to avoid documenting evidence of possible diversion in Florida, immediately after entering into this agreement supported its conclusion that there was an "imminent danger to the public health and safety."

95.     A few months later, in August 2011, Walgreens agreed to pay $500,000 as part of a settlement of claims brought by the DEA pertaining to prescription drug abuse at one of the Company's Arizona pharmacies (the "2011 Arizona Settlement Agreement").  This settlement resolved issues related to dispensing controlled substances prescribed by a certain doctor and the records involving those prescriptions.  Among other things in the 2011 Arizona Settlement Agreement, the Company represented that it provided training on the controlled substance record keeping and reporting requirements of the CSA and "will otherwise maintain good-faith measures to detect and prevent diversion."  On behalf of Walgreen Arizona Drug Co., the 2011 Arizona Settlement Agreement was signed by Dana I. Green, a Vice President, and John A. Gilbert, Jr., the same counsel who signed the 2011 DEA Settlement Agreement.

96.     Both of these 2011 settlement agreements demonstrate that the Company's practices regarding its verification and dispensing procedures for prescription drugs were defective and a contributing factor toward the size of the fine Walgreens paid in connection with the 2013 Settlement Agreement—the DEA's largest in its history.  It is reasonable to infer that the Board had notice of these settlements, the conduct alleged therein, and the subsequent requirements they imposed on the Company.

## Prior Settlements With the DOJ and the 2008 CIA

97.     In addition to the two DEA settlements in 2011 and the latest in 2013, the 2008 CIA provides an additional evidentiary basis to infer that the Board knew or should have known about the conduct at issue in the DEA's 2012 investigation.

98.     As alleged above, on June 4, 2008, Walgreens settled litigation involving Medicaid prescription-drug-fraud claims.  As part of this settlement, the Company paid a $35 million fine and also entered into the 2008 CIA.  The 2008 CIA applied to certain Walgreens

directors and officers and required specific compliance changes and regular reporting to the

Walgreens Board and its Audit Committee of certain activity. This settlement further provides a

reasonable basis to infer that the Board should have been aware of the misconduct described in

the 2013 Settlement Agreement.

**The 2013 Settlement Agreement**

99.     On June 11, 2013, Walgreens announced that it had reached an $80 million

settlement with the DEA in connection with certain sales of prescription painkillers, including

oxycodone.

100.     Among other things in the 2013 Settlement Agreement, Walgreens acknowledged

that "suspicious order reporting for distribution to certain pharmacies did not meet the standards

identified by DEA" that were sent to Walgreens on September 27, 2006, February 7, 2007, and

December 27, 2007."

101.     Walgreens also acknowledged in the Settlement Agreement that certain of its

retail pharmacies "dispense[d] certain controlled substances in an manner not fully consistent

with its compliance obligations" under the CSA.

102.     Additionally, Walgreens acknowledged in the 2013 Settlement Agreement that

"its record keeping practices regarding the dispensing of controlled substances from certain retail

pharmacies utilizing its CPO Facilities as central-fill pharmacies did not require such original

subscriptions to be marked "CENTRAL FILL."[3]

103.     According to the DEA, Walgreens, the nation's largest pharmacy chain, had

committed an "unprecedented number" of record-keeping and prescription dispensing violations

---

[3] The Settlement Agreement defined a CPO Facility as a Central Pharmacy Operations facility that is or was registered with the DEA as Retail/Chain Pharmacies or Central Fill Pharmacies to handle Schedule II-V controlled substances under the CSA.

and had "negligently allowed" prescription painkillers "to be diverted for abuse and illegal black market sales."

104.    The underlying conduct does not appear limited to Florida.  The 2013 Settlement also resolved similar open civil investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the CSA.  Public information regarding misconduct investigated in the Eastern District of New York shows that Walgreens violated the CSA by filling numerous prescriptions that Walgreens employees knew, or should have known, were not issued for a legitimate medical purpose, including those prescribed by a nurse practitioner, Eva MacDowall. According to the Department of Justice, over a two year period from July 2010 until July 2012, MacDowall filled 94 different, illegitimate prescriptions—primarily for two highly addictive painkillers, oxycodone and hydrocodone—at a Walgreens pharmacy in Selden, New York and two Walgreens pharmacies in Medford, New York.  Given the known repeated violations, it is likely that these practices are even more widespread.

105.    Given that the $80 million fine alone is expected to impact the Company's stock price by 4 to 6 cents per share in the third quarter 2013, the impact of the 2013 Settlement Agreement on the Company's bottom line is all the more egregious.

## DERIVATIVE ALLEGATIONS

106.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

107.    Plaintiffs bring this action derivatively in their right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of the breaches of fiduciary duties by the Individual Defendants.

