**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| |
|---|
| IN RE WALGREEN CO. DERIVATIVE LITIGATION |

Lead Case No. 1:13-cv-05471

**CONSOLIDATED AND VERIFIED**
**SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   JURISDICTION AND VENUE ................................................................................9

III.  THE PARTIES............................................................................................................9

    A.    Lead Plaintiffs .............................................................................................9

    B.    The Nominal Corporate Defendant...........................................................10

    C.    The Board of Directors ..............................................................................10

IV.  THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES .........................13

    A.    Fiduciary Duties of the Members of the Board .......................................13

    B.    Walgreens' Articles of Incorporation Render the Board Liable for "Acts or Omissions Not in Good Faith or That Involve Intentional Misconduct or a Knowing Violation of the Law" ........................................14

    C.    Fiduciary Duties Imposed by the 2008 CIA ............................................15

    D.    Additional Fiduciary Duties of the Audit Committee Members ............16

    E.    Additional Fiduciary Duties of the Nominating and Corporate Governance Committee Members...............................................................17

V.   SUBSTANTIVE ALLEGATIONS ........................................................................17

    A.    Walgreens' Duties and Liability under the Controlled Substances Act ...............17

    B.    Walgreens' Duties under Florida Law .................................................20

    C.    Florida Has Been Walgreens' Most Strategically Important State.......................20

    D.    Prescription Sales Account for the Majority of Walgreens' Business..................21

    E.    The Prescription Drug Abuse Epidemic in the United States...............................22

    F.    Walgreens Has Experienced at Least 215 Reported Incidents of Oxycodone-Related Robbery, Theft, and Fraud at the Company's Pharmacies .................................................................................................25

    G.    Walgreens Pulled Oxycodone from its Stores in Tampa, Boston, and Nashville After Repeated Robberies and Conceded that Oxycodone is the "Drug of Choice" for Criminals.............................................................26

    H.    The Growth of Oxycodone Abuse in Florida and Florida's Legislative Response ...................................................................................................28

    I.    Walgreens Responded to Florida's Restrictions on Pill Mills by Stepping into Their Shoes.........................................................................30

    J.    Walgreens Creates Corporate Incentives to Distribute Oxycodone ...................33

            1.    Walgreens' "Bonus Program, Combined with a Concerted, Corporate-Directed Effort to Increase . . . Oxycodone Sales"..................33

         2.       Walgreens' Executive Compensation Incentivized Defendant Wasson and Other Executives to Move Inventory ....................................35

  K.     The DEA's Investigation of Walgreens .................................................................37

         1.       Notice Was Provided From Within the Company ......................................37

         2.       Local Police Gave Notice to Management and the CEO and Chairman......................................................................................................38

         3.       The Individual Defendants Had Notice that Other Walgreens Pharmacies Engaged in Similar Abuses .....................................................42

         4.       Notice Given to Upper Management and Corporate Counsel ...................44

  L.     In Response to DEA Scrutiny, Instead of Addressing the Diversion Problem, Walgreens Revised its Suspicious Order Policy .....................................49

  M.    The DEA Moves to Revoke the Registrations of the Jupiter Center and Six Walgreens Pharmacies for Violations of the CSA and Posing an "Imminent Danger to the Public Health and Safety"............................................51

         1.       The DEA Served an Order to Show Cause and Immediate Suspension Order Against the Jupiter Center ............................................51

         2.       The DEA Served an OTSC Against Walgreens 03629 ............................54

         3.       The DEA Served an OTSC Against Walgreens 04727 ............................55

         4.       The DEA Served an OTSC Against Walgreens 06997 ............................57

         5.       The DEA Served an OTSC Against Walgreens 03836 ............................59

         6.       The DEA Served an OTSC Against Walgreens 04391 ............................61

         7.       The DEA Served an OTSC Against Walgreens 03099 ............................63

  N.     The DEA Compiled Substantial Evidence of Wrongdoing in Support of its OTSC ........................................................................................................................65

  O.     Investigations and Regulatory Actions Concerning Walgreens in Other States Put the Board on Notice and Revealed Widespread Misconduct...............72

         1.       Prior Settlement with the OIG and the 2008 CIA.....................................73

          2.       Walgreens Other Prior Settlements with the DEA and Other Regulators ..................................................................................................73

  P.     Interviews with Confidential Witnesses Corroborate the DEA's Findings ..........75

  Q.    The 2013 Settlement Agreement ..........................................................................80

  R.     Walgreens Has Incurred Substantial Costs as a Result of the Board's Breaches of Fiduciary Duty .................................................................................82

VI.     DERIVATIVE ALLEGATIONS...............................................................................83

VII.    DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE ...............83

A.     Demand Is Excused Because the Individual Defendants' Conduct Is Not a Valid Exercise of Business Judgment ................................................................... 84

B.     Demand Is Excused Because a Majority of the Current Board Members Are Either Not Independent or Are Conflicted by a Substantial Likelihood of Liability Arising From Their Misconduct ........................................................ 86

VIII.    COUNT I – Derivative Claim for Breach of Fiduciary Duty ........................................... 93

IX.    PRAYER FOR RELIEF ................................................................................................... 93

X.    DEMAND FOR JURY TRIAL ........................................................................................ 94

Lead Plaintiffs Steamfitters Local #449 Retirement Security Fund ("Steamfitters #449"), West Palm Beach Police Pension Fund ("West Palm Beach Police"), the Police Retirement System of St. Louis ("St. Louis Police"), and Miami Firefighters' Relief and Pension Fund ("Miami Firefighters") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby make the following allegations in their Consolidated and Verified Shareholder Derivative Complaint (the "Complaint") on behalf of Walgreen Co. ("Walgreens" or the "Company"), as the nominal defendant, against certain members of the board of directors of Walgreens (the "Board"). The allegations herein are based upon Plaintiffs' personal knowledge as to their own acts, and upon information and belief as to all other matters, based on, among other things, the investigation made by and through their counsel and a review of publicly available information, including counsel's review of filings by the United States Securities and Exchange Commission ("SEC"), United States Department of Justice ("DOJ"), and United States Drug Enforcement Administration ("DEA").

## I.      INTRODUCTION

1.      This is a consolidated shareholder derivative action brought on behalf of nominal defendant Walgreens by several of its shareholders against the Individual Defendants (defined in ¶ 38 below). As detailed herein, these directors breached their fiduciary duties to the Company by willfully permitting Walgreens to operate in "staggering disregard" of the Controlled Substances Act (the "CSA") and other applicable laws, rules, and regulations aimed at preventing the unlawful distribution of controlled substances, particularly oxycodone, at the Company's retail pharmacies in Florida and nationwide, leading to the payment of a record fine to the DEA.

2.      In recent years, prescription painkillers have been responsible for more deaths than all illegal street drugs (such as cocaine, heroin, and amphetamines) combined. Oxycodone

is a Schedule II ("C-II") opioid narcotic used as a prescription painkiller to control moderate-to-severe pain, chronic pain, pain related to cancer, and other debilitating and terminal conditions. The DEA warns on its website that "[o]xycodone is a powerful addictive narcotic that is one of the most abused prescription medications . . . throughout the United States."

3.     Although oxycodone abuse is an epidemic throughout the United States, Florida has been hit particularly hard.  In 2008 and 2009, there was a significant rise in the number of pain-management clinics registered in Florida. According to the DEA, many of these clinics were run by unscrupulous doctors who prescribed and dispensed large quantities of medications to drug abusers and organized criminals without any legitimate medical basis.[1]  According to the DEA, during the first six months of 2010, Florida physicians dispensed more oxycodone than all other states combined.

4.     In response to this epidemic, federal, state, and local law enforcement began cracking down on these so-called "pill mills" and the diversion of prescription drugs into the black market.  In 2010, Florida enacted legislation to curb the "diversion" of prescription drugs such as oxycodone for recreational use.  As a result of this legislation, pain clinics in Florida were no longer authorized to dispense C-II drugs.  To fill their prescriptions, drug users were forced away from "pill mills" and toward traditional pharmacies.  Walgreens, which operates over 8,000 pharmacies in the United States and over 850 in Florida, stood in a prime position to absorb the pill mills' illegal business.

---

[1] *See* Statement of Joseph T. Rannazzisi to the Caucus on International Narcotics Control at 6-7 (July 18, 2012), *available at* http://www.justice.gov/dea/pr/speeches-testimony/2012-2009/responding-to-prescription-drug-abuse.PDF; Statement of Michele M. Leonhart to the U.S. Senate Judiciary Committee, Subcommittee on Crime and Terrorism at 7 (May 24, 2011), *available at* http://www.judiciary.senate.gov/pdf/11-5-24%20Leonhart%20Testimony.pdf ("Leonhart Statement").

5.     Walgreens did just that, and soon the Company's pharmacies in Florida experienced explosive growth in oxycodone sales.  In 2010, only three Walgreens retail pharmacies were in the top 100 purchasers of oxycodone in Florida.  By 2011, however, 38 Walgreens pharmacies made the top 100 and six were among the top ten.  Through May 2012, 44 Walgreens pharmacies were among the top 100 oxycodone purchasers.  All of these retail pharmacies were supplied by Walgreens' Jupiter, Florida distribution facility (the "Jupiter Center"), which supplies oxycodone and other prescription drugs to Walgreens pharmacies in Florida and surrounding states.

6.     By late 2010 through mid-2011, Walgreens' Florida locations accounted for 16 of the Company's 25 largest retail oxycodone purchasers, including the top six purchasers.  In 2011, at least 43 Walgreens pharmacies in Florida purchased in excess of 500,000 dosage units of oxycodone.  As alleged below, the top six Walgreens stores each averaged more than 1.6 million dosage purchases of the strongest oxycodone dosage (30 mg) in 2011.  By comparison, the average U.S. retail pharmacy purchased only 73,000 dosage units of *all formulations* of oxycodone (15 mg and 30 mg) during that same period.  The Company's expanding sales raised such blatant red flags that the DEA sent its Diversion Investigators to investigate.

7.     In 2012, the DEA conducted a six-month investigation into the practices of the Jupiter Center and Walgreens' retail pharmacies in Florida.  On September 13, 2012, the DEA concluded that continued distribution of controlled substances by the Jupiter Center posed an "imminent danger to the public health and safety," and issued an Immediate Suspension Order ("ISO")[2] and Order to Show Cause ("OTSC") as to why its DEA registration should not be

---

[2] An ISO suspends a DEA registrant's authorization to manufacture, distribute, or dispense Schedule II-V controlled substances.  It does not affect the entity's ability to manufacture, distribute, prescribe, or dispense other pharmaceuticals.

revoked.  Backed by dozens of witnesses and hundreds of exhibits, the DEA alleged that Walgreens had committed an "unprecedented number of record-keeping and dispensing violations" in violation of the CSA.  The DEA found that Walgreens' pharmacists, and its senior management, had exhibited a "staggering disregard" for the Company's obligations under the CSA.  Between November 26, 2012 and February 19, 2013, the DEA issued additional OTSCs against Walgreens' top-six oxycodone-selling pharmacies in Florida.

8.      On June 11, 2013, Walgreens announced it had reached an $80 million settlement with the DEA (the "2013 Settlement"), the largest in DEA history.  As part of the 2013 Settlement, Walgreens *admitted*, among other things, that it had not upheld its obligations as a DEA registrant, which requires the Company to report suspicious orders of prescription painkillers like oxycodone.  The 2013 Settlement banned the Jupiter Center and six Walgreens pharmacies from distributing or dispensing oxycodone and other similar controlled substances until 2014.[3]  The wrongful conduct, however, was not limited to Florida.  The 2013 Settlement resolved administrative actions by the DEA, and civil investigations by the DOJ in the Eastern District of New York, the Southern District of Florida, the District of Colorado and the Eastern District of Michigan, as well as civil investigations by the DEA nationwide.

9.      Publicly available information demonstrates that a majority of the Walgreens Board was aware of or consciously disregarded that the Company had been improperly selling prescription painkillers and either condoned the practices or did nothing to prevent them.  On or about September 8, 2008, in connection with the Company's June 4, 2008 settlement with the Office of Inspector General of the United States Department of Health and Human Services

---

[3] The Settlement and Memorandum of Agreement ("2013 Settlement Agreement") among the DOJ, DEA, Walgreens, and its wholly owned subsidiaries is attached hereto as Exhibit 1 and incorporated herein by reference.

("OIG"), Walgreens entered into a Corporate Integrity Agreement (the "2008 CIA") with the OIG. The 2008 CIA required Walgreens to enforce and enhance its policies and reporting procedures involving "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The 2008 CIA also required Walgreens to have procedures and mechanisms in place to alert the Board of any drug dispensing issues and lack of compliance with federal and state laws. Those very procedures and mechanisms would have put the Board on notice of the violations found by the DEA in 2012.

10.    The dramatic rise of oxycodone distribution from the Juniper Center and sales at the Company's Florida pharmacies did or should have alerted the Board to the potential that a large portion of the sales had been diverted for illegal use. For example, the Walgreens store in Oviedo, Florida was ranked 444th on that list, filling on average only four oxycodone prescriptions per day in June 2010. In June 2011, it purchased 169,700 pills—*an increase of 2,471 percent* over the 6,600 pills it bought in June 2010. Additionally, one of the Walgreens stores under investigation by the DEA in Fort Myers, Florida went from selling 95,800 units of oxycodone in 2009 to more than 2.1 million units in 2011, which was *67 percent of all the oxycodone purchased by pharmacies in that same zip code in 2011*.

11.    The spectacular rise in oxycodone sales was in direct response to actions taken by the Company's officials. In July 2010, Walgreens' corporate headquarters analyzed oxycodone dispensing for its Florida stores, ranking each pharmacy by the number of such prescriptions dispensed in June of that year, and effectively told them to increase sales. Driven by the Company's plan to "Focus on Profit," management instructed pharmacy supervisors to "look at stores on the bottom end . . . [and] to make sure we aren't turning legitimate scripts away."

Armed with the Company's micro-level data, one high-level Company employee criticized pharmacies that only filled one prescription per day, while praising a pharmacy that filled almost 18 prescriptions a day.

12.     Despite this push from high-level officials within the Company, certain Walgreens employees still raised concerns about the staggering number of oxycodone prescriptions the Company was filling.  In an email to the corporate manager of "Rx Inventory Drug Stores" at Walgreens' headquarters, the Jupiter Center's manager (with overall responsibility for C-II drug operations) stated that she felt that three Florida pharmacies needed "to justify the large quantity" of the orders being filled.  In particular, that manager noted that the Jupiter Center had supplied one pharmacy with 3,271 bottles in a single day period, and wondered how the store managed to "even house this many bottle[s]."  She also asked, "How do we go about checking the validity of these orders?"

13.     Pursuant to the 2008 CIA, the Board either knew or should have known about the Jupiter Center's manager's concerns.  The DEA found, nevertheless, that the Company did absolutely nothing to investigate these concerns.  Instead, the Jupiter Center continued to process the orders.

14.     The Board also ignored direct pleas from the Chief of Police, Jeffrey Chudnow, whose jurisdiction included two of the Walgreens pharmacies in question.  In March 2011, Chief Chudnow separately wrote identical letters to the then-Chairman of Walgreens, Alan McNally ("McNally"), and the Company's Chief Executive Officer ("CEO"), Greg Wasson ("Wasson"), alerting them to the more than 120 arrests he had made for illegal distribution of oxycodone and informing them that the parking lots of the Walgreens pharmacies in Oviedo, Florida had "become a bastion of illegal drug sales and drug use."  McNally and Wasson—and the entire

Board—ignored these letters and instead showed "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." Notably, these letters came *after* the chief had written several other letters to the individual pharmacies detailing his concerns and *after* he had met with senior members of Walgreens' management, including its Market Loss Prevention Manager, to discuss these same problems. According to the DEA, Chief Chudnow's concerns led Walgreens to "take a look at this market . . . and see if we have an increase in dispensing"— evidence that enhances the plausible inference that the Board knew or should have known of the possible instances of diversion the DEA later investigated.

15.    A month later, in April 2011, Walgreens settled allegations of wrongdoing stemming from the illegal prescription filling and diversion brought by the DEA regarding one of its retail pharmacies in San Diego, California. Among other things, as part of this settlement, the Company agreed to maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations. This program was supposed to include procedures to identify the common signs associated with the diversion of controlled substances (such as doctor-shopping and requests for early refills) and also routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA. In particular, Walgreens agreed that the compliance program mandated by this settlement would apply to all current and future Walgreens walk-in, retail pharmacies registered with the DEA in the United States and its territories and possessions.

16.    Instead of properly implementing the mandated compliance program, Walgreens deliberately structured its anti-diversion measures to avoid reporting diversion to the DEA as required under the law and the April 2011 settlement. The DEA later characterized this behavior

as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." Thus, it is reasonable to infer that the Board was aware of the Company's continuing violations.

17.     Finally, in August 2011 several DEA officials met with Walgreens personnel to discuss Walgreens' sales of oxycodone in Florida. At least ten Walgreens corporate employees were present, including Dwayne Pinon ("Pinon"), Walgreens' corporate in-house counsel. At that meeting, the DEA discussed with Walgreens employees, among other things, that Walgreens pharmacies, and particularly the ones located in Florida, sold more oxycodone than most other pharmacies in the United States. Despite this meeting, as alleged further below, the Board failed to take any steps to address these issues, leading to the DEA investigations, $80 million fine, and additional resulting damages.

18.     As directors of Walgreens, each of the Individual Defendants owed and owes the Company and its shareholders the fiduciary duties of good faith, loyalty, fair dealing, due care, and trust in the management and administration of the Company. The Individual Defendants have breached these obligations, however, by, *inter alia*, approving, authorizing, acquiescing in, and/or willfully turning a blind eye to Walgreens' substantial and systematic violation of federal and state law, including the CSA. To date, these violations have cost Walgreen over $80 million and have caused the Company significant reputational harm.

19.     Plaintiffs therefore bring this shareholder derivative action to recover damages and other relief on behalf of nominal defendant Walgreens and against the Individual Defendants for breach of fiduciary duty related to the actions and inactions that violated the law and that ultimately caused, and continue to cause, the Company substantial harm. Absent the relief sought herein, this harm will go unaddressed.

II.    **JURISDICTION AND VENUE**

20.    This shareholder derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs and the Individual Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. Moreover, a substantial portion of the occurrences complained of herein occurred in this District. In addition, one or more of Individual Defendants either reside in, or maintain offices in, this District, and nominal defendant Walgreens is headquartered in this District.

III.    **THE PARTIES**

A.    **Lead Plaintiffs**

22.    Lead Plaintiff Steamfitters #449 currently holds 9,800 shares of the Company and has held Walgreens shares continuously since at least January 1, 2009. Steamfitters #449 is a public pension plan with an eight-member board of trustees, each member of which is a citizen of Pennsylvania. Steamfitters #449 is a citizen of Pennsylvania.

23.    Lead Plaintiff West Palm Beach Police currently holds 7,000 shares of the Company and has held Walgreens shares continuously since March 2012. West Palm Beach Police is a public pension plan with a five-member board of trustees, each member of which is a citizen of Florida. West Palm Beach Police is a citizen of Florida.