108.     Walgreens is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.     As alleged above, Plaintiffs are and were stockholders of Walgreens at the time of the breaches of fiduciary duties complained of and will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.  Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

110.     The wrongful acts complained of herein subjected, and continue to subject, Walgreens to harm.

## DEMAND ON THE BOARD IS EXCUSED AS FUTILE

111.     Plaintiffs have not made a demand on the Board to bring suit asserting the claims set forth herein because pre-suit demand is excused as futile.

112.     As detailed below, a majority of the Walgreens directors face a substantial likelihood of liability in connection with the acts and omissions alleged herein.

113.     As of the date of the filing of this complaint, the Board consisted of the following thirteen (13) directors: Skinner, Wasson, Babiak, Brailer, Davis, Foote, Frissora, Graham, McNally, Murphy, Pessina, Schlichting and Silva.  Although only six of these directors were on the Board at the time the 2008 CIA was executed (Skinner, Wasson, Foote, McNally, Schlichting and Silva), by its terms, all of the directors have received general and specific training on the CIA's requirements and the Company's Compliance Program, as amended by the CIA.  This would include reviewing the Company's policies regarding "the proper and accurate

documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization."

114. Nine (9) of the directors—Skinner, Wasson, Davis, Foote, Frissora, Graham, McNally, Schlichting and Silva—were directors in July 2010, when the Company began urging its Florida pharmacies to increase their oxycodone sales. Defendants Schlichting, Silva and Skinner were members of the Audit Committee at that time. Defendants Davis, Foote, Frissora, McNally and Silva were members of the Nominating and Corporate Governance Committee. Thus, a total of eight directors were members of Board committees having specific duties with respect to the claims at issue in this action at the time they were occurring.

115. Additionally, ten (10) of the directors—Skinner, Wasson, Brailer, Davis, Foote, Frissora, Graham, McNally, Schlichting and Silva—were directors in February 2011, when Chief Chudnow alerted upper Walgreens management and Skinner and Wasson of his investigation and drug arrests. They were also directors in March 2011, when the "Focus on Profit" / "Focus on Compliance" memo was distributed. It is reasonable to infer that these Board members were aware of the same information found by the DEA—that a Walgreens Co. corporate attorney reviewed the survey and ultimately changed the focus of the questions to avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion. These same directors were on the Board at the time of the 2011 settlement agreements, giving them knowledge of the underlying facts in those matters as well. Defendants Brailer, Schlichting, Silva and Skinner were members of the Audit Committee at that time. Defendants Davis, Foote, Frissora, McNally and Silva were members of the Nominating and Corporate Governance Committee. Thus, a total of nine directors were members of Board

committees having specific duties with respect to the claims at issue in this action at the time they were occurring.

116.    The Individual Defendants participated in, approved of, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them.

## I.    THE BOARD WAS AWARE OF AND EITHER CONSCIOUSLY DISREGARDED RED FLAGS CONCERNING DRUG DIVERSION ISSUES AT THE JUPITER CENTER AND OTHER FLORIDA PHARMACIES OR ACTUALLY ENCOURAGED THESE VIOLATIONS

### A.    The Company Had Sufficient Internal Controls in Place to Detect the Issues Investigated by the DEA

117.    In 2008, Walgreens entered into the CIA, which required Walgreens to implement written policies and procedures regarding the operation of the Company's compliance program and its compliance with the Federal health care program requirements.

118.    Among other things, these policies and procedures were required to address the proper and accurate documentation of medical and prescription records and the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization.  A Compliance Officer within the Company was designated to develop and implement all of the policies, procedures, and practices designed to ensure compliance with the requirements set forth in the CIA and with applicable Federal health care programs, including those involving documentation of prescription records and proper and accurate dispensing of prescription drugs.  The Compliance Officer was required to file periodic (at least quarterly) reports regarding Federal health care program compliance matters directly to the Audit Committee, and the Compliance Committee (of which the Compliance Officer was chair) was required to make at least annual reports to the Audit Committee.  It is reasonable to infer that the

Company (and the Board) complied with these requirements and received regular updates from the Compliance Officer and/or the Compliance Committee.

119. Additionally, the 2008 CIA mandated that the Audit Committee would be responsible for review and oversight of matters related to compliance with the requirements of Federal health care programs and the obligations of the CIA, which would include the CIA's obligations regarding compliance with how prescription records are documented and how prescription drugs are properly and accurately dispensed. At least quarterly, the Audit Committee would meet, review, and oversee Walgreens' Compliance Program, including but not limited to the performance of the Compliance Officer and Compliance Committee. It is reasonable to infer that the Audit Committee (and therefore the rest of the Board) would have complied with these requirements and therefore would have received regular updates of incidents regarding them.

120. The Board also oversees the management of the Company through a governance structure that includes Board committees and management committees. The Board of Directors exercises oversight over the Company's strategic, operational and financial matters, including the elements and dimensions of major risks facing the Company. The Board oversees the management of the majority of risks faced by the Company through the Audit Committee.