24.    Lead Plaintiff St. Louis Police currently holds 13,350 shares of the Company and has held Walgreens shares continuously since December 2011. St. Louis Police is a public

pension plan with a nine-member board of trustees, each member of which is a citizen of Missouri. St. Louis Police is a citizen of Missouri.

25. Lead Plaintiff Miami Firefighters currently holds 17,425 shares of Walgreens common stock and has been a continuous holder of Walgreens stock since at least April 30, 2005. Miami Firefighters is a public pension plan with a five-member board of trustees, each member of which is a citizen of Florida. Miami Firefighters is a citizen of Florida.

**B.      The Nominal Corporate Defendant**

26. Nominal defendant Walgreens is an Illinois corporation with its principal place of business in Deerfield, Illinois. Founded in 1901, Walgreens is the nation's largest drug store chain, serving more than 6.3 million customers each day. It operates more than 8,000 retail pharmacies across the United States, employing roughly 27,000 pharmacists and filling nearly 800 million prescriptions each year, which represents approximately 21 percent of all prescriptions in the United States. The Company reported $72.2 billion in sales in 2011, two-thirds of which came from pharmacy sales. Walgreens has approximately $44 billion in market capitalization, and its stock trades on the New York Stock Exchange under the ticker symbol "WAG." Walgreens' Board maintains several standing committees on which the Company's directors serve. These standing committees include the Audit Committee and the Nominating and Corporate Governance Committee.

**C.      The Board of Directors**

27. Defendant James A. Skinner ("Skinner") is Walgreens' Chairman of the Board ("Chairman"). Skinner has served as a director of the Company since July 1, 2005, and has served as Chairman since July 11, 2012. Skinner has served on the Audit Committee since 2006. Since July 11, 2012, Skinner has also attended meetings of all Board committees. Since 2008,

Skinner has received more than $1,200,000 for his service as a director of the Company. Upon information and belief, Skinner is a citizen of Illinois.

28. Defendant Wasson is President and CEO of Walgreens. He has served as a director of the Company since February 1, 2009. Wasson was President and CEO of Walgreens from May 2007 to February 2009, Executive Vice President from October 2005 to May 2007, Senior Vice President from February 2004 to October 2005, and Vice President from October 2001 to February 2004. Since 2008, Wasson has received more than $38.8 million for his service to the Company. Upon information and belief, Wasson is a citizen of Illinois.

29. Defendant Janice M. Babiak ("Babiak") has been a member of the Board since April 9, 2012. Babiak has served on the Audit Committee since April 9, 2012, and currently serves as its Chairman. Upon information and belief, Babiak is a citizen of Tennessee.

30. Defendant David J. Brailer, M.D. ("Brailer") has been a member of the Board since 2010. Davis has served on the Audit Committee since December 1, 2010. Since 2008, Brailer has received more than $312,000 for his service as a director of the Company. Upon information and belief, Brailer is a citizen of California.

31. Defendant Steven A. Davis ("Davis") has been a member of the Board since March 16, 2009. Davis has served on the Nominating and Corporate Governance Committee since 2009 and currently serves as its Chairman. Since 2008, Davis has received more than $679,000 for his service as a director of the Company. Upon information and belief, Davis is a citizen of Ohio.

32. Defendant William C. Foote ("Foote") has been a member of the Board since 1997. Foote has served on the Nominating and Corporate Governance Committee since 1999.

Since 2008, Foote has received more than $1,196,000 for his service as a director of the Company.  Upon information and belief, Foote is a citizen of Wisconsin.

33.     Defendant Mark P. Frissora ("Frissora") has been a member of the Board since January 14, 2009.  Frissora has served on the Nominating and Corporate Governance Committee since 2009.  Since 2008, Frissora has received more than $727,000 for his service as a director of the Company.  Upon information and belief, Frissora is a citizen of New Jersey.

34.     Defendant Ginger L. Graham ("Graham") has been a member of the Board since May 1, 2010.  Since 2008, Graham has received more than $412,000 for her service as a director of the Company.  Upon information and belief, Graham is a citizen of Colorado.

35.     Defendant McNally has been a member of the Board since 1999.  McNally was the acting CEO of Walgreens from October 10, 2008 to February 1, 2009 and lead director of the Board from January 30, 2008 to October 10, 2008.  McNally served on the Nominating and Corporate Governance Committee since 2002, but stepped down from that committee upon assuming the position of acting CEO.  He rejoined that committee on July 11, 2012.  Since 2008, McNally has received more than $2,131,000 for his service as a director of the Company.  Upon information and belief, McNally is a citizen of Illinois.

36.     Defendant Nancy M. Schlichting ("Schlichting") has been a member of the Board since October 1, 2006.  Schlichting has served on the Audit Committee since October 11, 2006.  Since 2008, Schlichting has received more than $1,127,000 for her service as a director of the Company.  Upon information and belief, Schlichting is a citizen of Michigan.

37.     Defendant Alejandro Silva ("Silva") has been a member of the Board since January 9, 2008.  Silva has served on the Audit Committee since January 9, 2008.  Silva has served on the Nominating and Corporate Governance Committee since 2008.  Since 2008, Silva

has received more than $933,000 for his service as a director of the Company. Upon information and belief, Silva is a citizen of Illinois.

38.     The parties identified in paragraphs 27 through 37 are collectively referred to herein as the "Individual Defendants."[4]

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.     Fiduciary Duties of the Members of the Board

39.     By reason of their positions as officers, directors, and/or fiduciaries of Walgreens and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Walgreens and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to manage, supervise, and direct the business affairs of Walgreens in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Walgreens and its stockholders.

40.     Each director and officer of the Company owes to Walgreens and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Walgreens, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and/or directorial positions with Walgreens, each of the Individual Defendants had

---

[4] Walgreens directors Dominic Murphy ("Murphy") and Stefano Pessina ("Pessina"), who joined the Board on August 2, 2012, are not defendants in this action. However, the Company concedes Murphy and Pessina are not independent directors, and therefore, they are relevant to the demand futility analysis, as discussed *infra*, in Section VII.

access to adverse non-public information about the operations and improper practices of Walgreens.

42.    At all times relevant hereto, each of the Individual Defendants was an agent of each of the other Individual Defendants and of Walgreens, and was at all times acting within the course and scope of such agency.

43.    To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Walgreens were required to, among other things:

    a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

    b.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

    c.    remain informed as to how Walgreens conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

    d.    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**B.    Walgreens' Articles of Incorporation Render the Board Liable for "Acts or Omissions Not in Good Faith or That Involve Intentional Misconduct or a Knowing Violation of the Law"**

44.    Although Article VIII of Walgreens' Amended and Restated Articles of Incorporation ("Article VIII") contains a provision that purports to exculpate the Board for breaches of fiduciary duties, Article VIII specifically holds Company directors liable for "acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law."  Article VIII states as follows:

> The Directors of the Corporation shall not be liable to the Corporation or to the shareholders of the Corporation for monetary damages for breach of fiduciary duties as a Director, provided that this provision ***shall not eliminate or limit the liability of the Director (i) for any breach of the Director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of the law***, (iii) under Section 8.65 of the IBCA or (iv) for any transaction from which the Director derived an improper personal benefit.

(Emphasis added.)

### C.     Fiduciary Duties Imposed by the 2008 CIA

45.     The 2008 CIA imposes additional duties on Walgreens directors and officers and required specific compliance changes and regular reporting to the Walgreens Board and its Audit Committee of certain activity.

46.     Specifically, the 2008 CIA required that Walgreens' Policies and Procedures were to be reviewed to ensure that the Company complied with the following requirements: (1) "the proper and accurate documentation of medical and prescription records;" and (2) "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization," which encompass the misconduct that the Company acknowledged in the 2013 Settlement Agreement.  Pursuant to the 2008 CIA, Walgreens was required to design procedures to alert the Board to any lack of compliance with federal and state laws governing the dispensing of prescription drugs.  To the extent the Policies and Procedures did not have these features, the 2008 CIA required them to be added and implemented within 120 days of the effective date of the 2008 CIA, which means they would have been in place by January 2009— and to and through the time of the misconduct alleged in the 2013 Settlement Agreement.

47.     Walgreens management, including members of the Board, were required to receive notice of these updated policy changes as well as regular updates on compliance with the 2008 CIA during the entirety of the five-year term of the 2008 CIA.

**D.**     **Additional Fiduciary Duties of the Audit Committee Members**

48.     In addition to the fiduciary duties discussed above, the Board's Audit Committee is responsible for assisting in the oversight of, among other things, ***compliance by the Company with legal and regulatory requirements***.  Since 2008, Defendants Babiak, Brailer, Schlichting, Silva, and Skinner served on the Audit Committee at various times.[5]  The Audit Committee is currently composed of Defendants Babiak (Chairman), Brailer, Schlichting, and Silva.

49.     The Audit Committee Charter expressly provides that the Audit Committee members "review policies and processes with respect to enterprise risk assessment and risk management and, as delegated by the full Board, review the status of key enterprise risks on a quarterly basis, and obtain periodic updates from management regarding compliance matters."

50.     As discussed herein, the 2008 CIA also imposed additional duties on the Audit Committee and the Board, including oversight of compliance with the terms of the 2008 CIA. Specifically, the Audit Committee is expressly responsible for review and oversight of the obligations of the 2008 CIA and is also required to meet and review and oversee the Company's Compliance Program at least quarterly.  Additionally, the Company's Compliance Officer (who was responsible for developing and implementing policies, procedures, and practices pursuant to the 2008 CIA) reported to the Audit Committee on at least a quarterly basis.  The review required pursuant to the 2008 CIA provides a reasonable basis to infer that the Board was or should have been aware of the misconduct described in the 2013 Settlement Agreement.

51.     According to Walgreens' public filings, the Audit Committee met eight times in 2012, eight times in 2011, eight times in 2010, eight times in 2009, and eight times in 2008—a total of 40 times since 2008.

---

[5] Defendant Skinner served on the Audit Committee prior to his appointment as Chairman on July 11, 2012.

### E. Additional Fiduciary Duties of the Nominating and Corporate Governance Committee Members

52.     In addition to the fiduciary duties discussed above, the Board's Nominating and Corporate Governance Committee, according to its charter, is responsible for "establishing the corporate governance principals of the Company," including overseeing the "evaluation . . . of the effectiveness of the Board and its committees and management."  In addition, the members of the Nominating and Corporate Governance Committee are required to "review the Company's Code of Business Conduct and recommend any changes to the Board."  The Nominating and Corporate Governance Committee is also responsible for reviewing, "[a]t least annually . . . the Company's policies and activities regarding social responsibility . . . ."

53.     According to Walgreens' public filings, the Nominating and Corporate Governance Committee met four times in 2012, three times in 2011, three times in 2010, three times in 2009, and three times in 2008—a total of 16 times since 2008.

## V.     SUBSTANTIVE ALLEGATIONS

54.     Under the supervision and direction of the Individual Defendants, Walgreens management embarked on a systematic program to push sales of oxycodone and other C-II prescription drugs and evade requirements of federal and state law.  In fostering and condoning this illegal conduct, the Individual Defendants breached their fiduciary duties to the Company.

### A.     Walgreens' Duties and Liability under the Controlled Substances Act

55.     The CSA imposes restrictions on the distribution of controlled substances— substances that pose a risk of addiction and abuse.  The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit

market.  Any entity that seeks to become involved in producing or distributing controlled substances must first register with the DEA.

56.    Under the DEA's regulations, registered pharmacies must "provide effective controls and procedures to guard against theft and diversion of controlled substances."  21 C.F.R. § 1301.71(a).  And while "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner," a "corresponding responsibility rests with the pharmacist who fills the prescription."  21 C.F.R. § 1301.04(a).  Pharmacies therefore are required to ensure that prescriptions for controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  *Id.*

57.    DEA registrants authorized to distribute or dispense any controlled substance are prohibited from distributing, dispensing, or manufacturing controlled substances that are not authorized by a registrant's registration.  21 U.S.C. § 842(a)(2).  Registrants must maintain accurate records and furnish them when required to do so by law enforcement officials. 21 U.S.C. § 842(a)(5).  Registrants must also maintain a degree of transparency by allowing law enforcement officials access to their premises for inspections authorized by the CSA.  21 U.S.C. § 842(a)(6).  Failure to adhere to the registration requirements of the CSA may subject a registrant to civil fines, imprisonment, or both.  21 U.S.C. § 842(c).

58.    The CSA also proscribes certain acts related to the manufacture and distribution of controlled substances and listed chemicals.  Registrants who knowingly or intentionally (1) distribute Schedule I and II substances without a valid order form, 21 U.S.C. § 843(a)(1); (2) use an invalid registration number during the course of handling or acquiring controlled substances, 21 U.S.C. § 843(a)(2); (3) furnish false or fraudulent material information in a record

or report required by the CSA, 21 U.S.C. § 843(a)(4)(A); or (4) present false or fraudulent identification when receiving a listed chemical, 21 U.S.C. § 843(a)(4)(B); are subject to criminal fines, imprisonment, or both. *See* 21 U.S.C. § 843(d) (requiring prison sentences of between four and eight years for DEA registrants that violate 21 U.S.C. § 843).[6] Additionally, registrants who violate the aforementioned provisions may be subject to injunctive or declarative actions filed by the Attorney General in federal district court. *See* 21 U.S.C. § 843(f).

59. Finally, the CSA specifies several offenses regarding listed chemicals, including C-II chemicals such as oxycodone. For example, criminal fines and/or imprisonment may be imposed upon any person who knowingly or intentionally (1) possesses a listed chemical with the intent to manufacture a controlled substance without proper registration; (2) possesses or distributes a listed chemical with knowledge or a reasonable belief that the listed chemical will be used to manufacture a controlled substance; or (3) evades the CSA's recordkeeping and reporting requirements by receiving or distributing listed chemicals in small units. *See* 21 U.S.C. §§ 841(c)(1)-(3). Also, any person who knowingly possesses or distributes listed chemicals in violation of the CSA, or knowingly violates the CSA's recordkeeping requirements, is subject to criminal fines, imprisonment, or both. *See* 21 U.S.C. §§ 841(f)(1)-(2). Furthermore, in addition to the other applicable penalties, violators of the aforementioned provisions may also be enjoined for up to ten years from handling listed chemicals. 21 U.S.C. § 841(e).

---

[6] Under 21 U.S.C. § 843(d), "***any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years***, a fine under Title 18, or both; except that if any person commits such a violation after one or more prior convictions of him for violation of this section, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 8 years, a fine under Title 18, or both." (Emphasis added.)

**B.** **Walgreens' Duties under Florida Law**

60. Florida law also requires wholesale distributors of controlled substances such as Walgreens to conduct due diligence and develop a program to identify suspicious orders and prevent suspicious transactions. *See* Fla. Stat. 499.0121(15). In particular, a wholesale distributor must assess the reasonableness of orders in excess of 5,000 unit doses of any one controlled substance in any one month. *See* Fla. Stat. 499.0121(15)(b). A pharmacy that violates Florida's controlled substances distribution laws may have its permit or certification revoked. *See* Fla. Stat. 499.067. Pharmacies who so violate Florida law are also subject to cease and desist orders from the Florida Department of Health, Fla. Stat. 499.0661, as well as a $5,000 fine per violation per day, Fla. Stat. 499.066(2)-(3).

**C.** **Florida Has Been Walgreens' Most Strategically Important State**

61. In recent years, more than ten percent of Walgreens' pharmacies have been in Florida—far more than in any other state. For example, in fiscal year 2010, there were 850 Florida locations (10.6%), 864 in fiscal year 2011 (10.5%), and 878 in fiscal year 2012 (10.5%). As illustrated by the chart below, which was compiled from data in Walgreens' annual reports, between 2007 and 2012, Walgreens had more locations in Florida than in any other state.



**Walgreens' Top 20 States 2007-2012**

Because Florida has been Walgreens' single most important state, it is reasonable to infer that the Board was particularly aware of developments affecting Walgreens' business in Florida.

**D.    Prescription Sales Account for the Majority of Walgreens' Business.**

62.    Prescription sales account for the majority of Walgreens' business.  Prescriptions accounted for 63.2% of sales in fiscal year 2012 compared to 64.7% in fiscal year 2011, and 65.2% in fiscal year 2010.  Total sales during this same period were approximately $71.6 billion in fiscal year 2012, $72.2 billion in fiscal year 2011, and $67.4 billion in fiscal year 2010.  This means that prescription sales were approximately $46.7 billion in fiscal years 2012 and 2011 and $42.6 billion in fiscal year 2010.  Given the significant impact of prescription sales on the Company's bottom line, the Board was almost certainly aware of and would have focused upon significant increases in any particular market, including its biggest one—Florida.

63.     According to the DEA, the Jupiter Center has been the single largest distributor of oxycodone products in Florida since 2009.  The Jupiter Center is one of 12 Distribution Centers owned and operated by Walgreens and supplies drugs to more than 850 Walgreens pharmacies in Florida and surrounding states.  Collectively, these pharmacies dispensed almost one third of all prescription drugs in Florida.

### E.     The Prescription Drug Abuse Epidemic in the United States

64.     Prescription drug abuse occurs in the United States at an alarming rate.  The 2010 National Survey on Drug Use and Health reveals that approximately seven million Americans abuse controlled substance pharmaceuticals for non-medical purposes.   Second only to marijuana, controlled substance prescription drugs are abused by more people than cocaine, heroin, hallucinogens, and inhalants combined.  Of all prescription drugs, narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently.  Each year, roughly 5.1 million people abuse narcotic pain relievers in the United States.  According to the Substance Abuse and Mental Health Services Administration's Treatment Episode Data Set, between 1998 and 2008 the number of persons admitted for treatment who reported any pain reliever abuse increased more than fourfold.

65.     According to the Centers for Disease Control and Prevention, since 2000, the number of unintentional drug overdose deaths related to prescription opioid analgesics has risen sharply.  In 2007, the number of deaths involving opioid analgesics was 1.93 times the number involving cocaine and 5.38 times the number involving heroin.[7]

---

[7] *See* "Unintentional Drug Poisoning in the United States," Centers for Disease Control and Prevention Bulletin July 2010, *available at* http://www.cdc.gov/homeandrecreationalsafety/pdf/poison-issue-brief.pdf.



**Unintentional drug overdose deaths by major type of drug, United States, 1999-2007**

Source: National Vital Statistics System

66. This increase parallels a striking increase in overall unintentional drug overdoses in the United States in recent years that has dwarfed the heroin and cocaine epidemics of the 1970s and 1980s.[8]



**Unintentional Drug Overdose Deaths United States, 1970−2007**

National Vital Statistics System, http://wonder.cdc.gov

---

[8] *See* "Prescription Drug Overdoses: An American Epidemic," Centers for Disease Control and Prevention Presentation February 17, 2011, *available at* http://www.cdc.gov/about/grand-rounds/archives/2011/pdfs/PHGRRx17feb2011.pdf.

67.     The federal government and the DEA have sought to prevent the abuse of prescription painkillers.  For example, the Ryan Haight Online Pharmacy Consumer Protection Act ("Ryan Haight Act"), which took effect in April 2009, sought to curb abuses by Internet pharmacies and the illegal diversion of prescription drugs through the Internet.  Nevertheless, coinciding with the passage of this act, there was a "sharp increase" in rogue pain clinics, commonly known as "pill mills."