121. The Board also utilizes an ongoing Enterprise Risk Management ("ERM") process under the direction of management's Risk Steering Committee. The ERM approach helps the Board and Board committees (such as the Audit Committee) to receive relevant information about and understand the Company's risk management process, the participants in the process, and key information gathered through the process. The purpose of the ERM process is to identify risks that could affect the Company and the achievement of its strategic objectives,

to understand, assess and prioritize those risks, and to facilitate the implementation of risk mitigation strategies and processes across the Company. The key risks identified through this process are reviewed with the full Board of Directors.

122.    The Audit Committee also reviews the Company's policies and processes with respect to enterprise risk assessment and risk management as well as financial risk assessment and risk management. On a quarterly basis, the Audit Committee reviews and discusses the key risks identified in the ERM process with management, their potential impact on our Company and our risk mitigation strategies. In the regular meeting of each of the other standing Board committees, those committees oversee management of risks relating to the applicable committee's areas of responsibility.

123.    Given the pervasive and systematic nature of the misconduct alleged herein, the Company's comprehensive internal controls would certainly have alerted the Board to the existence of such wrongdoing. Having been alerted that illegal drug diversion was taking place in its Florida pharmacies, the Board had a duty to prevent further similar violations. It did not, and in fact, with respect to, for example, the practice of providing bonuses based on the number of prescriptions filled, may have endorsed it. Accordingly, demand on the entire Board is excused as futile as each of the Individual Defendants faces a substantial likelihood of personal liability for their failure to act.

**B.      Internal Reports of Drug Diversion Raise Serious Red Flags Concerning Management's Noncompliance with Federal Law**

124.    Even without the Company's sophisticated internal control system, the sheer magnitude of internal information concerning management's noncompliance with federal law would have alerted any minimally competent Board member that management was engaging in a course of improper conduct.

125.    First, as alleged above, in July 2010, Walgreens' corporate headquarters analyzed oxycodone dispensing for its Florida stores, and sent a spreadsheet that ranked each pharmacy based on the number of such prescriptions dispensed in June 2010, and told them to pay attention to the stores with the lowest number of sales.  This message was reinforced to Florida market pharmacy supervisors by a corporate market director of pharmacy operations, who highlighted that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions per day, yet appeared to be turning away "good customers."  The message was also reinforced with a monetary component: Pharmacy employees were eligible for bonuses based on the number of prescriptions filled at the pharmacy.  The message was clear: Push more prescriptions.

126.    Second, in 2010, after Chief Chudnow began his letter writing campaign about the increase in drug arrests at two Walgreens pharmacies, management was sufficiently aware of and concerned about the misconduct that the Director of Divisional Loss Prevention summarized his complaint in an email, which Walgreens responded to.  Chief Chudnow met with Walgreens' Market Loss Prevention Director in February 2011.  Despite the statistics and facts Chief Chudnow provided during that meeting (including the numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests), these pharmacies continued to fill prescriptions for these associated doctors.  Chief Chudnow then wrote letters to Walgreens Chairman and Defendant McNally and Walgreens CEO and Defendant Wassan regarding the illegal diversion at these pharmacies.  These letters stated unequivocally that the parking lots of the Ovieda Walgreens pharmacies were being used to sell prescription drugs that had just been purchased there.  Chief Chudnow never got any response to his request for assistance from anyone at Walgreens.

127. Third, it appears from the public record that by March 2011 (at the same time Chief Chudnow sent his letters to both the Company's CEO and Chairman), management was still set on profit at the expense of preventing illegal prescription filling and dispensing. When, as alleged in more detail above, prescriptions skyrocketed, management initiated a Florida pharmacy store review initially titled, "Focus on Profit," which was later changed to "Focus on Compliance." According to the DEA, the purpose of this review was to address the "significant increase in the number of [Schedule II controlled substance] prescriptions we are filling in [Florida]." Compounding the problem, this survey appears to have been changed to avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion—allowing the Company to continue to the profit while breaking the law.

128. Any minimally diligent Board member would have been aware of management's systematic and intentional violations of federal between 2010 and 2012. Despite repeated red flags, the Board failed to act at any time. Thus, the Individual Defendants who served on the Board during that period of time—Skinner, Wasson, Brailer, Davis, Foote, Frissora, Graham, McNally, Schlichting and Silva—face a substantial likelihood of personal liability for their failure to halt such violations, and demand on these Defendants is therefore excused as futile.