68.     Oxycodone is an opiate narcotic and C-II drug under the CSA.  It is marketed under various brand names, including Roxycodone and, most prominently, OxyContin.  According to the DEA, oxycodone is probably the most abused or diverted prescription drug on the market.  In recognition of the growing threat caused by oxycodone abuse, beginning in 2007 the DEA began dedicating vastly more full-time personnel to its program to prevent the diversion of prescription oxycodone to illicit use, as shown by the below chart.[9]



[9] Leonhart Statement at 8.

69.     Specifically, the DEA sent letters to all distributors and manufacturers—including Walgreens—on September 27, 2006; February 7, 2007; and December 27, 2007.  These letters explained to distributor registrants their obligations to maintain effective controls against diversion and report suspicious orders as part of their duties within the closed system established by the CSA.  The suspicious order requirement of 21 C.F.R. § 1301.74(b) and its relationship to the statutory obligation of all distributors is to maintain effective controls against diversion of controlled substances pursuant to 21 U.S.C. §§ 823(b)(l) & 823(d)(l).  Consistent with the guidance of these letters, a distributor has a further obligation to devise and implement an effective system to identify suspicious orders and the obligation to report suspicious orders to the DEA as they are discovered.  A distributor has an obligation under the statutory and regulatory scheme to determine the legitimacy of any order it identifies as suspicious prior to filling that order.

**F.     Walgreens Has Experienced at Least 215 Reported Incidents of Oxycodone-Related Robbery, Theft, and Fraud at the Company's Pharmacies**

70.     Beginning in the 1980s and rapidly increasing in the 2000s, Walgreens pharmacies experienced hundreds of instances of forgery, fraud, theft, and robbery by addicts and criminals seeking oxycodone and similar C-II drugs.  A review of major national newspapers reveals at least 51 reported instances of prescription fraud, 21 reported instances of theft, 79 reported instances of robbery, and 66 reported instances of armed robbery.  Of these reported incidents, the majority of which involve oxycodone, at least 66 occurred in Florida.  Details regarding these drug-related incidents are set forth in the chart attached hereto as Exhibit 2.[10]

---

[10] Co-Lead Counsel have copies of the articles summarized in Exhibit 2 and can provide any or all of them to the Court upon request.

The rampant, oxycodone-related crime afflicting Walgreens pharmacies across the country could not have gone unnoticed by the Board.

### G. Walgreens Pulled Oxycodone from its Stores in Tampa, Boston, and Nashville After Repeated Robberies and Conceded that Oxycodone is the "Drug of Choice" for Criminals

71.     In response to widespread armed robberies and theft, Walgreens took what it described as the "extreme decision" to stop selling oxycodone from various stores in Tampa, Boston, and Nashville.  In doing so, Walgreens acknowledged that oxycodone is the drug of choice for criminals.[11]

72.     On August 7, 2001, the *Houston Chronicle* published an article entitled "*'Hillbilly Heroin' Houston officials brace for nation's newest drug abuse fad.*"  The article described the growing abuse of oxycodone and Walgreens' response: "Illinois-based Walgreens operates more than 100 pharmacies in the Houston area.  *A spokeswoman for the retail giant said Walgreens officials are watching the OxyContin situation closely and are in daily contact with branch pharmacies.*"  (Emphasis added.)

73.     On May 26, 2006, the *Tennessean* reported that Walgreens stopped selling OxyContin at 70 of its Nashville stores after a "rash of robberies."  The article stated, "The powerful prescription painkiller OxyContin will no longer be sold in Nashville-area Walgreens stores after a rash of robberies targeting the drug, company officials announced Thursday.  The Nashville market's 70 Walgreens locations will be affected by the change, said Carol Hively, corporate spokeswoman for Walgreens.  *'Any drug that has street value is of interest to criminals,'* said Hively."  (Emphasis added.)

---

[11] As noted above, OxyContin is a brand name formulation of oxycodone.

74.     Similarly, on April 5, 2008, the *St. Petersburg Times* quoted a Walgreens spokesperson as saying that the Company had taken the "extreme decision" to pull OxyContin from stores in that area because it is the "drug of choice" for robbers and due to "the concerns we have about . . . the extent criminals will go to get OxyContin."  The article reported:

> A surge in pharmacy robberies has prompted Walgreen Co. to remove the painkiller OxyContin from some of its Pinellas County drugstores and staff other pharmacies with armed police officers.  In just the past three weeks, at least six Tampa Bay area drugstores have been robbed.  The robbers demanded prescription drugs – in some cases OxyContin – in all the holdups.  Walgreen spokeswoman Carol Hively said the company pulled OxyContin from some stores out of concern for the safety of customers and employees.
>
> * * *
>
> Hively said it's rare for Walgreen to pull a drug from stores.  She said OxyContin was pulled because it's the ***"drug of choice"*** for many pharmacy robbers.  ***"This is an extreme decision, because we don't like to restrict access of OxyContin to legitimate customers,"*** Hively said.  Hively declined to say Friday how many Walgreens stores pulled OxyContin.  She also couldn't say if Walgreens stores in other bay area counties would pull OxyContin.  ***"The fact that we don't make public where OxyContin is kept locally speaks to the concerns we have about violent crime and the extent criminals will go to get OxyContin,"*** Hively said.
>
> * * *
>
> Walgreen has pulled OxyContin from some stores in Boston and Nashville after robberies increased in those cities, Hively said.  It's usually a temporary move, she said, and ends when the robbers are arrested, though the Boston stores have continued to restrict OxyContin for years.

(Emphases added.)

75.     On May 17, 2008, *The Seattle Times* reported on a string of oxycodone-related robberies throughout Washington.  The article reported that "a spokeswoman for Walgreens said the company routinely pulls OxyContin from the shelves of stores that have been robbed."

### H.    The Growth of Oxycodone Abuse in Florida and Florida's Legislative Response

76.    Florida has been the epicenter of the prescription drug epidemic.  In July 2011, the Florida Surgeon General declared a Public Health Emergency based on statistics that showed an average of *seven deaths per day* in Florida.  DEA records indicate that medical practitioners in Florida purchased 41.2 million oxycodone pills during the first six months of 2010, compared to a total of 4.8 million purchased by practitioners in the other 49 states combined.  In response to these statistics, the DEA increased its enforcement efforts, targeting the primary distributors that supplied the rogue clinics in Florida.

77.    According to the Florida Department of Law Enforcement 2010 Report on Drugs Identified in Deceased Persons by Florida Medical Examiners, oxycodone is one of the "four most frequently occurring drugs found in decedents" statewide.  The Florida Medical Examiner's Office reported a 345.9% increase in the number of overdose deaths associated with oxycodone between 2005 and 2010.  According to the 2010 Florida Medical Examiner's Commission Drug Report, the drug that caused the most deaths in the state of Florida for 2010 was oxycodone (1,516 deaths), followed by benzodiazepines (1,304 deaths, of which 981 were caused by alprazolam.)

78.    On October 1, 2010, Florida enacted new laws to combat the prescription drug abuse problem, particularly oxycodone and other abused drugs dispensed directly from pill mills. These new laws severely restricted the ability of pain clinics and physicians to dispense C-II drugs directly from the clinics.  The purpose of these legislative changes was to stem the overwhelming tide of controlled substances being diverted from pill mills and into illicit channels for sale and recreational abuse.

79.     As a result of this legislation, the wholesale distribution of oxycodone to doctors and clinics plummeted from over 8,000,000 dosage units in May 2010 to roughly 200,000 units by October 2010, as seen from the chart below.[12]



80.     As a result, Florida pharmacies and the distributors who served them knew or should have known that starting in 2010, there would be a significant increase in requests to dispense oxycodone pursuant to prescriptions issued by physicians associated with pain clinics that were now banned from filling prescriptions themselves.

81.     Following the changes in Florida law aimed at curbing the problematic dispensing of oxycodone and other "cocktail" drugs direct from the pain clinics, drug abusers found other ways to obtain such drugs.  Rather than dispensing the drugs directly to "patients," pain clinics and complicit doctors were forced to write prescriptions for oxycodone and other abused drugs. Drug abusers wanting their prescriptions filled were forced to take their prescriptions to a retail

---

[12] *Id.* at 10.

pharmacy. As noted by the DEA in one of its pre-hearing statements against Walgreens, the "epidemic of controlled substance drug abuse and diversion has now shifted to pharmacies."

## I. Walgreens Responded to Florida's Restrictions on Pill Mills by Stepping into Their Shoes

82. At roughly the same time that these legislative changes went into effect, Walgreens' leadership was urging the Company's Florida pharmacies to increase their oxycodone sales.

83. In September 2009, Walgreens **tripled** the amount of oxycodone that its pharmacists were authorized to sell customers in a single visit. Specifically, Walgreens' "90-day at Retail" program allowed Walgreens customers—who formerly could only purchase 30-day supplies of oxycodone and other C-II drugs at Walgreens' retail pharmacies—to purchase three-month supplies of such drugs in a single visit to a retail store. According to a September 29, 2009 article in the *Chain Drug Review*, "Walgreen Co. has kicked off a program to deliver 90-day prescriptions for maintenance and chronic care medications through its retail pharmacies and worksite centers." According to the Company's website, "Filling 90-day prescriptions offers customers a convenient and hassle-free way to get a three-month supply. Through the 'I Want My 90-Day at Retail' program, Walgreens customers can receive their 90-day prescriptions either at their neighborhood pharmacy or through mail."[13] In a September 27, 2011 investor conference call, Defendant Wasson stated, "Through our leading 90-Day at Retail program, Walgreens promotes 90-day prescriptions for patients on chronic medications, . . . allowing patients to receive extended supplies of chronic medications through a 90-day at retail benefit . . . ."

---

[13] *See* "I Want My 90-Day at Retail" Walgreens Registration Page at https://www.walgreens.com/pharmacy/ipp/ipp90day.jsp.

84.     Walgreens saw an immediate and significant increase in the volume of prescriptions for oxycodone brought in by its newfound customers, many of whom resided hundreds of miles from Florida and/or their unscrupulous doctors.  The following chart, created by counsel for Walgreens, illustrates the increase in sales of 15 mg and 30 mg oxycodone during 2010 and 2011 at eight Walgreens stores.[14]



85.     Specifically, from late 2010 through mid-2011, many of Walgreens' pharmacies received growing numbers of prescriptions for oxycodone, almost all of which were supplied by the Jupiter Center.  Sixteen of the top 25 largest Walgreens retail oxycodone purchasers, including the top six purchasers, were in Florida and supplied by the Jupiter Center.  The following table, taken from publicly available DEA documents, shows these six stores (all of which were investigated and would later have their registrations suspended as part of the 2013 Settlement Agreement) and their yearly oxycodone purchases for 2009 through 2011:[15]

**Oxycodone Purchases by Dosage Unit (by Year) (by Store)**

---

[14] "Trends at Eight Walgreens' Pharmacies Dispensing High Volumes of Oxycodone, 2010-2012."  *See* Brief of Petitioner, On Petition for Review of a Final Order of the Drug Enforcement Administration, *Walgreen Co. v. Drug Enforcement Administration*, at 19, No. 12-1397 (D.D.C. Cir. Dec. 26, 2012).

[15] 2013 Settlement Agreement, Ex. 1, at App'x B.

| Walgreen Store # | Location | 2009 | 2010 | 2011 |
|:---:|:---|:---:|:---:|:---:|
| 03629 | Hudson, FL | 388,100 | 913,900 | 2,211,700 |
| 03099 | Ft. Myers, FL | 95,800 | 496,100 | 2,165,900 |
| 06997 | Oviedo, FL | 80,900 | 223,500 | 1,684,900 |
| 03836 | Port Richey, FL | 344,000 | 849,000 | 1,406,000 |
| 04391 | Ft. Pierce, FL | 250,000 | 881,400 | 1,329,600 |
| 04727 | Ft. Pierce, FL | 153,500 | 507,100 | 1,192,000 |
| Average | | 218,717 | 645,167 | 1,665,017 |

86.    The below chart also illustrates the increase in oxycodone sales at these six Florida Walgreens pharmacies.[16]



87.    As these figures suggest, by 2009 the Jupiter Center had become the single largest distributor of oxycodone products in Florida.  At about the same time as the abuse of prescription drugs became an epidemic in Florida, Walgreens' Florida retail pharmacies commanded an increasingly large percentage of the state's growing oxycodone business.  In 2010, only three Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida.  In

---

[16] Amy Pavuk, *DEA: Walgreens Was Pushing Oxycodone Sales Amid Rx-Drug Epidemic*, Orlando Sentinel (June 29, 2013).

2011, 38 Walgreens pharmacies made the top 100 and six were in the top ten. In May 2012, 44 Walgreens pharmacies were in the top 100 oxycodone purchasers.

88. In response to the growing abuse of oxycodone, on July 1, 2011, the State Health Officer and Surgeon General, Dr. Frank Farmer, issued a statewide public health emergency declaration in response to the ongoing problem of prescription drug abuse and diversion in Florida. Titled "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic," the declaration noted that in 2010, 98 of the top 100 doctors dispensing oxycodone nationally were in Florida. The declaration added that more oxycodone is dispensed in the State of Florida than in the remaining states combined. Additionally, the declaration noted that 126 million oxycodone pills were dispensed through the top 100 dispensing pharmacies in Florida.[17] Much of this was through Walgreens.

**J.      Walgreens Creates Corporate Incentives to Distribute Oxycodone**

        **1.      Walgreens' "Bonus Program, Combined with a Concerted, Corporate-Directed Effort to Increase . . . Oxycodone Sales"**

89. Oxycodone is one of Walgreens' most profitable drugs. Thus, Walgreens' abdication of its responsibilities was brought about by a desire to increase oxycodone sales and, therefore, profits. According to documents obtained by the DEA, and as reported by the *Orlando Sentinel*, Walgreens had in effect compensation programs for pharmacy employees in which bonuses were based on the number of prescriptions filled at the pharmacy. The DEA found that "[t]his bonus program, combined with a concerted, corporate directed effort to increase oxycodone sales, served as an incentive for pharmacists and pharmacy technicians to ignore the 'red flags' of diversion presented by these prescriptions, many of which, in the proper exercise of

---

[17] *See* "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic," Florida Dept. of Health Emergency Declaration (July 1, 2011), *available at* http://newsroom.doh.state.fl.us/2011/07/01/emergency-declaration.

the pharmacist's corresponding responsibility under 21 C.F.R. § 1306.04(a), should have resulted in a refusal to fill."

90.    Bonuses for filling prescriptions were not the only directive or program implemented by Walgreens' senior management and/or the Board to pump sales.  In July 2010, Walgreens' corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies.  Management produced an eleven-page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June 2010.  The spreadsheet was sent to Walgreens' market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "look at the stores on the bottom end . . . .  We need to make sure we aren't turning legitimate scripts away.  Please reinforce."  A corporate market director of pharmacy operations reinforced this message to Florida market pharmacy supervisors, highlighting that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions per day, yet "We also have stores doing about 1 a day.  Are we turning away good customers?"

91.    That message was not lost on the Company's Florida stores.  For example, one of the Walgreens pharmacies under investigation in Fort Myers, Florida went from selling 95,800 units of oxycodone in 2009 to more than 2.1 million units in 2011, which represented 67 percent of all the oxycodone purchased by pharmacies in that same zip code in 2011.[18]   Another Walgreens pharmacy located in Oviedo, Florida, went from selling 80,900 units of oxycodone in 2009 to over 1.6 million units in 2011.

92.    In addition to this suspiciousness caused by this large jump in sales, the number of units sold by these pharmacies is drastically out of line with the size of the populations of the

---

[18] *See Report: DEA Investigating Walgreens Store & Distribution Center*, CBS Miami Apr. 6, 2012, http://miami.cbslocal.com/2012/04/06/report-dea-investigating-florida-Walgreens-store-distribution-center/ (last visited July 8, 2013).

cities in which the pharmacies are located. According to the 2010 census, Oviedo is a city of just over 33,000 people. Yet, a Walgreen pharmacy there sold over 1.6 million units. Hudson, Florida has a population of just over 12,000. Nevertheless, in 2011, the Walgreens pharmacy located there sold over 2.1 million units of oxycodone.

93.     Additionally, in the first two months of 2012, 53 Walgreens pharmacies were listed in the DEA's top 100 purchasers of oxycodone. In 2009, none were on the list.

### 2. Walgreens' Executive Compensation Incentivized Defendant Wasson and Other Executives to Move Inventory

94.     Just as Walgreens' bonus programs encouraged the Company's pharmacists to sell high quantities of oxycodone and other C-II drugs, Walgreens' executive compensation program also tied Defendant Wasson's cash bonus to the Company's ability to move inventory and create cash flow.

95.     For example, according to Walgreens' November 19, 2012 proxy statement, the Company's "Management Incentive Plan" for the fiscal year ending August 31, 2012 had a "target" financial goal of $4.419 billion in FIFO EBIT, which is "earnings before interest and taxes, measured based on a first-in, first-out accounting method for valuing inventory." According to Walgreens' November 19, 2012 proxy, the Company achieved its FIFO EBIT goal at 87.0%, which according to the chart below, was only 2.0%, or $88.38 million, above the "threshold" level below which Defendant Wasson would receive *none* of the 70% weighted portion of his bonus tied to FIFO EBIT.

| Performance Measure[1] | Weighting | Goal | Company Performance (as a % of Target) | | Bonus Payout (as a % of Target) |
|---|---|---|---|---|---|
| **FIFO EBIT** = earnings before interest and taxes, measured based on a first-in, first-out accounting method for valuing inventory | 70% | $3.756B $4.419B $5.082B | <85% 85% 100% 115% >115% | (threshold) (target) (maximum) | 0% 50% 100% 200% 200% |
| **Free Cash Flow** = cash flow from operations less our capital expenditures | 30% | $1.719B $2.865B $4.298B | <60% 60% 100% 150% >150% | (threshold) (target) (maximum) | 0% 50% 100% 200% 200% |

Nov. 19, 2012 Proxy at 30.

96.     As shown above, the other 30% of Defendant Wasson's cash bonus was tied to a target financial goal of $2.865 billion in free cash flow ("FCF").  If Walgreens failed to achieve this target, Wasson would only receive 50% of the 30% portion of his bonus that was tied to this goal.  According to Walgreens' November 19, 2012 proxy statement, the Company exceeded this target by only 2.7%, or $77.355 million.

97.     Ultimately, Defendant Wasson received a "Fiscal 2012 Bonus" of $1,150,052, which was 71% of his "Target Bonus" of $1,619,791, which in turn was 125% of his "Fiscal 2012 Bonus Eligible Salary" of $1,295,833.  If Walgreens had not reached its FIFO EBIT threshold or FCF target, Wasson would have received none of the 70% portion of his bonus tied to FIFO EBIT, and only received 60% of the 30% portion of his bonus tied to FCF.  This would have been 15% of Wasson's target bonus, or a mere $242,969.