## II.    THE AUDIT COMMITTEE FAILED TO ADHERE TO ITS CHARTER, AND ITS MEMBERS ARE CONFLICTED

129. Defendants Brailer, Schlichting, Silva, and Skinner, as members of the Audit Committee during the relevant time period, also breached their fiduciary duties of loyalty and good faith and grossly mismanaged Walgreens' affairs. Under the Audit Committee Charter, these Defendants were responsible for oversight of the Company's compliance with legal and regulatory requirements.

130.     Despite their duties, Defendants Brailer, Schlichting, Silva, and Skinner knowingly and/or recklessly permitted the occurrence of systematic violations of federal law that have caused and threaten to continue to cause significant harm to the Company.

131.     Thus, demand upon Defendants Brailer, Schlichting, Silva and Skinner is excused as futile because they each face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and grossly mismanaging Walgreens' affairs.

## COUNT I
## Derivative Claim for Breach of Fiduciary Duty

132.     Plaintiffs repeat and reallege the foregoing paragraphs as set forth herein.

133.     The Individual Defendants, as directors of Walgreens, are fiduciaries of the Company and its stockholders.  As such, they owe the Company the highest duties of loyalty, care, candor, and good faith and fair dealing.

134.     The Individual Defendants' breaches of their fiduciary duty directly and proximately caused substantial losses to the Company in an amount to be proven at trial.

135.     The Individual Defendants are liable to the Company as a result of the acts alleged herein.

136.     Plaintiffs, on behalf of Walgreens, have no adequate remedy at law.

**WHEREFORE**, Plaintiffs demand judgment against all defendants as follows:

(a)     Declaring that Plaintiffs may maintain this derivative action on behalf of Walgreens and that Plaintiffs are proper and adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to Walgreens;

(c)      Directing that the Individual Defendants account to Plaintiffs and Walgreens for all damages caused to Walgreens and account for and disgorge all profits and any special benefits obtained by Individual Defendant as a result of their unlawful conduct;

(d)      Determining and awarding to Walgreens the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

(e)      imposing corporate governance reform on the Walgreens Board including, without limitation, reformation of Board membership; altering the composition of and charge of Walgreens' pertinent Board committees; and creation of appropriate measures to protect against future breaches of fiduciary duty;

(f)      Awarding Walgreens restitution from the Individual Defendants;

(g)      Awarding Walgreens actual, compensatory, and exemplary damages;

(h)      Awarding Plaintiffs, on behalf of Walgreens, their reasonable and necessary attorneys' fees and costs;

(i)      Awarding pre- and post-judgment interest; and

(j)      Granting such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: July 31, 2013

/s/ Carol V. Gilden
Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
190 South LaSalle Street
Suite 1705
Chicago, Illinois  60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com
ARDC No:  6185530

*Local Counsel for Plaintiffs*

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
Iona Evans
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Christine S. Azar
Charles B. Vincent
LABATON SUCHAROW LLP
300 Delaware Avenue, Suite 1225
Wilmington, Delaware  19801
Telephone: (302) 573-2530
Facsimile: (302) 573-25290

*Counsel for Plaintiffs*

## VERIFICATION

STATE OF FLORIDA            )
                                      ) ss. :
COUNTY OF PALM BEACH     )

       I, Edward Mitchell, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

       1.      I am Chairman of the Board of Trustees of West Palm Beach Police Pension Fund ("West Palm Beach Police"), in the above-entitled action.

       2.      I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint") prepared on behalf of West Palm Beach Police, and I authorize its filing.

       3.      I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

       4.      I further declare that West Palm Beach Police is a current shareholder, and has been a holder, of the common stock of Walgreens in the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: July _17__, 2013

                                     Edward Mitchell
                                     Chairman

**VERIFICATION**

COMMONWEALTH OF PENNSYLVANIA    )
                                         ) ss. :

COUNTY OF ALLEGHENY              )

        I, Joseph M. Little, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

      1.      I am Chairman of the Board of Trustees of Steamfitters Local #449 Retirement Security Fund ("Steamfitters #449"), in the above-entitled action.

      2.      I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint") prepared on behalf of Steamfitters #449, and I authorize its filing.

      3.      I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

      4.      I further declare that Steamfitters #449 is a current shareholder, and has been a holder, of the common stock of Walgreen Co. in the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: July 24, 2013

                                       Joseph M. Little
                                       Chairman of the Board of Trustees

## **VERIFICATION**

| | |
|---|---|
| STATE OF MISSOURI | ) |
| | ) ss. : |
| COUNTY OF ST. LOUIS | ) |

I, Stephen G. Olish, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am Executive Director of the Police Retirement System of St. Louis ("St. Louis Police"), in the above-entitled action.

2.     I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint") prepared on behalf of St. Louis Police, and I authorize its filing.

3.     I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4.     I further declare that St. Louis Police is a current shareholder, and has been a holder, of the common stock of Walgreen Co. in the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: July **29**, 2013

                                       _____
                                       Stephen G. Olish
                                       Executive Director