98.     Thus, during 2012, Wasson's bonus program incentivized him to generate the $88.38 million of FIFO EBIT, and $77.335 million of FCF—approximately $80 million—that would assure that he received the majority of his 2012 cash bonus.

**K.     The DEA's Investigation of Walgreens**

99.     In response to the violations described herein, the DEA began investigating the Company.     On April 4, 2012, the DEA served Walgreens with Administrative Inspection Warrants ("AIW") on the Jupiter Center, six individual Walgreens pharmacies, and the Company's "corporate headquarters."     The subpoena requested information concerning Walgreens' handling of controlled substances at the Jupiter Center and individual pharmacies.

100.     After a six month-long investigation, the DEA ultimately concluded that the Company failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1).   The DEA's investigation also revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. § 1301.74(b), which provides that distributors are required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances . . . suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

101.     As alleged herein, Walgreens' corporate officers and the Board ignored internal calls to investigate the increased volume of oxycodone shipments and orders.     The DEA investigation found several examples, confirming that the Board was aware or should have been on notice of these "red flags."

**1.     Notice Was Provided From Within the Company**

102.     In January 2011, the Company's Jupiter CII Function Manager ("CII Function Manager"), the manager with overall responsibility for C-II drug operations, expressed concern about the enormous volume of 30 mg oxycodone being ordered by three stores, Walgreens stores 7298, 3836, and 5018.  The CII Function Manager concluded in an email to the "Manager, Rx

Inventory Drug Stores" at Walgreens' Corporate Headquarters in Deerfield, Illinois (Barbara Martin) and Distribution Center Manager Rob Varno, that she felt the stores needed "to justify the large quantity." With regard to store 3836 in Port Richey, Florida, she noted that 3,271 bottles of 100 count 30 mg oxycodone (i.e., 3,271 lots of 100 dosage units, or 327,100 dosage units) had been shipped to the store in a 40-day period from December 1, 2010 to January 10, 2011, causing her to question "how they can even house this many bottle[s]." She further inquired of the same corporate manager: "How do we go about checking the validity of these orders?"

103.    The DEA investigation found that the Jupiter Center did not check the validity of the increasingly frequent and large orders for highly abused controlled substances and that there was "no evidence of any due diligence conducted" by Walgreens or "anyone else within the corporation to verify the legitimacy of these orders in order to fulfill their obligation to maintain effective controls against diversion." Additionally, the DEA found that "none of these orders [reported by the CII Function Manager] were reported [to the DEA] as suspicious and there appears to have been no other inquiry conducted into the circumstances of [these worrisome orders]." In fact, the Jupiter Center continued to ship large quantities of oxycodone to these pharmacies long after management was made aware of the potentially illegal problem.

### 2.    Local Police Gave Notice to Management and the CEO and Chairman

104.    Walgreens 06997, located in Oviedo, Florida, is an exemplar of how certain of the Company's store capitalized on Florida's new law restricting "pill mills." In June 2010, the Oviedo pharmacy was ranked 444th on Walgreens' spreadsheet comparing oxycodone sales generated at its Florida retail pharmacies (alleged in more detail in paragraph 10 above), filling on average only four oxycodone prescriptions per day and buying 6,600 pills in June 2010. Just

one year later, in June 2011, the same store purchased 169,700 pills—an increase of **2,471 percent**.

105.    Oviedo is a town of about 34,000 people and is home to two Walgreens retail pharmacies.  Beginning in late 2010, these pharmacies became the site of multiple arrests by the local police for drug offenses.   The local Chief of Police of the City of Oviedo, "Chief Chudnow" began writing letters to the individual pharmacies after each arrest stemming from prescriptions the Oviedo pharmacies filled.   These letters informed the pharmacy of the circumstances of the arrest and that the dispensed drugs were not being used for treatment.  The letters further provided the pharmacies with the name and date of birth not only of the person whose prescription they filled, but also of others associated with the illegal distribution of the dispensed drugs.   These letters then concluded with a request for the pharmacies' help in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.  Chief Chudnow sent dozens of these letters.

106.    Chief Chudnow's concerns reached the highest levels of Walgreens' Loss Prevention Operations, which provides a reasonable basis to infer that the Board knew or should have known about them.  Specifically, the Director of Divisional Loss Prevention noted in an email on January 28, 2011 that "[e]vidently the Chief of Police is concerned that we are filling too many [C-II] prescriptions . . . .   From what I've been told, he is referencing 100 plus incidents/arrests in his jurisdiction."  Walgreens' response was to "take a look at this market . . . and see if we have an increase in dispensing."   It is reasonable to infer that the reporting mechanisms and procedures put in place by the 2008 CIA would have resulted in this issue reaching the Board.

107.     Chief Chudnow convened a meeting with Walgreens' Loss Prevention officials, including Ed Lanzetti ("Lanzetti"), Walgreens' Market Loss Prevention Director, on February 10, 2011.   The purpose of this meeting was to provide further information to the Company regarding the problems Chief Chudnow had seen at the Company's stores and to brief Walgreens on the number of arrests at each location.   At the meeting, Chief Chudnow presented Lanzetti with numerous statistics and facts regarding controlled substance arrests related to the two Walgreens pharmacies in Oviedo.   These statistics included numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests.   Notwithstanding the Company's receipt of this information, these Oviedo pharmacies continued to fill prescriptions emanating from these same doctors subsequent to the February 2011 meeting attended by Chief Chudnow and Company management.

108.     On March 15, 2011, after the meeting with Walgreens' upper management, Chief Chudnow wrote identical letters to Walgreens Chairman, Defendant McNally, and Walgreens CEO, Defendant Wasson, regarding the illegal diversion at the Ovieda pharmacies.   These letters notified them that the parking lots of the Ovieda Walgreens pharmacies had "become a bastion of illegal drug sales and drug use" where once the prescriptions are filled, "the drugs are sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies."   Chief Chudnow also notified them that his department had made over 120 arrests for illegal distribution of oxycodone and other C-II drugs, and that the majority of those arrests had taken place at the two Walgreens retail stores in his jurisdiction.   Significantly, Chief Chudnow asked for Walgreens' "cooperation by allowing your pharmacist not to fill suspected illicit prescriptions from doctors who have shown a propensity to

prescribe large quantities of these drugs in multiple prescriptions, 180 pills per prescription of one strength and 180 pills of another strength, per visit." Additionally, Chief Chudnow noted, "These types of prescriptions overtly denote misuse and possible street sales of these drugs." Chief Chudnow's pleas were ignored.

109. Despite Chief Chudnow's letter-writing campaign, the meetings he had with senior leaders of the Company, and the letters he sent to two Board members, the DEA found that large quantities of oxycodone continued to be shipped to Walgreens pharmacies in Oviedo. Specifically, the Individual Defendants permitted the Company to ship the following quantities of 30 mg formulation oxycodone to Oviedo store 06997 during the same six-month period when Chief Chudnow's complaints had been made to management and Board members.

**Oxycodone Dosage Units (30 mg formulations)**
**Shipped to Walgreens From Jupiter Center**

| Month | Dosage Units |
|-------|-------------|
| Feb-11 | 75,300 |
| Mar-11 | 72,900 |
| Apr-11 | 101,700 |
| May-11 | 133,900 |
| Jun-11 | 115,200 |
| Jul-11 | 145,300 |

110. Additionally, the DEA found that records for both Oviedo Walgreens pharmacies showed that on multiple occasions each had dispensed additional prescriptions of commonly diverted narcotics to the same individuals who they knew had been previously arrested for drug offenses at their pharmacies.

111. Bearing in mind that the average U.S. retail pharmacy in 2011 purchased only 73,000 dosage units of *all formulations* of oxycodone for *the entire year*, the DEA Administrator found that Walgreens demonstrated a "staggering disregard" for its obligations under the CSA in light of the information provided by Chief Chudnow.

112. Had a trial taken place, Chief Chudnow was prepared to testify in support of the DEA's OTSC (discussed herein) about the very tangible effects that the diversion of controlled substances has had on the city of Oviedo, as evidenced by increases in, among other things, crime rates and overdoses. Chief Chudnow was further prepared to testify: (1) about his department's knowledge of Walgreens 06997, as well as another Walgreens within the city limits, as centers for illicit controlled substance sales and use; and (2) that it was his practice following one of these arrests to send a letter to the pharmacy that dispensed the controlled substance being diverted, notifying them of the details and asking for the pharmacy's assistance in preventing future diversion.

113. Chief Chudnow's letters were an explicit warning that reasonably put McNally, Wasson, and the entire Board on notice of substantial wrongdoing. Moreover, the Individual Defendants knew or should have known that while the average U.S. retail pharmacy in 2011 purchased 73,000 pills of all formulations of oxycodone for the entire year, the Jupiter Center shipped 145,300 oxycodone pills to the Oviedo pharmacy in July 2011 alone. *See DEA: Walgreens Was Pushing Oxycodone Sales Amid Rx-Drug Epidemic*, *supra*. Given the significant impact of prescription sales on the Company's bottom line (particularly in an important state like Florida), it is reasonable to infer that the Board knew or should have known about this information.

### 3. The Individual Defendants Had Notice that Other Walgreens Pharmacies Engaged in Similar Abuses

114. Walgreens' distribution practices were not limited to a few rogue pharmacies. Many of the Company's pharmacies dispensed oxycodone in amounts far in excess of the U.S. and Florida averages and had also experienced dramatic increases in their distribution of oxycodone from at least 2009 to the present. No fewer than 43 Walgreens pharmacies in Florida

purchased in excess of 500,000 dosage units of oxycodone in 2011, despite a national average of approximately 74,000 dosage units for all U.S. pharmacies and an average of approximately 110,000 dosage units for all Florida Walgreens pharmacies.

115.     While the detailed information provided by Chief Chudnow put Walgreens on notice of actual diversion occurring at the two Oviedo pharmacies, the Company had ample other indications that its other pharmacies were direct and significant contributors to the epidemic of prescription drug abuse and diversion in Florida.  For example, documentation from the DEA provides specific examples of numerous Walgreens pharmacists ignoring prescription drug diversion and generating more revenue for the Company and, in turn, themselves (through the bonus program alleged herein).

116.     The first, according to the DEA, arose out of an incident on September 27, 2010, where a pharmacist working at Walgreens 04727 in Ft. Pierce, Florida reported to law enforcement that he mistakenly provided an extra 120 dosage units of 15 mg oxycodone to a customer.  When the pharmacist tried to call the customer to request he return the mistakenly dispensed oxycodone, he was told by the customer's girlfriend that the customer was an addict who sells his pills and views the extra oxycodone as a "pot of gold" which he would not return. Despite this incident, Walgreens 04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011.

117.     The second, according to the DEA, occurred on November 4, 2010, when a Walgreens 04727 pharmacist reported to police that she dispensed a prescription for 60 dosage units of 15 mg oxycodone to a 24-year-old male who she then witnessed transfer the drugs to a female in the store.  The female entered the pharmacy restroom, leaving behind evidence indicating she had smoked the oxycodone.  Despite this incident, Walgreens 04727 continued to

fill the same customer's oxycodone and alprazolam prescriptions on several occasions in November and December 2010 and January 2011.

118.    The third occurred on December 21, 2010, when a pharmacist employed by Walgreens 03629 in Hudson, Florida reported to the Pasco County (Florida) Sheriff's Office that an individual had attempted to fill a prescription for 270 dosage units of 30 mg oxycodone, but ran from the pharmacy after learning the pharmacy had contacted law enforcement, suspecting the prescription was a forgery.  Despite this incident, the same pharmacy that reported this customer to the local sheriff's office continued to fill the same customer's oxycodone prescriptions in February, March, April, May, and October of 2011.

119.    Additionally, on October 28, 2011, the Sheriff of St. Lucie County notified Walgreens 04727 by letter that it needed to take action to stem the tide of prescription drug diversion.  St. Lucie County Sheriff Ken Mascara requested Walgreens 04727's "help in dealing with the prescription painkiller epidemic" in St. Lucie County and Florida by "closely scrutinizing" prescriptions for C-II narcotics, written by out-of-town physicians and/or written for out-of-town individuals.  Nevertheless, Walgreens 04727 continued its practice of filling numerous opiate/opioid prescriptions issued by out-of-town physicians through early 2012. Several of these out-of-town physicians subsequently surrendered their registrations for cause and/or were subject to state action for their conduct involving controlled substances prescriptions.

### 4.    Notice Given to Upper Management and Corporate Counsel

120.    Faced with regulatory scrutiny, in May 2011 Walgreens surveyed some of its stores for regulatory compliance, then selectively edited the results of the survey for the explicit purpose of avoiding evidence of its own non-compliance.    Additionally, the Company

deliberately structured certain of its anti-diversion measures to avoid learning about and/or documenting evidence consistent with diversion.

121.    Not by coincidence, Walgreens' manipulation of its compliance survey occurred just one month after the Company entered into a nationwide Memorandum of Agreement ("April 2011 MOA") with the DEA to resolve an OTSC issued to a San Diego Walgreens pharmacy based on allegations that Walgreens had (1) dispensed controlled substances based on prescriptions from unlicensed physicians; (2) dispensed controlled substances based on Internet prescriptions "issued by physicians for other than a legitimate medical purpose"; and (3) "dispensed controlled substances to individuals that [Walgreens] knew or should have known were diverting the controlled substances. In Walgreens' April 2011 MOA, the Company pledged to enact a compliance program to detect and prevent diversion of controlled substances and to implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations.

122.    In the April 2011 MOA, Walgreens promised the DEA, among other things, to:

a.    "maintain a compliance program to detect and prevent diversion of controlled substances as required by the [CSA]";

b.    establish "procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills";

c.    "implement a system to notify the local DEA office within two business days of a refusal to fill a prescription for controlled substances where such refusal is based on the Walgreens pharmacists' determination that the prescription was forged, altered, and/or issued for other than a legitimate medical purpose by a practitioner acting outside the usual course of professional practice";

d.    "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations"; and

     e.     "not knowingly fill an invalid prescription or a prescription that it reasonably believes was issued for other than a legitimate medical purpose or by a practitioner acting outside the usual course of professional practice."

*See* Exhibit 1, Appendix A.

123.     Despite these promises, Walgreens' effort to enact such a program in Florida appears to have been, in part, intentionally skewed to avoid actually detecting certain evidence of possible diversion. Consequently, any attempts by the Company to mitigate its failings ring hollow.

124.     Specifically, according to publicly available DEA documentation, corporate officials at Walgreens headquarters in Illinois initiated a Florida pharmacy store review initially entitled "Focus on Profit" and later changed to "Focus on Compliance." The purpose of this review was to address the "significant increase in the number of [C-II controlled substance] prescriptions we are filling in [Florida]" after the October 2010 change in Florida law regarding pain clinics.

125.     Documents summarized by the DEA in publicly available records set forth that the initial pilot survey asked the following questions, amongst others: "Do pain management clinic patients come all at once or in a steady stream?" and "Do you see an increase in pain management prescriptions on the day the warehouse order is received?" On May 17, 2011, in an email with the subject heading "Florida Focus on Profit," a Walgreens corporate attorney reviewed the survey. With respect to the above-noted questions, he noted: "If these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance."

126.     According to the DEA's records, the surveys that ultimately were used in the "Focus on Compliance" initiative did not contain those questions. Given that these questions

were omitted so that the Company could avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion, the DEA concluded that the program appeared to have been, in part, "intentionally skewed to avoid actually detecting certain evidence of possible diversion." Additionally, the DEA concluded that "the Walgreens Corporation and Respondent as a corporate subsidiary ignored its statutory and regulatory obligation to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. *See* 21 U.S.C. § 823(b) and (e)." The DEA also concluded that the selective edits to that survey were made "for the explicit purpose of avoiding evidence of its own non-compliance" and showed that "Walgreens appears to have deliberately structured certain of its anti-diversion measures to avoid learning about and/or documenting evidence consistent with diversion." *See* Ex. 1, Appendix B. The DEA also noted that it regarded this as "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant." *Id.*

127.    DEA documentation also shows that on August 19, 2011, Susan Langston (a DEA Diversion Investigator, Diversion Group Supervisor, and Diversion Program Manager) met with Walgreens personnel at the DEA Miami Field Division offices in Weston, Florida to apprise them of relevant DEA-generated information about Walgreens' sales of oxycodone in Florida. Present from Walgreens were Pinon (corporate in-house counsel), Ed Forbes (Market Loss Prevention Director), Wesley Rohn (Pharmacy District Supervisor), Joan Bustelo (Pharmacy District Supervisor), Anne-Marie Aldrich (Pharmacy District Supervisor), Cesar Cedeno (Pharmacy District Supervisor), Georgia Lehoczky (Market Pharmacy Director), Robert Espinosa (Pharmacy Supervisor), Lakeisha Axem (Pharmacy Supervisor), Sandra Vazquez (Pharmacy Supervisor) and Susan Thompson (Loss Prevention Manager). At this meeting, the DEA discussed with the Walgreens officials, among other things, the fact that 20 Florida

Walgreens pharmacies were in the top 300 of oxycodone purchasers in the United States for the first half of 2011, and within the State of Florida over the same time frame, 100 of the top 300 pharmacy oxycodone purchasers were Walgreens retail pharmacies. Moreover, Florida Walgreens pharmacies purchased more than double the average amount of oxycodone purchased by other Florida pharmacies. Because of the importance of this meeting and its regulatory and high-level attendees, it is reasonable to infer that the Board knew or should have known that this meeting was taking or took place and of the substance of the discussions.

128. According to publicly available DEA documentation, following this meeting and as part of its "Focus On Compliance," Walgreens allegedly sought to appear to be taking action by developing and implementing "Oxycodone Action Plans" within certain districts in Florida in an attempt to reduce the volume of oxycodone Walgreens pharmacies were dispensing. For example, at one store in Hudson, Florida, the plan devised by District Pharmacy and Loss Prevention supervisors in a memo dated August 23, 2011 included "contacting the Jupiter warehouse and designating order limits for Oxycodone." The plan, effective immediately, was supposed to "limit" the Hudson store to orders of no more than 100 bottles of 100 count 30 mg. oxycodone. Notwithstanding the memo and the "plan" to limit that store's purchases to no more than 100 bottles, the DEA found that the Jupiter Center shipped the following orders to that store:

| Date | Bottles | Dosage Units |
|---|---|---|
| 9/26/2011 | 331 | 33,100 |
| 10/10/2011 | 371 | 37,100 |
| 11/29/2011 | 200 | 20,000 |
| 12/6/2011 | 113 | 11,300 |
| 12/13/2011 | 150 | 15,000 |

129.     Using this data as an example, the DEA concluded that Walgreens' "inability to enforce a very simple, modest limitation on this one pharmacy is further evidence of its failure to maintain effective controls against diversion, even in the rare instance when it tried to do so."

**L.     In Response to DEA Scrutiny, Instead of Addressing the Diversion Problem, Walgreens Revised its Suspicious Order Policy**

130.     According to publicly available DEA documentation, in April 2012, Walgreens revised its "order" policy, but made this policy retroactive to January 1, 2012. The policy states, in pertinent part, that

> Effective calendar year 2012, the Controlled Substance Order Monitoring and Prevention System prevents suspicious control drugs from being shipped to the stores. In calendar year 2012, because of the program mentioned, ***suspicious control drug reports are no longer generated as their shipment is prevented by the system.***

(Emphasis added.)

131.     This policy, however, was fundamentally flawed because it ignores the fact that the reporting requirement of 21 C.F.R. § 1301.74(b) applies to *orders*, not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement, which is to provide investigators in the field with information regarding potential illegal activity in an expeditious manner.

132.     DEA documentation also shows that on June 14, 2012, a DEA Group Supervisor conducted a telephone interview with Pinon, in-house corporate counsel for Walgreens. As alleged above (¶ 127), Pinon was also at the August 19, 2011 meeting with Susan Langston, Diversion Program Manager, DEA Miami Field Division. According to the DEA, during the June 14, 2012 interview, Pinon stated that Walgreens' prior suspicious order reporting system

was based on a formula for pseudoephedrine reporting in the DEA Chemical Handlers Handbook. Pinon stated that the old system automatically reported any orders for quantities above the algorithm's threshold limit. Pinon stated that the DEA had informed Walgreens that this algorithm reporting system was outdated and that Walgreens needed to establish their own system for reporting suspicious orders. Pinon stated that the old reports were not suspicious orders, but were in fact just orders that "bounced off" the old reporting system. Pinon informed the DEA that Walgreens had implemented a new system which they hoped to present to the DEA at some point. According to Pinon, the new system set limits on a pharmacy ordering controlled substances based on their sales history, and any order over the set limit would trigger an alert to Walgreens Loss Prevention. Loss Prevention would then resolve the order. Pinon stated that any orders that Loss Prevention could not resolve would be reported to the DEA. However, he stated that initial implementation of this new version of the Suspicious Order Monitoring System had produced "thousands" of allegedly suspicious orders, and was thus still being adjusted to produce different results. This shows that the Company's reporting systems, imposed by the 2008 CIA and, as alleged below, other settlement agreements, were admittedly outdated and ineffective. Because Walgreens' counsel admitted to DEA officials the Company's systems were ineffective, it is reasonable to infer that the Board knew or should have known the same regarding these existing policies and reporting systems.

133. In short, given these high-level meetings with senior management and corporate counsel, in addition to the modified memos circulated from management to Walgreens pharmacies designed to avoid creating any awareness of potential failures to comply with applicable law, it is reasonable to infer that the Board knew or should have known that the

Company was violating the applicable provisions of the CSA in exchange for higher prescriptions fills and profit, and did nothing to remedy these issues.

**M.   The DEA Moves to Revoke the Registrations of the Jupiter Center and Six Walgreens Pharmacies for Violations of the CSA and Posing an "Imminent Danger to the Public Health and Safety"**

134.   On April 4, 2012, the DEA served its administrative subpoena on Walgreens and began conducting its six-month investigation into the Jupiter Center and Walgreens pharmacies in Florida.

**1.   The DEA Served an Order to Show Cause and Immediate Suspension Order Against the Jupiter Center**

135.   Based on the DEA's findings from its inspections, on September 13, 2012, the DEA Administrator concluded that continued distribution of controlled substances by the Jupiter Center posed an "imminent danger to the public health and safety," and issued an ISO and an OTSC as to why the Jupiter Center's registration to manufacture, distribute, or dispense controlled substances should not be revoked.

136.   In support of its OTSC, the DEA identified numerous witnesses who were prepared to testify about the illegal activities at Walgreens.  The DEA also identified emails (produced by Walgreens in response to its administrative subpoena) in which the Company urged its Florida pharmacy supervisors to increase their oxycodone sales.  Backed by this evidence, including "detailed information provided by the [Oviedo] Chief of Police," the DEA described numerous incidents of Walgreens' pharmacies distributing controlled substances in gross disregard of red flags that the Company's customers were diverting those products for illicit use.  Among other things, as alleged in more detail above, the DEA Administrator's investigation revealed several "red flags" including:

> a.   Walgreens had systematically failed to take steps needed to ensure the safe distribution of controlled substance prescription drugs.

b.      Walgreens failed to recognize "readily identifiable orders and ordering patterns that, based on the information available . . . , should have been obvious signs of diversion [taking drugs out of legitimate channels and into channels for illicit use] occurring at [Walgreens'] customer pharmacies."

c.      Despite well-known concerns about the diversion and abuse of controlled substances and specific guidance from the DEA, Walgreens did not implement an effective system for detecting suspicious orders and reporting them to the DEA. Suspicious orders (those where there are grounds for suspecting diversion) repeatedly went unreported to the DEA for investigation or monitoring.

d.      There were "systematic shortcomings" in the detection, treatment, and reporting of suspicious orders affecting the distribution of controlled substances to more than 800 pharmacies in Florida from the Jupiter Center, including inadequate due diligence protocols and the failure to train employees to conduct due diligence.

e.      The Jupiter Center's "abdication of its responsibilities as an individual registrant," by which Walgreens neglected to inform the DEA of the suspicious orders as required by federal law, was at least facilitated by a push from Walgreens corporate headquarters to increase oxycodone sales at the Company's retail pharmacies in Florida.

f.      Even when managers recognized that orders plainly raised suspicions, they continued to make shipments without conducting inquiries.

g.      Even where Walgreens' systems identified orders as suspicious, Walgreens did not act to protect the public.

h.      Steps that Walgreens had taken after the DEA began its investigation, such as voluntary dispensing restrictions at eight stores and a reduction from peak levels in the quantity of oxycodone being shipped to Walgreens' other highest-volume Florida pharmacies, did not establish that Walgreens had "recognized and adequately reformed" the Jupiter Center's "systematic shortcomings" as a registered distributor of controlled substances.

137.    The DEA also was prepared to offer testimony from George Corripio ("Corripio") concerning his thirty-one years of experience as a pharmacist, and his work as a Staff Pharmacist at Walgreens 5079 at Ft. Pierce, Florida. Corripio was prepared to testify about a brief period in 2011 when he worked at Walgreens 4727, also located in Ft. Pierce, Florida, concerning the

clientele at Walgreens 4727, which was "heavy CII traffic," and that "80% of the clientele was oxy[codone]." In his professional opinion, the diagnoses did not match the customers, as most of the clientele were young people and most of the diagnoses were for back pain. He felt that most of the customers were not telling the truth. The customers were young, they seemed to all know each other, and they often appeared to be under the influence. Often the clientele would present "cocktail prescriptions." On one occasion, a female customer presented a prescription for ten opiates, which is the type of prescription dispensed to a patient suffering from terminal illness.

138. Corripio was also prepared to testify about his general discomfort at filling oxycodone prescriptions at Walgreens 4727, and about how the supervising pharmacist did not seem concerned by the clientele and offered to fill prescriptions for Corripio that he felt uncomfortable filling. The supervising pharmacist suggested that as long as the pharmacy had a diagnosis code for the prescription, they were fine to fill. When Corripio refused to fill a prescription, the customer would often ask when the female pharmacist was coming back. In Corripio's professional opinion, any reasonable pharmacist and technician would know that something was not right with the situation going on at the pharmacy. Corripio brought the situation to the attention of the local police department. Corripio was also prepared to testify that he believed his District pharmacy supervisor knew about the dispensing practices at Walgreens 4727.

139. Based on the foregoing, the DEA concluded that "Walgreens' continued registration is inconsistent with the public interest" and that "[Walgreens'] continued registration while these proceedings are pending constitutes an imminent danger to the public health and safety."

## 2. The DEA Served an OTSC Against Walgreens 03629

140. On November 26, 2012, the DEA issued an OTSC against Walgreens 03629, 12028 Majestic Boulevard, Hudson, Florida 34667. In the OTSC, the DEA stated that "Walgreens 03629 has consistently failed to exercise its corresponding responsibility to ensure that controlled substances it dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA alleged that "Walgreens 03629 ignored readily identifiable red flags that controlled substances prescribed were being diverted and dispensed controlled substances despite unresolved red flags."

141. From late 2010 to November 2011, Walgreens 03629 dispensed oxycodone to customers who presented prescriptions with addresses and locations from 26 states outside of the State of Florida. In addition, Walgreens 03629 dispensed controlled substances, primarily in suspicious cocktail combinations of oxycodone, alprazolam, and carisoprodol to patients of at least 20 practitioners who were subjected to disciplinary action for dispensing illegitimate prescriptions for controlled substances. Most of these practitioners' registered locations were significant distances from Walgreens 03629. These practitioners include, but are not limited to, the following:

    a. 354 prescriptions for controlled substances prescribed by Ramiro Abaunza, M.D ("Dr. Abaunza"), a purported pain management physician practicing in Miami, Florida. On November 7, 2011, Dr. Abaunza voluntarily surrendered his DEA registration for cause. Walgreens 03629 is over 300 miles from Miami, Florida.

    b. 1,550 prescriptions for controlled substances prescribed by Robert R. Reppy, M.D. ("Dr. Reppy"), whose DEA Certificate of Registration was revoked effective November 2, 2011.

    c. Fifty-two prescriptions for controlled substances prescribed by Christopher Wayne, M.D. ("Dr. Wayne") of Delray Beach, Florida. Dr. Wayne voluntarily surrendered his DEA Certificate of Registration for

cause on July 15, 2011, following the emergency suspension of his Florida medical license. Walgreens 03629 is approximately 272 miles from Delray Beach, Florida.

d.   335 prescriptions for controlled substances prescribed by T.J. McNichol, M.D. ("Dr. McNichol") of Brandon, Florida. Dr. McNichol's DEA Certificate of Registration was revoked by DEA on September 17, 2012. Walgreens 03629 is approximately 57 miles from Brandon, Florida.

e.   Forty prescriptions for controlled substances prescribed by Paul J. Glusman, D.O. ("Dr. Glusman") of Deerfield Beach, Florida. Dr. Glusman voluntarily surrendered his DEA Certificate of Registration for cause on February 2, 2011, following the issuance of an Immediate Suspension Order. Walgreens 03629 is approximately 265 miles from Deerfield Beach, Florida.

142.   As alleged above in paragraph 118, the DEA further noted that pharmacy personnel at Walgreens 03629 contacted local law enforcement when, on December 21, 2010, an individual attempted to fill a prescription for 270 dosage units of 30 mg oxycodone with a forged prescription (causing the individual to abruptly depart the store). Notwithstanding that fact, Walgreens 03629 nevertheless continued to fill that same individual's prescriptions for oxycodone and other controlled substances. *See* Nov. 26, 2012 OTSC to Walgreens 03629, attached hereto as Exhibit 1, Appendix C for additional details of violations at Walgreens 03629.

### 3.   The DEA Served an OTSC Against Walgreens 04727

143.   On November 26, 2012, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 04727, 4950 South U.S. Highway 1, Fort Pierce, Florida 34952. In the OTSC, the DEA stated that "Walgreens 04727 consistently failed to exercise its corresponding responsibility to ensure that controlled substances it dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA alleged that "Walgreens 04727 ignored readily identifiable red flags that controlled substances prescribed were being diverted and dispensed controlled substances despite unresolved red flags."

144.    The DEA further alleged that "Walgreens 04727 dispensed controlled substances when it knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacy knew or should have known that the controlled substances were abused and/or diverted by the customer."

145.    The DEA alleged that "[s]tarting in at least 2010, Walgreens 04727 filled numerous controlled substance prescriptions despite customers exhibiting multiple 'red flags' of controlled substance diversion that were never resolved before dispensing." These "red flags" included: multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone and alprazolam; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; and individuals paying for prescriptions for controlled substances with cash and non-insurance discount cards. *See* Nov. 26, 2012 OTSC attached hereto as Exhibit 1, Appendix C for a full description of the violations the DEA uncovered at Walgreens 04727.

146.    Following its investigation, the DEA concluded that "Walgreens 04727 knew or should have known that the vast increase of customers seeking controlled substance prescriptions created a suspicious situation requiring increased scrutiny, and nonetheless failed in carrying out its responsibilities as a DEA registrant." The DEA further stated that "Walgreens 04727 knew, or should have known, that a large number of the prescriptions for controlled substances that it filled were not issued for a legitimate medical purpose or were issued outside the usual course of professional practice." Accordingly, the DEA concluded that "Walgreens 04727 failed to

exercise its corresponding responsibility regarding the proper prescribing and dispensing of controlled substances, in violation of 21 C.F.R. § 1306.04(a)."

### 4. The DEA Served an OTSC Against Walgreens 06997

147. On November 26, 2012, the DEA issued an OTSC against Walgreen Co., d/b/a Walgreens 06997, 785 Lockwood Blvd., Oviedo, Florida 32765. The DEA alleged that "since at least 2010, Walgreens 06997 has dispensed controlled substances based on prescriptions issued by physicians who lacked authority to do so, in violation of 21 U.S.C. § 842(a)(l) and 21 C.P.R.§ 1306.05." As an example, the DEA noted that between December 2010 and July 2011, Walgreens 06997 filled at least 268 controlled substance prescriptions under an out-of-state registration number for a California doctor. According to the DEA, Walgreens 06997 continued to fill at least 64 of this doctor's prescription even after his out-of-state registration had expired. The DEA noted a separate instance in which, on June 6, 2011, Walgreens 06997 dispensed 30 dosage units of Vyvanse (a C-II drug) 30 mg tablets as prescribed by a doctor whose DEA registration had expired on May 31, 2011.

148. The DEA further alleged that "Walgreens 06997 dispensed controlled substances when it knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacy knew or should have known that the controlled substances were abused and/or diverted by the customer."

149. Between August 10, 2010, and November 9, 2011, local law enforcement documented 17 incidents taking place at Walgreens 06997 involving controlled substances, resulting in the arrest of 35 individuals on controlled substance-related charges. Chief Chudnow discussed his significant concerns with Walgreens, both in person and in writing, regarding the association of Walgreens 06997 with these controlled substance incidents. In multiple letters

sent to Walgreens 06997, as well as to Walgreens Corporate Headquarters, Chief Chudnow noted controlled substance-related arrests of Walgreens 06997 customers and requested Walgreens' assistance in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.  For example:

a.    By letter dated November 23, 2010, Chief Chudnow advised Walgreens 06997 of the November 11, 2010 arrest of Steven Sean Reynolds for illegal distribution of Xanax (alprazolam, Schedule IV).  Reynolds had obtained the Xanax through a prescription filled by Walgreens 06997, and Chief Chudnow advised the pharmacy that the controlled substance was not used for treatment of injury or illness.

b.    By letter dated January 19, 2011, Chief Chudnow advised Walgreens 06997 of the January 12, 2011 arrest of Frederick J. Goepel for illegal distribution of oxycodone.  The letter stated that Goepel had obtained the oxycodone from Walgreens 06997.

c.    By letter dated January 21, 2011, Chief Chudnow advised Walgreens 06997 of the January 20, 2011 arrest of Clinton Brekke for possession of oxycodone with intent to sell.  The letter stated that Brekke had obtained the oxycodone from Walgreens 06997.  Despite notification by law enforcement that Brekke was diverting his oxycodone prescription, Walgreens 06997 again dispensed oxycodone to Brekke on March 13, 2011, April 7, 2011, and April 11, 2011.  In addition, the January 21, 2011 letter also identified Valerie Brekke as being involved in the oxycodone-related arrest.  Nevertheless, Walgreens 06997 filled prescriptions for Valerie Brekke on March 16, 2011 and April 25, 2011.

d.    By letter dated January 25, 2011, Chief Chudnow advised Walgreens 06997 of the January 21, 2011 arrest of Matthew S. Miller and Timothy Kemp Dawson for illegal distribution of oxycodone.  The letter stated that Miller and Dawson obtained the oxycodone from Walgreens 06997.

e.    By letter dated January 27, 2011, Chief Chudnow advised Walgreens 06997 of the January 26, 2011 arrest of Brian Lee Kemm for illegal distribution of oxycodone.  The letter stated that Kemm obtained the oxycodone from Walgreens 06997.  The letter further stated that the pills were illegally distributed to Staci Lynn Starling and Anna Marie Girst.  Despite the content of the letter, Walgreens 06997 distributed alprazolam, hydromorphone (C-II), and oxycodone to Staci Lynn Starling on February 15, 2011, March 14, 2011, and April 13, 2011.

150.    The DEA also noted that Chief Chudnow and other representatives of the Oviedo Police Department met with Walgreens Loss Prevention officials in order to discuss his police department's concerns with criminal activities associated with Walgreens 06997 and also sent identical letters to both the Chairman and CEO of Walgreens, asking them for their support and assistance in combating the prescription drug epidemic.  *See supra* ¶¶ 107-108.

151.    Following its investigation, the DEA concluded that:

> Despite the specific guidance provided to Walgreens Corporation by DEA and local law enforcement, and despite the public information readily available regarding the oxycodone epidemic in Florida, Walgreens 06997 nonetheless failed in carrying out its responsibilities as a DEA registrant.  Based on the facts as outlined above, Walgreens 06997 has failed to exercise its corresponding responsibility regarding the proper prescribing and dispensing of controlled substances in violation of 21 C.F.R. § 1306.04(a).

152.    The DEA further concluded that "Walgreens 06997 knew, or should have known, that a large number of the prescriptions for controlled substances that it filled were not issued for a legitimate medical purpose or were issued outside the usual course of professional practice."

### 5.    The DEA Served an OTSC Against Walgreens 03836

153.    On February 4, 2013, the DEA issued an OTSC against Walgreen Corporation d/b/a Walgreens 03836, 9332 U.S. Highway 19, Port Richey, Florida 34668.  The DEA alleged that "Walgreens 03836 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice."  The DEA stated that "Walgreens pharmacists ignored readily identifiable red flags that controlled substances prescribed were being diverted, and they dispensed controlled substances despite unresolved red flags."  The DEA stated that "Walgreens 03836 pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate

medical purpose, including circumstances where the pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer."

154.    According to the DEA, "[s]tarting in at least 2010, Walgreens 03836 pharmacists filled numerous controlled substance prescriptions despite customers exhibiting multiple 'red flags' of controlled substance diversion that were never resolved before dispensing," including:

> multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone and alprazolam; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; individuals paying for prescriptions for controlled substances with cash and non-insurance discount cards; individuals residing long distances from the pharmacy; and individuals residing long distances from the practitioners from whom the prescriptions were obtained.

155.    The DEA identified numerous dispensing events, among others, at Walgreens 03836 that demonstrated an astonishing pattern of supplying vast quantities of oxycodone and other controlled substances to suspicious groups of individuals located hundreds, and even thousands, of miles from their prescribing doctors and/or Port Richey, Florida.  Some examples of violations the DEA discovered include:

> a.    On April 29, 2011 and May 27, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to residents of Frankfort, Kentucky, both of whom obtained their prescriptions from Dr. Abaunza.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 2,242 miles roundtrip."

> b.    From April 12, 2011, through May 26, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to residents of Riceville, Tennessee who had obtained their prescriptions from Dr. Abaunza in Miami, Florida.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1733 miles roundtrip."

> c.    On or about April 23, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to a resident of Spring City,

Tennessee pursuant to prescriptions issued by Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, [the customer] would have had to travel approximately 1762 miles roundtrip."

d.     On May 2, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to two residents of Columbus, Ohio, pursuant to prescriptions from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 2490 miles roundtrip."

e.     From April 9, 2011, through February 28, 2012, Walgreens 03836 pharmacists dispensed approximately 81 prescriptions for controlled substances to individuals residing in Tennessee. The majority (68%) of those prescriptions were issued by physicians practicing in either Doral or Miami, Florida, both of which are more than 270 miles from Walgreens 03836.

f.     During January 2011, one or more Walgreens 03836 pharmacists dispensed controlled substances to approximately 22 different individuals who presented fraudulent prescriptions that contained no patient address in violation of 21 C.F.R. § 1306.124(a) and FLA. STAT. § 893.04(1)(e)(2). During December 2010, one or more Walgreens 03836 pharmacists dispensed controlled substances to approximately six individuals who presented fraudulent prescriptions that contained no patient address.

*See* Feb. 4, 2013 OTSC attached hereto as Exhibit 1, Appendix C for a full description of the violations the DEA uncovered at Walgreens 03836.

### 6.    The DEA Served an OTSC Against Walgreens 04391

156.    On February 11, 2013, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 04391, 2501 Virginia Avenue, Fort Pierce, Florida 34981. The DEA alleged that "Walgreens 04391 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA stated that "Walgreens pharmacists ignored readily identifiable

'red flags' that controlled substances were being diverted and/or abused, and they dispensed controlled substances despite unresolved 'red flags.'"

157. According to the DEA, between January 1, 2010 and April 4, 2012, Walgreens 04391 pharmacists filled numerous prescriptions for controlled substances despite "red flags" indicating a risk of controlled substance diversion and/or abuse. Such "red flags" included the following:

> multiple individuals presenting prescriptions for the same drugs in the same quantities from the same practitioner; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone and benzodiazepines; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; individuals presenting prescriptions for controlled substances issued by multiple practitioners, or "doctor shoppers"; and warnings documented by pharmacy employees regarding physicians prescribing illegitimately.

158. The DEA provided the following examples of "Walgreens 04391's practice of dispensing controlled substances despite unresolved 'red flags'":

> a. Between July 6, 2010 and March 22, 2012, Walgreens 04391 pharmacists filled at least 40 prescriptions for hydrocodone, oxycodone 30 mg, oxycodone 60 mg, and oxycodone 80 mg for a customer who obtained these prescriptions from ten different physicians, seven of whom were located in Miami, Florida, approximately 144 miles away from Walgreens 04391. At least four of the above-referenced oxycodone prescriptions were issued by Dr. Armando Falcon ("Dr. Falcon") and dispensed despite the following warning printed on the prescription label beneath Dr. Falcon's name and recorded in the pharmacy's electronic dispensing log: "FAKE CII DO NOT FILL CANDY DR."

> b. On February 3, 2012 and February 11, 2012, Walgreens 04391 pharmacists filled two prescriptions for oxycodone issued by Dr. Dustin Lee ("Dr. Lee") despite the following warning printed on the prescription label beneath Dr. Lee's name and recorded in the pharmacy's electronic dispensing log: "FAKE CII DO NOT FILL CANDY DR ***FAKE."

> c. Between February 28, 2011 and February 3, 2012, Walgreens 04391 pharmacists filled at least 28 prescriptions for oxycodone and Schedule IV benzodiazepines for a customer who obtained the prescriptions from four different physicians, three of whom were located in Miami, Florida, approximately 140 miles away from the pharmacy. On January 4, 2012

and February 3, 2012, Walgreens 04391 dispensed oxycodone to this customer despite the following warning printed on the prescription label underneath Dr. John Wolf's ("Dr. Wolf") name and recorded in the pharmacy's electronic dispensing log: "DO NOT FILL ANY FILL ANY CII."

d.    On January 19, 2011, a Walgreens 04391 pharmacist(s) filled 11 prescriptions for oxycodone and alprazolam cocktails to five different customers, all prescribed by Dr. Ralph Miniet ("Dr. Miniet"), who is located in Fort Lauderdale, Florida, approximately 100 miles away from the pharmacy. According to the time stamp on the prescription labels, all six of the oxycodone prescriptions were dispensed within a ten-minute time period.

### 7.    The DEA Served an OTSC Against Walgreens 03099

159.    On February 19, 2013, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 03099, 1525 Colonial Boulevard, Fort Myers, Florida 33907. The DEA alleged that "Walgreens 03099 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA stated that "Walgreens 03099 pharmacists ignored readily identifiable red flags that controlled substances prescribed were being diverted, and they dispensed despite unresolved red flags."

160.    The DEA further stated that "Walgreens 03099 pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer." For example:

a.    On September 27, 2010, Fort Myers police received a 911 call from Walgreens 03099 regarding a customer, whose identity was known to Walgreens 03099, who appeared to be under the influence of drugs and was trying to buy syringes. A trespass warning was issued to the customer. Despite this incident, Walgreens 03099 pharmacists filled

oxycodone, morphine, and alprazolam prescriptions for this customer on numerous occasions between February 3, 2011 and October 10, 2011.

b. On September 28, 2010, Fort Myers police documented that a Walgreens 03099 customer, whose identity was known to Walgreens 03099, engaged in a drug deal on the premises of Walgreens 03099 by selling for money controlled substances he had just purchased from Walgreens 03099. The customer had just filled prescriptions for oxycodone and alprazolam that he paid for using cash and with a Walgreens discount card. Nevertheless, Walgreens 03099 pharmacists filled oxycodone and alprazolam prescriptions for this customer on numerous occasions between September 28, 2010 and June 13, 2011.

161. The DEA further stated that "[s]ince at least 2010, Walgreens 03099 pharmacists filled numerous controlled substance prescriptions despite customers exhibiting multiple 'red flags' of controlled substance diversion that were not resolved before dispensing." These "red flags" included:

multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone, alprazolam and carisoprodol; individuals from out-of-state or who had travelled significant distances within state to fill prescriptions at Walgreens 03099; and filling new oxycodone prescriptions for customers when fewer than 30 days had elapsed since the customer had filled their previous prescription for a 30-day supply of oxycodone.

162. The DEA listed the following "dispensing events" as examples of "Walgreens 03099's practice of dispensing controlled substances despite unresolved red flags":

a. From January 5, 2011 through October 11, 2011, Walgreens 03099 pharmacists filled approximately 42 prescriptions for oxycodone 15 mg and 30 mg, alprazolam 2 mg, carisoprodol 350 mg, morphine sulfate 30 mg and 60 mg and zolpidem 10 mg for one customer. From December 20, 2010 through October 24, 2011, Walgreens 03099 pharmacists filled approximately 34 prescriptions for oxycodone 15 mg and 30 mg, alprazolam 2 mg, carisoprodol 350 mg, morphine sulfate 30 mg and diazepam 5 mg and 10 mg for another customer. Both customers resided at the same address in Fort Myers, Florida and both received their prescriptions from the same physician, Dr. Emiliya Hill, M.D. ("Dr. Hill").

b.      From August 8, 2011 through October 31, 2011, Walgreens 03099 pharmacists filled 29 prescriptions for oxycodone, morphine sulfate, and diazepam for three customers who all resided at the same address in Fort Myers, Florida and all received their prescriptions from Dr. Hill.

c.      From April 12, 2011 to May 12, 2011, pharmacists at Walgreens 03099 filled four prescriptions of oxycodone for one individual, including 240 dosage units of 15 mg oxycodone and 420 dosage units of 30 mg oxycodone.  Walgreens 03099 pharmacists also filled alprazolam and carisoprodol prescriptions on at least two occasions.  All prescriptions were written by Dr. Hill.

d.      On December 19, 2010, and January 14, February 11, March 11, April 7, May 5, June 2, June 30, July 28, and August 24, 2011, Walgreens 03099 pharmacists filled prescriptions for 90 dosage units of oxycodone 15 mg for one customer.  All but one of these prescriptions were written by Dr. Hill except for the April 7, 2011 prescription, which was written by Natalya Verbinskaya, M.D. Also, on December 18, 2010, and January 15, 2011, Walgreens 03099 pharmacists filled prescriptions for 42 dosage units of alprazolam 2 mg for the same customer pursuant to prescriptions written by Dr. Hill.  Also, on February 11, March 11, April 7, May 5, June 2, June 30, July 28, and August 24, 2011, Walgreens 03099 pharmacists filled prescriptions for 56 dosage units of alprazolam 2 mg for customer the same customer.  All but one of these prescriptions were written by Dr. Hill.

e.      From December 2010 through October 2011, Walgreens 03099 pharmacists filled identical, or nearly identical, prescriptions for oxycodone for three family members, two of whom sometimes filled their prescriptions at Walgreens 03099 on the same day.  These prescriptions were issued by three physicians who practiced at Southwest Medical Solutions, a pain clinic in Bonita Springs, Florida.

## N.      The DEA Compiled Substantial Evidence of Wrongdoing in Support of its OTSC

163.    The DEA was prepared to offer numerous witnesses and documentary evidence to support its claims that Walgreens has violated the CSA.  For example, in support of its OTSC against Walgreens stores 03629, 04727, and 06997, the DEA proposed to offer ten witnesses: (1) Susan Langston, Diversion Group Supervisor, DEA ("DI Langston"); (2) Gayle Lane, Group Supervisor, Miami Field Division, DEA ("GS Lane"); (3) Janet E. Pascalli, Detective for the Pasco County Sheriff's Office ("PCSO") and Task Force Officer, DEA ("Detective Pascalli");

(4) Donna G. Richards, Diversion Investigator, DEA ("DI Richards"); (5) Peter Flagg, Diversion Investigator, DEA; (6) Caren Cohalla, Pharmacist, Walgreens; (7) Stuart Eakins, Pharmacy Manager, Walgreens; (8) Patricia Gibson, Pharmacy Manager, Walgreens; (9) Mary E. Chmielewski Ph.D. ("Dr. Chmielewski"), Senior Personnel Psychologist, DEA; and (10) Paul L. Doering ("Prof. Doering"), Distinguished Service Professor of Pharmacy Practice, Emeritus, College of Pharmacy, University of Florida.

164.    DI Langston was prepared to testify "that DEA investigators advised Walgreens about specific red flags for diversion related to patients, specifically, out-of-state patients, questionable Florida identification cards, cocktail prescriptions for oxycodone 15 mg, oxycodone 30 mg, alprazolam 2 mg, and carisoprodol, customers under the age of 45 and customers paying for prescriptions with cash."  She was also prepared to testify "that Walgreens #03629 was put on notice that there would be a vast increase of customers seeking controlled substance prescriptions, particularly those involving oxycodone, for no legitimate medical purpose" and that Walgreens 03629 has dispensed controlled substances to customers residing in numerous states outside of Florida.

165.    GS Lane was prepared to testify that on August 19, 2011, the DEA met with Walgreens representatives and that she and DI Langston advised Walgreens of customer- and physician-specific red flags to look for prior to dispensing prescriptions for controlled substances.  GS Lane was also prepared to testify that on April 4, 2012, the DEA served an AIW on Walgreens 03629 and obtained inventory records, prescriptions, logs, and other records.  GS Lane was prepared to testify that Walgreens 03629's dispensing log revealed that it filled prescriptions issued by doctors who routinely prescribed oxycodone and alprazolam "cocktails,"

who were located significant distances away from the pharmacy, and whose patients paid for their prescriptions with cash.

166.    Detective Pascalli was prepared to testify that in her capacity as Detective for PCSO, her office received numerous reports regarding individuals who would frequent Walgreens 03629 because of the ease with which they could get combination controlled substance prescriptions filled.  Detective Pascalli was further prepared to testify that the PCSO received additional information that Walgreens 03629 became a favorite location for traffickers of prescription drugs and that some of these individuals would travel great distances to fill questionable prescriptions, primarily for oxycodone and alprazolam.  Detective Pascalli was also prepared testify to numerous calls received by local law enforcement from Walgreens 03629 about individuals who attempted to fill phony prescriptions.

167.    DI Richards was prepared to testify that despite being put on notice that a customer of Walgreens 03629 had been arrested for forging prescriptions on April 9, 2011, Walgreens 03629 continued filling prescriptions for that customer through October 2011.  All of the prescriptions were for oxycodone, hydromorphone, and/or alprazolam, were paid for in cash, and issued by physicians located a significant distance from Walgreens 03629.

168.    Mr. Flagg was prepared to testify that on April 4, 2012, the DEA executed an AIW at Walgreens 03629.  During the execution of the AIW, investigators obtained inventory records, copies of all C-II prescriptions, and dispensing records for Schedule II-IV controlled substances dispensed between January 1, 2010 and April 4, 2012.  Mr. Flagg was prepared to testify that a review of the records revealed that Walgreens 03629 filled prescriptions that should have raised concerns or red flags to the pharmacists.  Specifically, Walgreens 03629 filled prescriptions issued by doctors who routinely prescribed oxycodone, alprazolam, and Soma

(carisoprodal) cocktails, practiced outside their specialties, and were located significant distances away from the pharmacy.

169.     Ms. Cohalla was expected to testify to prescriptions filled by Walgreens 03629 by other individuals residing in distant locations such as Ohio, Kentucky, Tennessee, Colorado, and Missouri.

170.     Mr. Eakins was expected to testify regarding Walgreens 03629's filling of subsequent prescriptions for a customer through October 2011 despite that customer's previous history of prescription fraud and their having travelled a long distance to fill these prescriptions.

171.     Ms. Gibson was expected to testify regarding Walgreens 03629's procedure for filling central filled prescriptions and the pharmacy's failure to properly execute these prescriptions with the "CENTRAL FILL" designation as required by 21 C.F.R. § 1306.27(a).

172.     Dr. Chmielewski was prepared to testify regarding her analysis of oxycodone purchase data by Walgreens 03629.  Through that analysis, she determined that a statistically significant difference for orders from 2006 through 2011 was greater than what would be expected to occur due to chance or probability.

173.     Prof. Doering was prepared to discuss his analysis of Walgreens 03629's controlled substance dispensing between January 1, 2010 and April 4, 2012 and that the sheer number of controlled substance prescriptions filled per day can be an indicator that something might by awry.

174.     The DEA was prepared to offer similar evidence and testimony in its OTSC against Walgreens 04727.  For example, GS Lane was prepared to testify regarding a letter she obtained from St. Lucie County Sheriff's Office dated October 28, 2011 from Sherriff Ken Mascara to Walgreens 04727 requesting help in dealing the with prescription painkiller epidemic

in St. Lucie County and Florida by "closely scrutinizing" prescriptions for C-II narcotics written by out-of-town physicians and/or written for out-of town individuals.

175.    GS Lane was also prepared to testify that on August 23, 2012, she and other DEA investigators and DEA Chief Counsel attorneys interviewed Walgreens pharmacist George Corripio.  In his interview, Mr. Corripio stated that:

> [A]s soon as he was transferred to the store he immediately wanted to leave due to the heavy oxycodone traffic.  Mr. Corripio said that "80% of clientele was oxy" and that he thought it was "terrible."  Mr. Corripio said the oxycodone prescriptions were mainly for young people with diagnoses of lower back pain, that the pain clinics all gave the same lower back pain diagnosis for patients, and that the customers appeared to be under the influence of controlled substances.  Mr. Corripio said that "nothing felt right" and he did not think the customers or the doctors were being truthful about the prescriptions.  Mr. Corripio stated that Respondent's Pharmacy Manager, Andrea Cohen, tried to alleviate his concerns regarding filling the oxycodone prescriptions.  She told him to call the doctor, write a diagnosis code, and then "we will be fine."  Mr. Corripio said he did not believe the diagnosis codes fit the customers.  Mr. Corripio said he would fill one person's prescriptions, and immediately three to four other customers would come to the pharmacy with similar prescriptions.  Moreover, when he would call the doctor's office, some person at the clinic who was not the doctor would rattle of the same diagnosis for all the patients.  Mr. Corripio said Ms. Cohen filled the Schedule II narcotic prescriptions that he felt uncomfortable filling.  Mr. Corripio said Ms. Cohen also filled the prescriptions that the floater pharmacists would not fill.  Mr. Corripio told DEA investigators that when he refused to fill a prescription, customers would get angry and ask when the "lady" pharmacist was coming back.

176.    The DEA also proposed to make Mr. Corripio a witness at the hearing, at which "Mr. Corripio will testify that oxycodone dispensing at Walgreens 04727 was 'out of control' and he told Fort Pierce police that he needed help.  He said pharmacy personnel were aware of the problem, especially after receiving a letter from the St. Lucie County Sheriff's Office."

177.    The DEA was prepared to offer similar evidence and testimony in its OTSC against Walgreens 06997.  For example, Diversion Investigator Deborah George ("DI George") was prepared to testify that the Oviedo Police Department sent "multiple letters sent from the chief of police, Jeffrey Chudnow, to Walgreens 06997 informing the pharmacy that customers, to

whom they had dispensed controlled substances, were arrested and charged criminally with illegal distribution of the very controlled substances dispensed by Walgreens #06997." DI George obtained copies of the same letters, compared the names of the arrestees to the dispensing logs for Walgreens 06997, and able to corroborate that the arrestees were in fact supplied with controlled substances from Walgreens 06997. DI George also found that despite the content of the letters from Chief Chudnow, Walgreens 06997 filled controlled substance prescriptions for some of the arrested customers subsequent to these arrests and notifications to Walgreens 06997.

178. In addition, Chief Chudnow was prepared to testify that "it was his practice following one of these arrests to send a letter to the pharmacy which dispensed the controlled substance being diverted, notifying them of the details and asking for the pharmacy's assistance in preventing future diversion. Chief Chudnow sent dozens of these letters, at least five of which will be offered into evidence, because Walgreens #06997 continued to dispense to some of these individuals even after being notified of their arrest."

179. Chief Chudnow was also prepared to testify that on February 10, 2011, he met with Lanzetti, Walgreens Market Loss Prevention Director, and another Walgreens official. At the meeting, Chief Chudnow presented Lanzetti with numerous statistics and facts regarding controlled substance arrests related to Walgreens' two Oviedo pharmacies, including numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests. Chief Chudnow was prepared to testify that despite being given this information, Walgreens 06997 continued to fill prescriptions for these associated doctors subsequent to the February meeting with Chief Chudnow.

180. Chief Chudnow was also prepared to testify that on March 15, 2011, he sent letters to McNally and Wasson informing them about the numerous controlled substance arrests taking place at the Oviedo Walgreens pharmacies, and asking for their assistance and that he never received any response to his request for assistance from anyone at Walgreens.

181. Finally, in connection with the OTSCs and ISO, the DEA was prepared to offer more than 300 exhibits (consisting of thousands of pages), which it listed in its filings, attached hereto as Exhibit 1. These exhibits included the following:

    a.    The DEA's guidance letters sent to Walgreens on September 27, 2006, February 7, 2007, and December 27, 2007, *see* ¶ 69, *supra*;

    b.    Letters from Walgreens' legal counsel to DEA enforcement personnel;

    c.    Letters sent from Oviedo Police Department to Walgreens;

    d.    Monthly Serious Order Reports from the Jupiter Center and individual Walgreens pharmacies;

    e.    Excerpts of dispensing logs concerning prescriptions, drug cocktails, distances travelled, and customers coming from the same address;

    f.    Reports of prescriptions issued by certain physicians;

    g.    Maps and mileage information detailing distances between customers, physicians, and pharmacies;

    h.    Summaries of arrests and surveillance at Walgreens pharmacies in Oviedo, Florida;

    i.    A Pasco County Police report; and

    j.    Numerous emails with topics such as "Oxycodone sales," "Re: High Quantity Stores 682971," "Fw_Stores with many adjustments," "Re Fw Oxycontin question," "Florida Focus on Profit," "Dist #227 Oxycodone Memo August 2011," and "REQUEST REVIEW Florida Pain Management Visits," "Re Please advise on Pain Manag," "Standards of Practice for the Disp," "Re_Handling Pain Management RX," "New Florida Prescribing Law," "Focus on Compliance Survey Results," and "The Two Minute Oxy-Refusal," and "Re Fw CII Order."

**Investigations and Regulatory Actions Concerning Walgreens in Other States Put the Board on Notice and Revealed Widespread Misconduct**

182.     Walgreens' pattern of regulatory violations extends beyond Florida and provides a further indication of the Board's utter failure to prevent the unlawful distribution of controlled substances.  As noted above, the 2013 Settlement Agreement not only resolved administrative actions by the DEA concerning Walgreens' operations in Florida, but also civil investigations by the DOJ in the Eastern District of New York, the Southern District of Florida, the District of Colorado, and the Eastern District of Michigan, as well as civil investigations by the DEA nationwide.

183.     Further, on December 28, 2010, the Colorado State Board of Pharmacy (the "Colorado Board") and Walgreens 10118 entered into a Stipulation and Final Agency Order, following a "controlled substance and prescription drug audit" conducted by the Colorado Board between November 16, 2009 and January 31, 2010.  In the Stipulation, Walgreens 10118 admitted that "inspectors discovered deficiencies involving the overall controlled substance recordkeeping at [Walgreens 10118], some of which caused the inspectors to leave various prescriptions and other data out of the Audit, making performance of an accurate accounting of controlled substance and prescription drugs impossible."

184.     The Colorado Board found the following deficiencies: (1) inspectors were unable to locate Walgreens 10118's initial controlled substances inventory; (2) several daily printouts were not available for inspection; (3) "inter-store transfers" between Walgreens pharmacies lacked the required information; and (4) various prescription orders involved in the audit were not uniformly maintained in hard-copy form.  As a result of the Colorado Board's finding and the stipulation, Walgreens 10118 was placed on three years' probation and required to submit quarterly affidavits of compliance with applicable rules and regulations.

185.    Likewise, on September 12, 2012, California Board of Pharmacy, Department of Consumer Affairs brought an Accusation against Walgreens 06683, located in Visalia, California, and a pharmacist at Walgreens 06683, for inadequate pharmacy security and failure to report the loss of approximately 23,277 tablets of hydrocodone-containing medications and approximately 2,767 tablets of oxycodone.

### 1.    Prior Settlement with the OIG and the 2008 CIA

186.    As alleged above, on June 4, 2008, Walgreens settled litigation involving Medicaid prescription-drug-fraud claims (¶ 9).  As part of this settlement, the Company paid a $35 million fine and also entered into the 2008 CIA.  The 2008 CIA applied to certain Walgreens directors and officers and required specific compliance changes and regular reporting to the Walgreens Board and its Audit Committee of certain activity.  This settlement further provides a reasonable basis to infer that the Board should have been aware of the misconduct described in the 2013 Settlement Agreement.

### 2.    Walgreens Other Prior Settlements with the DEA and Other Regulators

187.    Walgreens' 2008 CIA is not the only settlement the Company entered into with the DEA prior to the 2013 Settlement.

188.    On August 8, 2005, Walgreens reached a civil settlement with the DOJ in which the Company accepted responsibility for supplying methamphetamine cooks with large quantities of pseudoephedrine products in the northeast Texas area.  In one such instance in April 2002, a Walgreens store in Denton, Texas sold more than 53,000 tablets to a single individual in one day.  As part of the settlement, Walgreens paid $1.3 million and further agreed to revise its compliance policies; implement computerized sales monitoring system designed to detect and prevent sales of large quantities of pseudoephedrine products; appoint a compliance officer to

monitor compliance within the Company; pay for an independent monitor selected by the U.S. Attorney to conduct compliance checks; and implement a specialized training program for employees.

189.    On April 7, 2011, Walgreens entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA (the "2011 DEA Settlement Agreement").    This settlement resolved similar claims of improper drug dispensing and prescription filling at a Walgreens retail pharmacy in San Diego, California.    Among other things, as part of the 2011 DEA Settlement Agreement, Walgreens pledged to enact and maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and other DEA regulations, which included procedures to identify the common signs associated with the diversion of controlled substances at all of its retail pharmacies.    Walgreens was also required to implement and maintain policies and procedures to ensure that prescriptions for controlled substances were only dispensed to authorized individuals pursuant to federal and state law and regulations.    The 2011 DEA Settlement Agreement was signed by Richard Ashworth, the Company's Divisional Vice President, Pharmacy Services and John A. Gilbert, Jr., one of Walgreens attorneys.

190.    The manipulation of the compliance survey sent to the Company's Florida pharmacies, as alleged in more detail above (¶¶ 120-126), took place in May 2011, one month after the 2011 DEA Settlement Agreement.    In its OTSC, the DEA found that the Company's active effort to avoid documenting evidence of possible diversion in Florida, immediately after entering into this agreement supported the agency's conclusion that there was an "imminent danger to the public health and safety."

191.     A few months later, in August 2011, Walgreens agreed to pay $500,000 as part of a settlement of claims brought by the DEA pertaining to prescription drug abuse at one of the Company's Arizona pharmacies (the "2011 Arizona Settlement Agreement"). This settlement resolved issues related to dispensing controlled substances prescribed by a certain doctor and the records involving those prescriptions. In the 2011 Arizona Settlement Agreement, the Company represented, among other things, that it provided training on the controlled substance record keeping and reporting requirements of the CSA and "will otherwise maintain good-faith measures to detect and prevent diversion." The 2011 Arizona Settlement Agreement was signed by Dana I. Green, a Company Vice President, and John A. Gilbert, Jr., the same Walgreens counsel who signed the 2011 DEA Settlement Agreement.

192.     These 2011 settlement agreements demonstrate that the Company's practices regarding its verification and dispensing procedures for prescription drugs were defective and contributed to the size of the fine that Walgreens paid in connection with the 2013 Settlement Agreement—the largest in DEA history. It is reasonable to infer that the Board had notice of these settlements, the conduct alleged therein, and the remedial requirements they imposed on the Company.

**P.     Interviews with Confidential Witnesses Corroborate the DEA's Findings**

193.     Numerous confidential witnesses ("CW") from across the country corroborate the DEA's findings discussed above. In interviews, these CWs confirmed that Walgreens corporate executives pressured the Company's pharmacists to increase sales of oxycodone and other C-II drugs.[19]

---

[19] All CWs are referred to in the masculine to protect their identities.

194. CW 1 was employed by Walgreens and held several positions from October 1985 to November 2011. He was most recently employed by the Company at its corporate headquarters in Deerfield, IL, as a Divisional Vice President of Retail Integration from 2009 to November 2011. As a Divisional Vice President, his main responsibility was searching for new pharmacies and locations to acquire. CW 1 advised that during that time he reported directly to Corporate Vice President of Retail Integration, John Spina, who in turn first reported to CFO and President International, Wade Miquelon, and then to the President of Operations and Community Management, Mark Wagner. Both Wade Miquelon and Mark Wagner reported to CEO Wasson. CW 1 confirmed that staff pharmacists were paid bonuses and that their bonus structure was based on numerous factors, including the quantity of all drugs sold, including C-IIs. CW 1 believed that a pharmacist's bonus was based on both the quantity and "overall profitability" of all drugs that were sold. He added that since the C-II level drugs had the highest profit margin, selling more of those would have resulted in an increase in the pharmacists' bonuses. CW 1 also said that the pharmacy managers' bonus structure was based on the "net profitability of the total unit or store" and consisted of five levels: (1) improvement profit versus the previous year; (2) total profit versus the previous year; (3) improvement in sales versus the previous year; (4) total sales versus the previous year; and (5) the result of the store's audit, and some other audit factors. CW 1 also said the same structure was used for the district supervisors, whose bonuses were based on the net profitability of all of the units in their district.

195. While CW 1 was a Director of Drugstore Operations, from 2000 to 2004, he worked with the group that developed Intercom Plus's Key Performance Indicators (KPI), which provided information on certain metrics at the department level, store level, district level, and chain level. CW 1 said that KPI included many different types of information including wait

time for a prescription to be filled, "general utilization area's in the chain," and inventory levels at both the local pharmacy and distribution center level, but patients' personal information was not kept in Intercom Plus because it would have violated HIPAA policy.

196.    CW 1 said he knew for a fact that some Board members had access to Intercom Plus (Walgreens' company-wide proprietary pharmacy computer system, which tracks store-to-store prescription filling) and that he had seen KPI screens open on Wasson's computer. CW 1 said that many employees at corporate headquarters had access to Intercom Plus, but that they were limited as to what they could see based upon their position and need-to-know basis. CW 1 said that Intercom Plus highlighted high and low levels of inventory at distribution centers and pharmacy locations. He explained that this allowed the corporate office to try to determine why a center or location was not selling the drugs, or to address low levels on a timely basis. CW 1 further added that Walgreens made stocking C-II painkillers a priority because patients, by nature, wanted to quickly get rid of pain and that Walgreens did not want to lose customers to a competitor for such expensive drugs.

197.    CW 2 was employed by Walgreens from January 1989 to February 2012. His title was Registered District Supervisor from January 2002 until 2012. CW 2 worked at a Walgreens office in Buffalo Grove, IL, and his district consisted of approximately 37 stores in the northwest suburbs of Chicago. As a Registered District Supervisor, he reported directly to his Regional Vice President, George Eilers, who in turn reported to Corporate Operations Vice President, Lisa Badgley, who in turn reported to President of Operations, Mark Wagner, who in turn reported to Wasson.

198.    CW 2 confirmed that every employee had access to Intercom Plus and that the level of access was based on the employee's responsibility. Supervisor levels and above had

access to reports generated by Intercom Plus. CW 2 believed the Board members had all-access to the system, but that they would have relied on reports provided by others such as senior level executives who reported to them. CW 2 confirmed that Intercom Plus kept track of inventory levels at distribution centers and pharmacies.

199.    CW 3 was employed as a Floating Pharmacist from June 2007 to August 2008 at a Walgreens in Baltimore, MD; from October 2009 to January 2011 at two Walgreens locations around the Washington D.C. metro area in Clinton, MD, and Centreville, VA; and the Walgreens location inside Calvert Memorial Hospital in Prince Frederick, MD. The last District Supervisor he reported to was Justin Coyle. CW 3 stated he felt pressure to fulfill C-II prescriptions that he believed were illegitimate or phony.

200.    CW 4 was employed by Walgreens from October 2007 to May 2011 as a Pharmacist at its store # 5245 located in Lake Mary, Florida (20 minutes north of Orlando). He reported to Pharmacy Manager Erin Stolfo, who reported to District Pharmacy Supervisor, Sujit Raval ("Raval"), who reported to a Regional Pharmacy Supervisor. CW 4 said that in early 2010 or late 2011, "decision making ability" was taken out of the hands of the local pharmacist as to whether or not to fill prescriptions that the local pharmacists were uneasy about.

201.    When CW 4 brought his concerns about suspicious prescriptions to Raval, his response was "it doesn't matter, you have to fill it as long as someone called you back." CW 4 believed that Walgreens' change in policy was a corporate decision because it was relayed via email to the pharmacists in his district by Raval, who he believed was a corporate employee. Raval's email specifically informed the pharmacists they were not allowed tell the customer if their physician was under investigation and that the pharmacists were legally required to fill the prescription.

202.    CW 5 was employed by Walgreens as a Pharmacist from May 2008 to May 2010. His first position was a Pharmacist Intern at a Walgreens location in Atlanta, Georgia from May 2008 to 2009.  He then became a Staff Pharmacist at a Walgreens in Beaumont, Texas from 2009 until May 2010.  At Beaumont, CW 5 reported to his pharmacy manager who in turn reported to Walgreens District Supervisor, Carole Oliver ("Oliver").  CW 5 revealed that pharmacists at his location were instructed and expected to fill every prescription, including C-II drugs, and that each pharmacist had quotas to meet.  He added that he was specifically told by his pharmacist manager not to turn away any prescriptions, including C-II drugs, and that his pharmacist manager was under significant pressure from Oliver to meet the quotas that "came from corporate headquarters."  CW 5 also stated that Oliver offered staff pharmacists managerial positions as an incentive to meet quotas on a continual basis.  CW 5 said that he complained to his pharmacy manager about having quotas to meet because he feared losing his license.  He believed that it was his complaining about the quotas that led to his termination.  According to CW 5, his pharmacy manager told him that Walgreens pharmacists were "protected" against normal controls on drugs, as opposed to the local mom-and-pop pharmacies, because Oliver sat on one of the local chapter pharmacy organizations in the Houston area, which provided Oliver with political connections with the State Board of Pharmacy.

203.    CW 5 also said he saw an increase in customer requests for, and his location's filling of, C-II drugs during the course of his employment in Beaumont.  He affirmed that customers arrived with questionable prescriptions for C-II drugs and that these included prescriptions from physicians' offices located hours away by car.

204.    CW 6 was employed as an Overnight Pharmacist at Walgreens in Peru, IL from 1995 to September 27, 2012.  He reported to the Pharmacy Manager, Kenya McKetta

("McKetta"), who in turn reported to District Pharmacy Supervisor, Bill Powers ("Powers"). CW 6 stated that there was a "no questions" policy on the selling of all drugs at Walgreens, including C-II prescriptions, and that he felt pressured against his judgment to fill C-II drugs on "questionable" prescriptions. CW 6 explained that many of the questionable prescriptions were presented by customers that arrived soon after midnight. Their prescriptions were for a C-II drug and dated for that calendar day which had just begun, which made it a seemingly postdated prescription. CW 6 advised that he witnessed this type of questionable prescription many times and his inclination was to not fill the prescription and inform the customer that he was going to wait until he could verify it with the doctor in the morning. CW 6 added that if the customer later called the store to complain, he would be verbally reprimanded by McKetta who advised him there was nothing seemingly wrong with the prescription and that it should have been filled. CW 6 further recalled Powers instructing him to fill such overnight prescriptions and telling him that "making a person wait does not conform to laws to verify." CW 6 was also ordered by McKetta and Powers to fill overnight prescriptions of C-II drugs that did not have any dates on them at all. CW 6 said that the pressure from McKetta and Powers to fill these questionable prescriptions ended around 2011 when the state of Illinois passed a law requiring pharmacists to wait until they received verification from the physician on any C-II prescriptions that were presented during overnight hours.

## Q. The 2013 Settlement Agreement

205. On June 11, 2013, Walgreens announced that it had reached an $80 million settlement with the DEA in connection with certain sales of prescription painkillers, including oxycodone.

206. Among other things in the 2013 Settlement Agreement, Walgreens acknowledged that "suspicious order reporting for distribution to certain pharmacies did not meet the standards

identified by DEA" that were sent to Walgreens on September 27, 2006, February 7, 2007, and December 27, 2007.

207.    Walgreens also acknowledged in the Settlement Agreement that certain of its retail pharmacies "dispense[d] certain controlled substances in a manner not fully consistent with its compliance obligations" under the CSA.

208.    Additionally, Walgreens acknowledged in the 2013 Settlement Agreement that "its record keeping practices regarding the dispensing of controlled substances from certain retail pharmacies utilizing its CPO Facilities as central-fill pharmacies did not require such original prescriptions to be marked 'CENTRAL FILL.'"[20]

209.    According to the DEA, Walgreens had committed an "unprecedented number" of record-keeping and prescription dispensing violations and had "negligently allowed" prescription painkillers "to be diverted for abuse and illegal black market sales."

210.    The underlying conduct was not limited to Florida.  The 2013 Settlement also resolved similar open civil investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the CSA.  Public information regarding misconduct investigated in the Eastern District of New York shows that Walgreens violated the CSA by filling numerous prescriptions that Walgreens employees knew, or should have known, were not issued for a legitimate medical purpose, including those prescribed by a nurse practitioner, Eva MacDowall. According to the Department of Justice, over a two-year period from July 2010 until July 2012, MacDowall filled 94 different, illegitimate prescriptions—primarily for two highly addictive

---

[20] The 2013 Settlement Agreement defined a CPO Facility as a Central Pharmacy Operations facility that is or was registered with the DEA as Retail/Chain Pharmacies or Central Fill Pharmacies to handle Schedule II-V controlled substances under the CSA.

painkillers, oxycodone and hydrocodone—at a Walgreens pharmacy in Selden, New York and two Walgreens pharmacies in Medford, New York. Given the known repeated violations, it is likely that these practices are even more widespread.

211. Given that the $80 million fine is expected to impact the Company's stock price by 4 to 6 cents per share in the third quarter 2013, the 2013 Settlement Agreement clearly is significant to the Company's bottom line.

**R.** **Walgreens Has Incurred Substantial Costs as a Result of the Board's Breaches of Fiduciary Duty**

212. According to Walgreens' June 28, 2013 Form 10-Q for the nine months ending May 31, 2013, "the settlement agreement [with the DEA and DOJ] requires the Company to pay $80 million, which the Company had fully reserved including the $25 million reserve accrued in the quarter ended May 31, 2013."

213. Moreover, according to the June 28, 2013 Form 10-Q, for the nine months ending May 31, 2013, Walgreens' "selling, general, and administrative expenses" increased by $628 million (from $12.629 billion to $13.259 billion) and "0.2%" of that increase (or approximately $25.258 million) were "costs related to the DEA settlement."

214. In addition, the June 28, 2013 Form 10-Q states that Walgreens' earnings were negatively impacted by "$47 million, or $.05 per diluted share, related to a legal settlement with the Drug Enforcement Administration (DEA)."

215. Taken together, these disclosures suggest that the Company has incurred substantial costs related to its violations of the CSA and that the Company had taken substantial reserves over a significant period of time (apparently more than nine months early) in anticipation of those costs materializing in a settlement or ruling adverse to the Company.

## VI.    DERIVATIVE ALLEGATIONS

216.    Plaintiffs bring this action derivatively in their right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of the breaches of fiduciary duties by the Individual Defendants.

217.    Walgreens is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

218.    As alleged above, Plaintiffs currently are stockholders of Walgreens.  They also were stockholders of Walgreens at the time of the breaches of fiduciary duties complained of herein.  Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action.  Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

219.    The wrongful acts complained of herein subjected, and continue to subject, Walgreens to harm.

## VII.    DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE

220.    The Board is comprised of 13 directors: Defendants Skinner, Wasson, Babiak, Brailer, Davis, Foote, Frissora, Graham, McNally, Schlichting, Silva, and non-defendants Murphy and Pessina.  Plaintiff did not make a demand upon the Board prior to instituting this action because a majority of the Board either: (1) engaged in conduct that was not a legitimate exercise of business judgment and/or was ultra vires and, therefore, cannot enjoy the protections of the business judgment rule; and/or (2) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Walgreens' illegal conduct.  Further, non-defendants

Murphy and Pessina are not independent, and therefore, likewise cannot impartially consider a demand to initiate litigation.

## A. Demand Is Excused Because the Individual Defendants' Conduct Is Not a Valid Exercise of Business Judgment

221. The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including the Individual Defendants' knowingly and consciously presiding over the Company's pervasive violations of the CSA. The Individual Defendants in their capacity as corporate directors affirmatively adopted, implemented, and/or condoned a business strategy based on deliberate and widespread violations of law. Such a strategy is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand is excused.

222. A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment—conduct for which the Individual Defendants should face potential personal liability. As noted by the DEA, selling controlled substances in "staggering disregard" of the CSA constitutes an "imminent danger to the public health and safety." Such misconduct cannot under any circumstances be considered legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority.

223. Significantly, Walgreens' unique history of non-compliance with the CSA and the DEA's consequent ISO, OTSCs, $80 million settlement, all in the wake of a reporting system required by the 2008 CIA, combine to make the Board's (in)action here unique and distinct. A typical corporate board might plausibly claim ignorance concerning isolated compliance failures. In this case, however, the Individual Defendants were made specifically and uniquely

accountable and responsible under the 2008 CIA for monitoring, ensuring, and enforcing the Company's compliance with "all applicable Federal health care program requirements and with Walgreens' own Policies and Procedures," including "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." Further, although only six of these directors were on the Board at the time the 2008 CIA was executed (Skinner, Wasson, Foote, McNally, Schlichting, and Silva), by the terms of that agreement, all of the directors have received general and specific training regarding the 2008 CIA's requirements and the Company's Compliance Program, as amended by the 2008 CIA. This would include reviewing the Company's policies regarding "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The directors' conscious decision to ignore these responsibilities, and to instead knowingly cause, and incentivize, Walgreens to undertake violations of the CSA as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.

224. Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee or division within the Company. Rather, as alleged herein, no fewer than 43 Walgreens pharmacies in Florida purchased in excess of 500,000 dosage units of oxycodone in 2011, despite a national average of approximately 74,000 dosage units and a Florida average of 110,000. Walgreens channeled these C-II drugs to the black market as a direct result of the Individual Defendants' decision to willfully disregard the requirements imposed by applicable law and the 2008 CIA.

**B. Demand Is Excused Because a Majority of the Current Board Members Are Either Not Independent or Are Conflicted by a Substantial Likelihood of Liability Arising From Their Misconduct**

225. Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the current Board are not disinterested or independent and cannot, therefore, properly consider any demand.

226. As an initial matter, the Board has effectively conceded, in the Company's SEC filings, that Wasson, Murphy, and Pessina are not independent directors of the Company. Indeed, in a January 9, 2013 press release titled "Walgreens Presents Growth Strategy at 2013 Annual Shareholders Meeting," the Company stated that only "[t]en of the 13 board members are independent . . . ."

227. Defendant Wasson is not independent because his principal occupation is serving as the Company's CEO. According to the Company's SEC filings, since 2008, Defendant Wasson has received in excess of $38.8 million in salary and other compensation from Walgreens. As a result of this lucrative employment relationship, Defendant Wasson has received and will receive valuable financial benefits from the Company—benefits that would be lost if Wasson's employment relationship were severed. As such, Wasson is incapable of impartially considering a demand to commence this action.[21]

228. Director Murphy, a Board member since August 2, 2012, is not independent because he is a partner of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and serves on the

---

[21] Defendants Wasson and McNally are also incapable of impartially considering a demand to commence this action because Chief Chudnow specifically alerted Wasson and McNally, in his March 2011 letters, that Walgreens' pharmacies in Oviedo, Florida had "become a bastion of illegal drug sales and drug use," and oxycodone in particular. Despite this knowledge, and even after Walgreens entered into the April 2011 MOA with the DEA, Wasson and McNally continued to permit and/or willfully turn a blind eye to the Company's rapidly growing oxycodone sales in Florida.

Board pursuant to the Company Shareholder Agreement among Walgreens, KKR, and others in connection with Walgreens' acquisition of a 45% equity stake in Alliance Boots GmbH ("Alliance Boots"), a pharmacy retailer in which KKR had previously invested $1.8 billion, and of which Murphy is a director. In addition, in September 2012, KKR served as co-managing underwriter of $4 billion in debt securities for Walgreens, which the Company has identified as a "Related Transaction." Murphy will not vote to initiate litigation against Defendant Wasson, Walgreens' CEO, for fear of jeopardizing future business transactions between Walgreens and KKR. In fact, Walgreens does not identify Murphy as an independent director in its proxy filings. Thus, a demand upon Murphy is excused.

229. Director Pessina, a Board member since August 2, 2012, is not independent because he currently serves as Executive Chairman of Alliance Boots. According to Walgreens' last annual proxy statement, filed November 19, 2012, "it is expected that the Company and Alliance Boots and/or their respective affiliates may from time to time engage in commercial transactions and arrangements in connection with initiatives intended to help realize potential synergies across both companies." Pessina receives compensation from his position as executive chairman of Alliance Boots, which, on information and belief, is his primary source of income. Due to Walgreens' control of Alliance Boots, Defendant Wasson, as CEO of Walgreens, can remove Pessina from his position. This fear of retaliation renders Pessina incapable of voting to initiate litigation against Defendant Wasson. In fact, Walgreens does not identify Pessina as an independent director in its proxy filings. Accordingly, demand upon Pessina is excused.

230. Further, six of the current members of the Board—Defendants Skinner, Wasson, Foote, McNally, Schlichting, and Silva—face a substantial likelihood of liability because they

each served on the Board since at least January 9, 2008,[22] well before Walgreens entered into the 2008 CIA in September 2008.

231.    As alleged herein, the 2008 CIA required Walgreens to implement "written standards" regarding the operation of the Company's compliance program and its compliance with the federal health care program requirements, including (1) a "Pharmacy Code of Conduct" setting forth Walgreens' "commitment to full compliance with all applicable Federal health care program requirements"; and (2) "written Policies and Procedures regarding the operation of [Walgreens'] compliance program," which "shall address . . . the proper and accurate documentation . . . and . . . dispensing of prescription drugs, including federal and state law requirements relating to prior authorization. . . ."

232.    Under the 2008 CIA, a "Compliance Officer" within the Company was designated to develop and implement all of the policies, procedures, and practices designed to ensure compliance with the requirements set forth in the 2008 CIA and with applicable federal health care programs, including those involving documentation of prescription records and proper and accurate dispensing of prescription drugs.  The Compliance Officer was required to file periodic (at least quarterly) reports regarding federal health care program compliance matters with the Audit Committee.

233.    Similarly, and in connection with the 2008 CIA, Walgreens established a Compliance Committee in order to meet the Company's obligations under the 2008 CIA.  The Compliance Committee was chaired by the Compliance Officer and was required to include members of "upper management."  The Compliance Committee was required to make at least annual reports to the Audit Committee.  It is reasonable to infer that the Company (and the

_____

[22] Defendant Silva, who joined the Board on January 9, 2008, was the Board's newest member when Walgreens entered into the 2008 CIA in September 2008.

Board) complied with these requirements and received regular updates from the Compliance Officer and/or the Compliance Committee.

234. Additionally, the 2008 CIA mandated that the Audit Committee would be responsible for review and oversight of matters related to compliance with the requirements of federal health care programs and the obligations of the CIA. This would include the CIA's obligations regarding compliance with how prescription records are documented and how prescription drugs are properly and accurately dispensed. At least quarterly, the Audit Committee would meet, review, and oversee Walgreens' Compliance Program, including, but not limited to, the performance of the Compliance Officer and Compliance Committee. It is reasonable to infer that the Audit Committee (and therefore the rest of the Board) complied with these requirements and received regular updates on compliance-related subjects, issues, and problems.

235. In addition to the compliance reporting required under the 2008 CIA, the Company's Corporate Governance Guidelines and Code of Business Conduct also ensured that the members of the Board were awash in "red flags" that necessarily informed them of the rampant violations taking place within the Company. Walgreens' Corporate Governance Guidelines required Walgreens' management to provide such information to the Board:

> Information and data that is important to the Board's understanding of the business is distributed in writing to Board members in advance of meetings whenever practicable. Management will make every attempt to see that this material is provided in a clear and concise form. Management will provide key information regarding the Company's business and financial results between meetings.

> \*       \*       \*

> Board members have complete access to the Company's management and its independent auditors. The Board encourages management to bring managers who can provide additional insight into the items being discussed into Board meetings.

*    *    *

> Directors are expected to attend the annual meeting of shareholders and all meetings of the Board and the committees of which they are members, unless prevented by unavoidable circumstances. Each director must review materials submitted to him/her in advance of any such meeting so as to familiarize himself/herself with those matters.

Walgreens' Corporate Governance Guidelines ¶¶ 7, 10, 14.

236.    Similarly, Walgreens' Code of Business Conduct describes the Walgreen Compliance Office's "objectives . . . to . . . [p]rovide status reports to the Compliance Committee and the Audit Committee of the Board of Directors"; to "[i]nvestigate compliance issues and questions submitted to the Compliance Office and provide recommendation, answers or solutions"; and to "[l]ead change in the company related to compliance activities."

237.    The Board also employs an ongoing Enterprise Risk Management ("ERM") process under the direction of management's Risk Steering Committee. According to Walgreens' filings with the SEC, the Company's ERM approach helps the Board and its committees to receive relevant information about and understand the Company's risk management process, the participants in the process, and key information gathered through the process. The purpose of the ERM process is to identify risks that could affect the Company and the achievement of its strategic objectives, to understand, assess and prioritize those risks, and to facilitate the implementation of risk mitigation strategies and processes across the Company. The key risks identified through this process are reviewed with the full Board. Throughout the year, the Board and its committees also provide oversight and guidance to management regarding the Company's strategy, operating plans and operating performance, and management identifies potential risk management matters for consideration by the Board and/or its committees.

238.    Given the duties placed on the Company's Board as described above, to the extent any of the Individual Defendants did not have actual knowledge of the extensive violations of the

CSA taking place within Walgreens, such lack of knowledge could only be the product of willful blindness that constitutes a bad faith breach of their fiduciary duties.

239. The Individual Defendants also were required to act upon this information to protect the Company from continued legal violations being committed in its name. Rather than doing so, the Individual Defendants, in violation of their fiduciary obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive violations of the CSA. As a result, Defendants Skinner, Wasson, Foote, McNally, Schlichting, and Silva face a substantial likelihood of liability for their conduct.

240. Defendants Babiak, Brailer, Schlichting, Silva, and Skinner also are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. As explained above, the 2008 CIA imposed certain affirmative obligations on the Audit Committee. *See, e.g.*, ¶¶ 45-47, 50, 223, 231-234. Moreover, the Audit Committee's charter also imposes specific duties on members of this committee to "[p]eriodically review and discuss the overall adequacy and effectiveness of the Company's legal, regulatory and compliance programs" and to "meet periodically with the Company's Chief Compliance Officer." The Audit Committee "has the authority to investigate any activity of the Company in order to adequately discharge its responsibility . . . ." Moreover, the Audit Committee was required by its Charter to report its findings to the Board as a whole:

> Committee Reports to the Board. The Chair of the Committee shall report to the Board regarding the activities of the Committee at appropriate times and as otherwise requested by the Chairman of the Board. ***The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements***, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

(Emphasis added.)

241. In accordance with its charter, the Audit Committee also reviews the Company's policies and processes with respect to risk assessment. On a quarterly basis, the Audit Committee reviews and discusses the key risks identified in the ERM process with management, their potential impact on our Company, and risk mitigation strategies.

242. As members of the Audit Committee, Defendants Babiak, Brailer, Schlichting, Silva, and Skinner violated their fiduciary duties to act in good faith to address the pervasive legal violations discussed herein. Accordingly, Defendants Babiak, Schlichting, Silva, and Skinner face a substantial likelihood of liability and cannot appropriately consider a demand, and therefore demand is excused with respect to these defendants.

243. Further, Defendants Davis, Foote, Frissora, McNally, and Silva are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Nominating and Corporate Governance Committee. Pursuant to the Corporate Governance Committee's charter, the members of the Corporate Governance Committee are specifically charged with "establishing the corporate governance principals of the Company," including overseeing the "evaluation . . . of the effectiveness of the Board and its committees and management." In addition, the members of the Nominating and Corporate Governance Committee are required to "review the Company's Code of Business Conduct and recommend any changes to the Board." The Nominating and Corporate Governance Committee is also required, at each regular meeting, to oversee management of risks relating to its areas of responsibility, including risks incident to the Company's governance structures. Defendants Davis, Foote, Frissora, McNally, and Silva breached their fiduciary duties of loyalty and good faith by acquiescing, permitting, and/or failing to detect and prevent a Company-wide scheme that flouted applicable law.

244. The rampant Company-wide conduct described herein, which included violations of the CSA, placed profits ahead of patients and ultimately resulted in a record $80 million settlement and substantial damage to Walgreens' reputation. The magnitude and scope of the misconduct described herein was so pervasive that it cannot be explained away as an isolated occurrence. Given the number of violations, their severity, and their persistence despite the Board-level reporting system established by the 2008 CIA and the repeated admonitions of federal and state law enforcement, the facts compel the conclusion that the Individual Defendants knew of this malfeasance, but did nothing to prevent it.

## VIII. COUNT I – Derivative Claim for Breach of Fiduciary Duty

245. Plaintiffs repeat and reallege the foregoing paragraphs as set forth herein.

246. The Individual Defendants, as directors of Walgreens, are fiduciaries of the Company and its stockholders. As such, they owe the Company the highest duties of loyalty, care, candor, and good faith and fair dealing.

247. The Individual Defendants' breaches of their fiduciary duty as detailed herein directly and proximately caused substantial losses to the Company in an amount to be proven at trial.

248. The Individual Defendants are liable to the Company as a result of the acts alleged herein.

249. Plaintiffs, on behalf of Walgreens, have no adequate remedy at law.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against all the Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this derivative action on behalf of Walgreens and that Plaintiffs are proper and adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to Walgreens;

(c)     Directing that the Individual Defendants account to Plaintiffs and Walgreens for all damages caused to Walgreens and account for and disgorge all profits and any special benefits obtained by the Individual Defendants as a result of their unlawful conduct;

(d)     Determining and awarding to Walgreens the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

(e)     imposing corporate governance reform on the Walgreens Board including, without limitation, reformation of Board membership; altering the composition of and charge of Walgreens' pertinent Board committees; and creation of appropriate measures to protect against future breaches of fiduciary duty;

(f)     Awarding Walgreens restitution from the Individual Defendants;

(g)     Awarding Walgreens actual, compensatory, and exemplary damages;

(h)     Awarding Plaintiffs, on behalf of Walgreens, their reasonable and necessary attorneys' fees and costs;

(i)     Awarding pre- and post-judgment interest; and

(j)     Granting such other and further relief as this Court deems just and equitable.

X.     **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

Dated:  October 4, 2013

Respectfully submitted,


Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
Iona Evans
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477


Christine S. Azar
Ned Weinberger
LABATON SUCHAROW LLP
300 Delaware Avenue, Suite 1225
Wilmington, Delaware  19801
Telephone: (302) 573-2530
Facsimile: (302) 573-25290

*Co-Lead Counsel for Plaintiffs*

Gregg S. Levin
Lance V. Oliver
William S. Norton
Christopher F. Moriarty
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9000

*Co-Lead Counsel for Plaintiffs*

George C. Aguilar
Gregory Del Gaizo
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, California 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

*Additional Counsel for Plaintiffs*

/s/ Carol V. Gilden
Carol V. Gilden
COHEN MILSTEIN SELLERS & TOLL, PLLC
190 South LaSalle Street, Suite 1705
Chicago, Illinois  60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com
ARDC No: 6185530

*Liaison Counsel for Plaintiffs*

## VERIFICATION

COMMONWEALTH OF PENNSYLVANIA    )
                                      ) ss. :

COUNTY OF ALLEGHENY              )

I, Joseph M. Little, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am Chairman of the Board of Trustees of Steamfitters Local #449 Retirement Security Fund ("Steamfitters #449"), in the above-entitled action.

2.    I have reviewed the Consolidated Verified Shareholder Derivative Action Complaint (the "Consolidated Complaint") prepared on behalf of Steamfitters #449, and I authorize its filing.

3.    I have reviewed the allegations made in the Consolidated Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4.    I further declare that Steamfitters #449 is a current shareholder, and has been a holder, of the common stock of Walgreen Co. during the time period in which the wrongful conduct alleged and complained of in the Consolidated Complaint occurred.

Dated: October  2 , 2013

Joseph M. Little
Chairman of the Board of Trustees

## VERIFICATION

STATE OF FLORIDA              )
                             ) ss. :
COUNTY OF PALM BEACH          )

I, Edward Mitchell, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am Chairman of the Board of Trustees of West Palm Beach Police Pension Fund ("West Palm Beach Police"), in the above-entitled action.

2.     I have reviewed the Consolidated Verified Shareholder Derivative Action Complaint (the "Consolidated Complaint") prepared on behalf of West Palm Beach Police, and I authorize its filing.

3.     I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4.     I further declare that West Palm Beach Police is a current shareholder, and has been a holder, of the common stock of Walgreens in the time period in which the wrongful conduct alleged and complained of in the Complaint occurred.

Dated October __2__, 2013

Edward Mitchell
Chairman

## **VERIFICATION**

STATE OF MISSOURI            )
                                     ) ss. :
CITY OF ST. LOUIS            )

I, Stephen G. Olish, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am Executive Director of the Police Retirement System of St. Louis ("St. Louis Police"), in the above-entitled action.

2.     I have reviewed the Consolidated Verified Shareholder Derivative Action Complaint (the "Consolidated Complaint") prepared on behalf of St. Louis Police, and I authorize its filing.

3.     I have reviewed the allegations made in the Consolidated Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4.     I further declare that St. Louis Police is a current shareholder, and has been a holder, of the common stock of Walgreen Co. during the time period in which the wrongful conduct alleged and complained of in the Consolidated Complaint occurred.


Dated: October __3__ , 2013

                                            *Stephen G. Olish*

                                         Stephen G. Olish
                                         Executive Director

## VERIFICATION

STATE OF FLORIDA            )
                                      ) ss. :

COUNTY OF MIAMI-DADE     )

I, Dan Givens, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Administrator of Miami Firefighters' Relief and Pension Fund ("Miami Firefighters"). I have the authority to make material decisions for Miami Firefighters, including the authority to make the decision to initiate this litigation.

2.      I have reviewed the allegations in the foregoing Consolidated and Verified Shareholder Derivative Complaint (the "Complaint") prepared on behalf of Miami Firefighters by Motley Rice LLC. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I authorize the filing of the Complaint.

3.      Miami Firefighters currently holds 17,425 shares of Walgreen Co. ("Walgreens" or the "Company") common stock, and has been a continuous holder of Walgreen stock since at least April 30, 2005.

4.      Miami Firefighters is ready, willing, and able to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the Company.

Dated: October 3, 2013

_____
Dan Givens
Administrator