**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE WALGREEN CO. DERIVATIVE LITIGATION | Lead Case No. 1:13-cv-05471 <br><br> Hon. Joan H. Lefkow |

**MEMORANDUM OF LAW IN SUPPORT OF THE**
**MOTION TO DISMISS THE DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF THE CASE.................................................................................................5

    A.    Walgreens is the largest drug store chain in the nation. ...........................5

    B.    Walgreens' board of directors is overwhelmingly independent. ............5

    C.    Florida prohibits physicians from dispensing oxycodone. ....................7

    D.    Walgreens responds to the rise in oxycodone prescriptions. .................8

    E.    The DEA takes action against Cardinal Health, CVS, and Walgreens.................11

    F.    Plaintiffs bring these derivative actions without alleging the substance of a single board meeting. ...................................................14

ARGUMENT ........................................................................................................................16

POINT I    TO EXCUSE DEMAND, PLAINTIFFS MUST PLEAD PARTICULARIZED FACTS SHOWING THAT THE WALGREENS DIRECTORS ACTED IN BAD FAITH....................................16

    A.    Demand excusal must be pleaded with particularity. ...........................16

    B.    To excuse demand, plaintiffs must plead particularized facts establishing that the directors face a substantial likelihood of personal liability.....................17

    C.    To establish a substantial likelihood of liability, plaintiffs must allege particularized facts establishing bad faith..............................................19

    D.    Courts have dismissed similar derivative suits against the boards of Cardinal Health and CVS arising out of oxycodone sales in Florida.. .................23

POINT II    THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO ALLEGE PARTICULARIZED FACTS ESTABLISHING THAT DEMAND WAS EXCUSED....................................................25

    A.    The complaint contains no particularized allegations showing that the directors were aware of the issues in Florida.......................................26

    B.    Plaintiffs' "scheme" theory is frivolous and fails to establish that the directors acted in bad faith..................................................................33

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

CASES

*Aronson* v. *Lewis*,
  473 A.2d 805 (Del. 1984) .......................................................................... 17, 18

*Beam* v. *Stewart*,
  845 A.2d 1040 (Del. 2004) ........................................................................ 27, 33

*Bronstein* v. *Austin*,
  2008 WL 4735230 (N.D. Ill. May 30, 2008).................................. 16, 16 n.6, 17, 33

*Desimone* v. *Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ................................................................. 20, 26, 29

*Fojas* v. *Ackerman*,
  No. 08-0423 (N.D. Ill. Aug. 21, 2008) ............................................................ 21

*Garden City Emps. Ret. Sys.* v. *Anixter Int'l, Inc.*,
  2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)................................................... 5 n.1

*Garza* v. *Belton*,
  2010 WL 3324881 (N.D. Ill. Aug. 13, 2010) .................................... 2, 17, 21, 31

*Gordon* v. *Goodyear*,
  2012 WL 2885695 (N.D. Ill. July 13, 2012)..................................................... 18

*Gordon* v. *Ryan*,
  2013 R.I. Super. LEXIS 180 (R.I. Super. Oct. 1, 2013)................................ 4, 24, 33

*Grimes* v. *Navigant Consulting, Inc.*,
  185 F. Supp. 2d 906 (N.D. Ill. 2002) ............................................................ 10 n.3

*Guttman* v. *Huang*,
  823 A.2d 492 (Del. Ch. 2003) ..................................................................... 17, 18

*Hale* v. *Chu*,
  614 F.3d 741 (7th Cir. 2010) ......................................................................... 16

*Higginbotham* v. *Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ......................................................................... 32

*In re Abbott Depakote*,
  2013 WL 2451152 (N.D. Ill. June 5, 2013)................................................. 30 n.10

*In re Abbott Labs.*,
  325 F.3d 795 (7th Cir. 2003) ....................................................................... 22 n.7

*In re Biosante Pharm., Inc.*,
2013 WL 4829122 (N.D. Ill. Sept. 11, 2013) .......................................... 16, 19, 21

*In re Caremark*,
698 A.2d 959 (Del. Ch. 1996) ................................................................. 20, 30

*In re Citigroup Inc. Shareholders Litig.*,
2003 WL 21384599 (Del. Ch. June 5, 2003) ........................................... 27

*In re Goldman Sachs Group, Inc. Shareholder Litigation*,
2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ........................................... 21

*In re Google, Inc. Shareholder Derivative Litigation*,
2012 WL 1611064 (N.D. Ca. May 8, 2012) ............................................. 21, 29

*In re Lear Corp. Shareholder Litig.*,
967 A.2d 640 (Del. Ch. 2008) ................................................................. 20

*In re Paxson Commc'n Corp. Shareholders Litig.*,
2001 WL 812028 (Del. Ch. July 12, 2001). ............................................. 25 n.8

*In re Walt Disney*,
906 A.2d 27 (Del. 2006) .......................................................................... 20

*In re Xethanol Corp. Derivative Litig.*,
2007 WL 2331975 (S.D.N.Y. Aug. 16, 2007) ......................................... 2, 26

*Ji* v. *Van Heyningen*,
2006 WL 2521440 (D.R.I. Aug. 29, 2006) ............................................... 25 n.8

*Kamen* v. *Kemper Financial Services, Inc.*,
500 U.S. 90 (1991) .................................................................................. 16 n.6

*Kamen* v. *Kemper Financial Services, Inc.*,
659 F. Supp. 1153 (N.D. Ill. 1987) ......................................................... 17

*King* v. *Baldino*,
648 F. Supp. 2d 609 (D. Del. 2009) ......................................................... 21

*Marvin H. Maurras Revocable Trust* v. *Bronfman*,
2013 WL 5348357 (N.D. Ill. Sept. 24, 2013) ......................................... 22, 29

*Oakland County Employees' Retirement System* v. *Massaro*,
772 F. Supp. 2d 973 (N.D. Ill. 2011) ....................................................... 21

*Rales* v. *Blasband*,
634 A.2d 927 (Del. 1993) ........................................................................ 17, 18

*Sherman* v. *Ryan*,
    392 Ill. App. 3d 712 (2009) ............................................................ 16

*Shields* v. *Erickson*,
    710 F. Supp. 686 (N.D. Ill. 1989) .................................................. 26

*Silver* v. *Allard*,
    16 F. Supp. 2d 966 (N.D. Ill. 1998) ................................... 16, 16 n.6

*Spiegel* v. *Buntrock*,
    571 A.2d 767 (Del. 1990) ............................................................... 16

*Stanley* v. *Arnold*,
    2012 WL 5269147 (S.D. Oh. Oct. 23, 2012) ..................... 4, 23, 24, 33

*Stanley* v. *Arnold*,
    2013 WL 4105646 (6th Cir. Aug. 14, 2013). .................... 4, 23, 24, 33

*Starrels* v. *First Nat'l Bank of Chicago*,
    870 F.2d 1168 (7th Cir. 1989) ....................................................... 17

*Stiegele ex rel. Viisage Tech., Inc.* v. *Bailey*,
    2007 WL 4197496 (D. Mass. Aug. 23, 2007) .............................. 25 n.8

*Stone* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ............................................................... 20

*Tierney* v. *Vahle*,
    304 F.3d 734 (7th Cir. 2002) ....................................................... 27

*Venture Assocs. Corp.* v. *Zenith Data*,
    987 F.2d 429 (7th Cir. 1993) .................................................. 10 n.3

*Waber* v. *Dorman*,
    2011 WL 814992 (N.D. Ill. Feb. 23, 2011) .................................. 21

*Westmoreland County Employee Retirement System* v. *Parkinson*,
    727 F.3d 719 (7th Cir. 2013) .................................... 28, 35 n.13

*White* v. *Panic*,
    793 A.2d 356 (Del. Ch. 2000) ..................................................... 34

*White* v. *Panic*,
    783 A.2d 543 (Del. 2001) ............................................................. 16

*Wood* v. *Baum*,
    953 A.2d 136 (Del. 2008) ...................................................... 19, 31

**STATUTES**

805 Ill. Comp. Stat. Ann. 5/2.10(b)(3) ..................................................... 19

805 Ill. Comp. Stat. Ann. 5/7.75 ........................................................... 14

805 Ill. Comp. Stat. 5/7.80(b) .............................................................. 17

Del. Gen. Corp. L. § 102(b)(7) .............................................................. 19

Fed. R. Civ. P. 23.1(b)(3) .................................................................. 16

Fla. Stat. § 465.0276 ....................................................................... 7


**OTHER AUTHORITIES**

*Dispensing Controlled Substances for the Treatment of Pain*,
   71 Fed. Reg. 52,716 (2006) ............................................................ 8, 9

*In the Matter of Cardinal Health*,
   (D.E.A. Feb. 2, 2012) .................................................................. 12

*In the Matter of Holiday CVS, L.L.C.*,
   (D.E.A. Feb. 2, 2012) .................................................................. 12

The director defendants and nominal defendant Walgreens submit this memorandum in support of their motion to dismiss the complaint for failure to make a pre-suit demand on the Walgreens board of directors.

## PRELIMINARY STATEMENT

This derivative action arises from a June 2013 settlement agreement between Walgreens and the Drug Enforcement Administration relating to the sale and distribution of oxycodone at six Florida pharmacies and one distribution center. Although the DEA did not fault the Walgreens board in any respect for the conduct that led to the settlement, plaintiffs now claim that the directors should be held personally liable to the company for its losses. But plaintiffs fail to allege any facts linking the board to the alleged regulatory infractions in Florida, much less show that the directors acted with the bad faith necessary to subject them to personal liability. Indeed, the complaint fails to plead the substance of a single board meeting. It is thus completely devoid of any factual allegations showing that the directors knew about or participated in the events in Florida that led to the regulatory settlement.

The Walgreens directors have a statutory right to manage the affairs of the corporation, which includes the power to decide whether to bring litigation on the company's behalf. A shareholder who wishes to remedy a perceived wrong against the corporation must either make a demand upon the board to pursue redress or show that such a demand would have been futile. Plaintiffs did not make a demand on the Walgreens board before commencing this derivative action, and they must thus satisfy the stringent requirements for excusing demand. Their burden is especially difficult here because the overwhelming majority of the Walgreens board consists of independent, outside directors with no ties to Walgreens or management that might compromise their ability to consider a demand. As such, the Walgreens directors are entitled to a heightened presumption that they would consider a demand in good faith.

Plaintiffs' only argument for excusing demand is that the directors would be personally interested in the outcome of the decision to pursue the claims asserted in their complaint. To excuse demand on this theory, plaintiffs cannot rely on the assertion that the directors would have to sue themselves. Rather, they must plead particularized facts showing that the Walgreens directors face a "substantial likelihood" of personal liability on the claims. Under Illinois law and the standard exculpation provision in the Walgreens charter, the directors face no prospect of personal liability unless they acted in bad faith — that is, that they either deliberately violated the law or consciously disregarded their fiduciary duties.

The complaint does not come close to providing a particularized factual basis to accuse the Walgreens directors of such egregious conduct. There are no factual allegations that any of the Walgreens directors — who oversee a business operating more than 8,000 retail pharmacies and employing 27,000 pharmacists nationwide — were made aware of the short-term increase in oxycodone dispensing at a small number of Florida stores prior to the DEA's investigation. Instead, virtually every allegation in the complaint is couched alternatively in terms of what the directors "knew or should have known" or what is "reasonable to infer." In pleading this way, plaintiffs concede that they are unable to allege that the board actually knew about or participated in the underlying events. Not surprisingly, courts have repeatedly held that such empty allegations that "directors 'knew or should have known' about . . . misconduct are, *as a matter of law*, insufficient to excuse demand." *In re Xethanol Corp. Derivative Litig.*, 2007 WL 2331975, at *4 (S.D.N.Y. Aug. 16, 2007) (emphasis added); *accord Garza* v. *Belton*, 2010 WL 3324881, at *6 (N.D. Ill. Aug. 13, 2010).

Because plaintiffs cannot plead particularized facts showing that the directors were aware of the events in Florida that led to the regulatory settlement, they argue that certain

supposed "red flags" should have alerted the board to the possibility of a problem. They cite, for example, identical letters sent to two directors by a local police chief in Oviedo, Florida in early 2011. But there is no allegation that the letters were ever shared with the full board. And on their face, the letters relate to local law enforcement concerns at two pharmacies in one city in Florida. They do not accuse Walgreens employees of any wrongdoing, nor do they purport to warn of a wide-spread increase in oxycodone dispensing at other Florida stores. Plaintiffs similarly point to an August 2011 meeting between Walgreens employees and DEA personnel in Florida. But plaintiffs do not plead any particularized facts showing that the Walgreens directors were ever informed about this meeting or what was discussed at it.

Despite failing to allege that the Walgreens directors ever even learned about the issues in Florida before the DEA commenced its investigation, plaintiffs ask this Court to take the additional leap of concluding that the directors purposefully failed to act on this supposed knowledge because they were complicit in a "scheme" to "pump" oxycodone sales. But plaintiffs offer absolutely no factual support for the existence of such a scheme and cannot provide any plausible explanation for why the directors would consciously imperil the company or their own hard-earned reputations to pump sales of a single controlled substance at a small number of stores in one state.

Plaintiffs' scheme theory is also entirely inconsistent with their own allegations of what happened. By plaintiffs' own account, the increase in oxycodone volume at the Florida locations was caused not by some nefarious board-level plot, but by an exogenous event outside the directors' control — namely, a change in Florida law in late 2010 barring physicians from dispensing controlled substances to their patients and causing those patients to take their prescriptions to retail pharmacies. Plaintiffs' scheme theory is also rebutted by their own

allegations showing that, well before the DEA commenced its investigation in April 2012, Walgreens management had already taken steps to bring down the volume of oxycodone distribution and dispensing at the Florida locations to early 2010 levels. As the DEA itself acknowledged, "[i]n mid to late 2011 and continuing into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing at its high-volume pharmacies and in some cases did, in fact, achieve a relatively significant reduction in Schedule II dispensing at these stores."

Walgreens, of course, was not the only major company in the drug distribution chain to experience an increase in oxycodone volume after the change in Florida law. In early 2012, the DEA also took action against both Cardinal Health and CVS in connection with the distribution and dispensing of oxycodone in Florida. After these actions were resolved with the DEA, shareholders of Cardinal Health and CVS brought derivative suits alleging that the boards of those companies "knowingly and consciously" presided over systemic violations of federal regulations. *See Stanley* v. *Arnold*, 2012 WL 5269147 (S.D. Oh. Oct. 23, 2012), *aff'd*, 2013 WL 4105646 (6th Cir. Aug. 14. 2013); *Gordon* v. *Ryan*, 2013 R.I. Super. LEXIS 180, at *9 (R.I. Super. Oct. 1, 2013). Much like here, plaintiffs based their allegations not on particularized allegations about what the board was actually told, but on inferences about what the board must have known about the alleged misconduct. Both suits were dismissed for failure to make pre-suit demand. As explained by the district court in the Cardinal case: "Alleging the 'presence' of supposed red flags, and asserting that the Board 'had to be aware of the red flags,' cannot serve as a basis for liability." *Stanley*, 2012 WL 5269147, at *6.

These cases are directly on point. The allegations in the complaint here fall far short of pleading particularized facts showing that the Walgreens directors acted in bad faith. Pre-suit demand was required, and the complaint should be dismissed in its entirety.

## STATEMENT OF THE CASE

### A. Walgreens is the largest drug store chain in the nation.

Walgreens is a publicly traded Illinois corporation headquartered in Deerfield, Illinois. ¶ 26. Founded in 1901, Walgreens is the nation's largest drug store chain, with net sales of $71.6 billion last year and a market capitalization of approximately $44 billion. ¶¶ 26, 62. Walgreens operates more than 8,000 retail pharmacies, which engage in the sale of prescription and non-prescription drugs as well as general merchandise. ¶ 26. The company serves more than 6.3 million customers each day, and employs approximately 27,000 pharmacists who fill nearly 800 million prescriptions each year. ¶ 26. Walgreens' operations are supported by seventeen distribution centers in locations throughout the United States. ¶ 26; Walgreens 2013 Form 10-K, at 25 (Exhibit A).[1]

Walgreens also has a substantial presence overseas through its 45% stake in Alliance Boots, which distributes pharmaceuticals to more than 170,000 pharmacies, doctors, health centers, and hospitals from over 370 distribution centers in 20 countries. *See* Exhibit A, at 10. Alliance Boots and its affiliates also own and operate more than 3,000 beauty retail stores with pharmacies across nine countries, including the United Kingdom, Norway, the Republic of Ireland, the Netherlands, Thailand, and Lithuania. *Id.*

### B. Walgreens' board of directors is overwhelmingly independent.

Walgreens is overseen by a thirteen-director board that is overwhelmingly independent. ¶¶ 27-37, 38 n.4. All but three of the board members are independent, outside directors with no alleged connection to management or the company beyond their service on the

---

[1] This Court may take judicial notice of the contents of publicly disclosed SEC filings when, as here, the facts sought to be disclosed are not subject to dispute. *Garden City Emps. Ret. Sys.* v. *Anixter Int'l, Inc.*, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011).

board.  ¶¶ 27-37, 38 n.4.  The men and women who serve on the Walgreens board of directors

have distinguished themselves in the business world and elsewhere.  The board consists of:

| | |
|---|---|
| *James Skinner* | Mr. Skinner has served as Chairman of the Board since 2012.  He was formerly the CEO of McDonald's Corporation and serves as a trustee of the Ronald McDonald House Charities. |
| *Janice Babiak* | Ms. Babiak is a former Partner at Ernst & Young. |
| *David Brailer* | Mr. Brailer is the Chairman of Health Evolution Partners and has served as adjunct faculty at the Wharton School of Business. |
| *Steven Davis* | Mr. Davis is the CEO of Bob Evans Farms, Inc. and serves on the board of the James Cancer Hospital Foundation. |
| *William Foote* | Mr. Foote is an independent business advisor and serves as a trustee of Northwestern Memorial HealthCare in Chicago. |
| *Mark Frissora* | Mr. Frissora is the CEO of the Hertz Corporation. |
| *Ginger Graham* | Ms. Graham is the President and CEO of Two Trees Consulting, Inc. and serves as a director of the Circle of Life Hospice Foundation. |
| *Alan McNally* | Mr. McNally was formerly the Chairman of the Board of Walgreens and was its acting CEO from October 2008 to February 2009. |
| *Dominic Murphy* | Mr. Murphy is a Partner of Kohlberg Kravis Roberts and serves as a member of the Great Ormond Street Hospital Children's Charity Corporate Partnerships Board. |
| *Stefano Pessina* | Mr. Pessina is the Executive Chairman of Alliance Boots and serves on the board of Galenica AG, a publicly traded Swiss healthcare group. |
| *Nancy Schlichting* | Ms. Schlichting is the CEO of the Henry Ford Health System and formerly served as the President and CEO of Henry Ford Hospital. |
| *Alejandro Silva* | Mr. Silva is the CEO of Evans Food Group and serves as a director of the Chicago Transit Authority. |
| *Gregory Wasson* | Mr. Wasson is the President and CEO of Walgreens and has served on its board since 2009. |

Walgreens 2013 Schedule 14A, at 7-13 (Exhibit B).  Each of the directors — other than Messrs.

Murphy and Pessina — are defendants in this case.  ¶ 38 n.4.

**C.**     **Florida prohibits physicians from dispensing oxycodone.**

The substantive allegations in the complaint draw largely from the facts underlying the DEA's investigation of oxycodone dispensing in Florida. Oxycodone is an analgesic prescribed to manage acute and chronic pain. ¶ 2. It is often prescribed to patients suffering from cancer and other debilitating and terminal conditions to help make their lives more bearable. ¶ 2. While oxycodone unquestionably has important and legitimate medical uses, it also has the potential to be abused. ¶ 2. Over the last decade, the incidence of prescription drug abuse involving pain medication such as oxycodone has increased significantly throughout the United States. ¶ 64. And Florida, in particular, has experienced a substantial increase in oxycodone abuse. ¶ 3.

Beginning in 2010, the Florida legislature attempted to combat this problem. ¶ 78. Prior to 2010, Florida law permitted DEA-registered physicians to prescribe controlled substances and then dispense the drugs directly to their patients. ¶¶ 78, 80-81; *see also* FLA. STAT. § 465.0276(1) (1997). Under this regime, physicians opened and operated pain management clinics in which they would prescribe and dispense pain medications such as oxycodone. ¶ 3. By 2010, these clinics accounted for a very large percentage of the oxycodone distributed in the state. ¶ 76.

On June 4, 2010, in an effort to address the perception that physician dispensing was responsible for the diversion of controlled substances in Florida, the Governor approved an amendment to Florida law prohibiting doctors from dispensing "more than a 72-hour supply" of certain controlled substances, including oxycodone. ¶ 78; FLA. STAT. § 465.0276(1)(b) (2010); Laws 2010, c. 2010-211, § 11. As a result of the change in Florida law, the volume of oxycodone being dispensed by physicians in Florida plummeted:



**Monthly Oxycodone Sales to Practitioners 2009 - 2010**

¶ 79.  But because the pain clinic physicians could continue to prescribe controlled substances after the change in Florida law, many patients who had been filling prescriptions at their doctors' offices began bringing those prescriptions to retail pharmacies like Walgreens.  ¶ 81.

**D.      Walgreens responds to the rise in oxycodone prescriptions.**

              After the change in Florida law, Walgreens, which owns and operates 878 pharmacies in Florida, experienced a dramatic increase in the volume of oxycodone prescriptions written by physicians who had previously been dispensing controlled substances themselves. ¶¶ 61, 81, 84.  The influx of prescriptions put Walgreens and other retail pharmacies in the difficult position of figuring out which prescriptions to fill.  While plaintiffs suggest that this should have been an easy task for the personnel on the ground, the DEA has recognized that "the overwhelming majority of American physicians who prescribe controlled substances do so for legitimate medical purposes."  *Dispensing Controlled Substances for the Treatment of Pain*, 71 Fed. Reg. 52,716, 52,719 (2006).  And the DEA has also recognized that "there are no definitive

criteria" for prescribing and dispensing controlled substances for acute, chronic pain, and "one cannot provide an exhaustive and foolproof list of 'dos and don'ts.'" *Id.*

Following the change in Florida law, certain Walgreens pharmacies in Florida experienced a significant increase in oxycodone prescriptions. ¶ 84. As alleged by the DEA and recounted in the complaint, pharmacists at six Walgreens stores in Florida on some occasions missed "red flags" when making individual dispensing decisions, such as the fact that the prescribing doctor's office was located many miles from the pharmacy. ¶¶ 140-162. The vast bulk of the individual dispensing decisions questioned by the DEA and in the complaint are from early 2011, shortly after the change in Florida law. ¶¶ 140-162.[2]

To address these issues, Walgreens took a series of affirmative steps that successfully reduced the volume of oxycodone prescriptions being filled at its Florida pharmacies. ¶¶ 124, 128. For example, beginning in May 2011, Walgreens initiated a "Focus on Compliance" review, which identified the problem as stemming from the change in Florida law and directed employees to "review good faith dispensing practices . . . and report activities related to pain management prescriptions in pharmacies with the highest sales volume increases." Joint Appendix at 146-151, *Walgreen Co.* v. *DEA*, No. 12-1397 (D.C. Cir. Feb. 21, 2013) (Exhibit C); ¶¶ 124-125. In connection with that review, Walgreens employees discussed

---

[2]     Plaintiffs allege that other Walgreens pharmacies in addition to the six that were subject to DEA action experienced an increase in the volume of oxycodone prescriptions and that 44 Walgreens pharmacies were among the top 100 oxycodone purchasers in Florida in May 2012. ¶ 87. This figure is not surprising, given that plaintiffs themselves allege that Walgreens pharmacies dispensed one third of all prescription drugs in Florida. ¶ 63. More importantly, the DEA did not charge any other Walgreens pharmacies with improper dispensing decisions, nor have plaintiffs alleged facts showing that any other stores engaged in such conduct.

best practices for good faith dispensing with local pharmacies and completed a survey reporting information on local dispensing issues. *Id.* at 148-151.[3]

In addition, on August 19, 2011, Walgreens employees met with personnel from the DEA's Miami Field Division Office to discuss the volume of oxycodone dispensing at certain stores. ¶ 127. Following that meeting, Walgreens personnel implemented "Oxycodone Action Plans" to control the volume of oxycodone dispensing in districts across the state. ¶ 128.

These efforts effected a significant reduction in the volume of oxycodone dispensing at Walgreens' high-volume Florida stores. ¶ 84. The data referenced in the complaint show that well before the DEA commenced its investigation, the volume of oxycodone prescriptions at Walgreens' high-volume stores in Florida had fallen significantly. ¶ 84. As a result, by early 2012, these stores were dispensing approximately the same amount of oxycodone as they had in 2010. ¶ 84.

---

[3]   Plaintiffs extensively refer to the Focus on Compliance document in their complaint, and it is part of the publicly available Joint Appendix filed with the D.C. Circuit in *Walgreen Co.* v. *DEA*, No. 12-1397 (D.C. Cir. Feb. 21, 2013). It is therefore proper for this Court to take judicial notice of the Focus on Compliance review. *Venture Assocs. Corp.* v. *Zenith Data*, 987 F.2d 429, 431 (7th Cir. 1993) ("A plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so."); *Grimes* v. *Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002) ("[T]he Seventh Circuit has stated that I may take judicial notice of . . . matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.").



¶ 84.[4]  Although plaintiffs claim that Walgreens' efforts to address the growth in oxycodone in

Florida "ring hollow," the DEA itself acknowledged that "[i]n mid to late 2011 and continuing

into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing at its high-

volume pharmacies and in some cases did, in fact, achieve a relatively significant reduction in

Schedule II dispensing at these stores."  Compl. Ex. 1, App. B(i) at 11.

**E.      The DEA takes action against Cardinal Health, CVS, and Walgreens.**

Beginning in early 2012, the DEA initiated a series of enforcement actions against

other retail pharmacies and distributors relating to the increased volume of oxycodone dispensing

in Florida.  On February 2, the DEA issued an Immediate Suspension Order ("ISO") to Cardinal

---

[4]      Although included in plaintiffs' initial complaint, Compl. ¶ 60, No. 13-5471 (N.D. Ill.
July 31, 2013), ECF No. 1, the title of this exhibit:  "8 Florida Stores:  *Downward Trend in
Oxycodone Dispensing*" has been inexplicably deleted from plaintiffs' amended complaint, ¶ 84.

Health's distribution center in Lakeland, Florida, alleging that it had failed to maintain effective controls against diversion of oxycodone. *In the Matter of Cardinal Health*, at 1-2 (D.E.A. Feb. 2, 2012) (Exhibit D). The same day, the DEA issued ISOs to two CVS pharmacies in Florida that had been customers of Cardinal's Lakeland facility. *In the Matter of Holiday CVS, L.L.C.*, at 1-2 (D.E.A. Feb. 2, 2012) (Exhibit E).

Shortly after the actions against Cardinal and CVS, the DEA commenced a similar investigation of Walgreens. ¶ 99. On April 4, 2012, the DEA served Walgreens with a subpoena requesting information related to the Jupiter Distribution Center and certain Walgreens pharmacies. ¶¶ 99, 134. The DEA also served Administrative Inspection Warrants on six of the company's Florida pharmacies. ¶ 99. Upon receiving the subpoena, Walgreens voluntarily stopped dispensing Schedule II controlled substances at the pharmacies that had received inspection warrants, as well as two additional pharmacies. Compl. Ex. 1, App. B(i) at 11.

On September 13, 2012, the DEA issued an ISO to the Jupiter Center. ¶ 135. As alleged in the complaint, continuing into 2012 Walgreens had been actively enhancing its suspicious order reporting system to respond to feedback from the DEA and to set limits on the amount of controlled substances that pharmacies could order. ¶¶ 130-132. Nevertheless, the ISO alleged that the Jupiter Center had failed to detect and report suspicious orders by the Walgreens stores, failed to maintain effective controls against diversion, and failed to conduct adequate due diligence of its retail stores. ¶¶ 135-136; Compl. Ex. 1, App. B(i) at 4. Walgreens believed that the ISO was unjustified, and it sought immediate review in the D.C. Circuit and before a DEA administrative law judge. *See* Petition for Review, No. 12-1397 (D.C. Cir. Oct. 10, 2012); Compl. Ex. 1, App. C. The adequacy of Walgreens' suspicious order reporting program was actively litigated in these proceedings. *Id.*

Between November 26, 2012 and February 19, 2013, the DEA also issued Orders to Show Cause to the six pharmacies that had received Administrative Inspection Warrants, alleging that they had failed to maintain effective controls against diversion. ¶ 7. After receiving each order, Walgreens exercised its right to challenge the order before a DEA administrative law judge. *See* Compl. Ex. 1, App. C. In the D.C. Circuit and before the administrative law judge, Walgreens argued, among other things, that injunctive relief was not warranted because the company had largely corrected the Florida issues. *See Walgreen Co.* v. *DEA*, No. 12-1397 (D.C. Cir. Feb. 21, 2013); Compl. Ex. 1, App. C.

On June 11, 2013, Walgreens entered into a Settlement and Memorandum of Agreement ("MOA") with the DEA to resolve the litigation. ¶¶ 205-208; Compl. Ex. 1 at 3-4. In connection with that MOA, Walgreens agreed to pay $80 million, acknowledge that certain aspects of its operations at the Jupiter Center and several pharmacies did not meet DEA standards, and temporarily surrender the registrations of the Jupiter Center and six Florida pharmacies for dispensing controlled substances. ¶ 8; Compl. Ex. 1 at 3-7. The MOA also reflects that, in responding to the DEA's investigation, Walgreens had already implemented or was in the process of implementing various remedial measures at the time the settlement was announced. As part of the MOA, for example, Walgreens committed to maintain a Department of Pharmaceutical Integrity comprised of pharmacy personnel trained in diversion-related issues, and to maintain certain limits for its suspicious order reporting system. Compl. Ex. 1 at 12-14. In resolving its investigation, the DEA took no action against any Walgreens employee, let alone any board member. Compl. Ex. 1.

The settlement with the DEA, which represents approximately 0.1% of Walgreens' annual revenue, had no effect on the company's share price, which is up 76% over the past year and 21% since the announcement of the settlement.[5]

**F.     Plaintiffs bring these derivative actions without alleging the substance of a single board meeting.**

Shortly after the MOA became public, the Robbins Arroyo law firm sent Walgreens a letter on behalf of a shareholder seeking to inspect certain books and records relating to the DEA settlement pursuant to 805 ILL. COMP. STAT. ANN. 5/7.75. In response to that request, Walgreens produced all board minutes and materials distributed to the Walgreens board concerning the DEA's investigation and the facts underlying that investigation.

Separately, on July 31, 2013, Labaton Sucharow filed this derivative complaint against Walgreens' board of directors on behalf of purported shareholders Steamfitters Local # 449 Retirement Security Fund, West Palm Beach Police Pension Fund, and the Police Retirement System of St. Louis. *See* Complaint, No. 13-5471 (N.D. Ill. July 31, 2013). Less than two weeks later, Motley Rice filed a separate derivative suit raising substantially similar allegations against the board on behalf of purported shareholder Miami Firefighters' Relief & Pension Fund. *See* Complaint, No. 13-5775 (N.D. Ill. Aug. 13, 2013).

On September 13, 2013, this Court entered an order consolidating the two actions and appointing Labaton Sucharow and Motley Rice co-lead counsel. On September 17, 2013, the Court adopted the parties' proposed scheduling order. Following the entry of those orders, Robbins Arroyo indicated that it intended to join the amended complaint to be filed by co-lead

---

[5]     Walgreens Historical Stock Price, Yahoo! Finance (last visited Dec. 2, 2013), *available at* http://finance.yahoo.com/q/hp?s=WAG&a=11&b=3&c=2012&d=11&e=2&f=2013&g=d&z=66&y=0.

counsel.  At the request of plaintiffs, on September 27, Walgreens produced to co-lead counsel the same board minutes and materials that it had produced to Robbins Arroyo.

On October 4, 2013, plaintiffs filed their amended complaint, which asserts a claim for breach of fiduciary duty against the directors seeking to hold them personally liable to Walgreens for the cost of the DEA settlement.  The theory of the complaint is that the Walgreens directors "knew" that pharmacists had been improperly filling oxycodone prescriptions at the Florida stores and purposefully "foster[ed]" the practice as part of a "Company-wide scheme" to "pump sales" of oxycodone.  ¶¶ 9, 54, 90, 243.  Though the plaintiffs received all board minutes and materials concerning the DEA investigation and the facts underlying that investigation, the complaint does not plead the substance of a single board meeting or communication among the directors to support that claim.

**ARGUMENT**

**POINT I**

**TO EXCUSE DEMAND, PLAINTIFFS MUST PLEAD PARTICULARIZED FACTS SHOWING THAT THE WALGREENS DIRECTORS ACTED IN BAD FAITH**

**A.      Demand excusal must be pleaded with particularity.**

It is a cardinal precept of corporate law that the "'directors of a corporation and not its shareholders manage the business and affairs of the corporation.'" *Sherman* v. *Ryan*, 392 Ill. App. 3d 712, 722 (2009) (quoting *White* v. *Panic*, 783 A.2d 543, 550 n.18 (Del. 2001)).[6]  The right to manage the business and affairs of the corporation includes the right to decide whether to "bring a law suit or to refrain from litigating a claim on behalf of a corporation." *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990); *accord In re Biosante Pharm., Inc.*, 2013 WL 4829122 (N.D. Ill. Sept. 11, 2013).  Because a shareholder derivative suit, "by its very nature, infringes on directorial freedom," *Bronstein* v. *Austin*, 2008 WL 4735230, at *3 (N.D. Ill. May 30, 2008), a shareholder who wishes to cause a corporation to pursue a lawsuit must "make a demand upon the board of directors to enforce a corporate right or demonstrate that extraordinary conditions exist to excuse such a pre-suit demand," *Silver* v. *Allard*, 16 F. Supp. 2d 966, 968 (N.D. Ill. 1998); *Hale* v. *Chu*, 614 F.3d 741, 742 n.1 (7th Cir. 2010).

Where, as here, a shareholder fails to make a demand, the complaint must be dismissed unless the shareholder demonstrates *with particularity* that such a pre-suit demand would have been futile.  FED. R. CIV. P. 23.1(b)(3) (requiring a shareholder to "state with particularity . . . any effort to obtain the desired action from the directors . . . [and] the reasons

---

[6]      Walgreens is an Illinois corporation, ¶ 26, and Illinois law governs the requirement for pleading demand futility, *see Kamen* v. *Kemper Financial Services, Inc.*, 500 U.S. 90, 96 (1991). Illinois law, in turn, follows Delaware law on that issue.  *See Bronstein* v. *Austin*, 2008 WL 4735230, at *3 (N.D. Ill. May 30, 2008); *accord Silver* v. *Allard*, 16 F. Supp. 2d 966, 969 (N.D. Ill. 1998).

for not obtaining the action or not making the effort"); *accord* 805 Ill. Comp. Stat. 5/7.80(b).

The particularized pleading requirement for derivative actions "represents a deliberate departure from the relaxed policy of notice pleading promoted elsewhere in the Federal Rules." *Kamen* v. *Kemper Financial Services, Inc.*, 659 F. Supp. 1153, 1161 (N.D. Ill. 1987). When factual particularity is required, "[i]t is not enough for the shareholder 'to state in conclusory terms that he made no demand because it would have been futile.'" *Starrels* v. *First Nat'l Bank of Chicago*, 870 F.2d 1168, 1170 (7th Cir. 1989) (affirming dismissal of derivative action); *accord Garza* v. *Belton*, 2010 WL 3324881 (N.D. Ill. Aug. 13, 2010).

**B.      To excuse demand, plaintiffs must plead particularized facts establishing that the directors face a substantial likelihood of personal liability.**

Illinois law follows Delaware law with respect to the standard for determining demand futility. *E.g.*, *Bronstein* v. *Austin*, 2008 WL 4735230, at *3 (N.D. Ill. May 30, 2008). Delaware, in turn, has articulated two tests for determining when demand is futile. The first, set forth in *Aronson* v. *Lewis*, 473 A.2d 805 (Del. 1984), applies where a shareholder challenges a corporate transaction approved by the board. For demand to be excused under *Aronson*, plaintiffs must allege with particularity facts creating a reasonable doubt that: "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* at 814. To satisfy *Aronson*'s second prong, the complaint must allege particularized facts sufficient to demonstrate that the board members face a "*substantial likelihood* of director liability." *Id.* at 815 (emphasis added); *accord Guttman* v. *Huang*, 823 A.2d 492, 500 (Del. Ch. 2003).

The second test for determining demand futility, set forth in *Rales* v. *Blasband*, 634 A.2d 927 (Del. 1993), applies when a stockholder does not challenge a board decision on a transaction but instead asserts claims based on director inaction, such as a "failure to oversee

subordinates." *Id.* at 933-34 n.9. These cases do not fall within the *Aronson* "paradigm" because they do not involve "a *decision* of the board." *Id.* Demand excusal in this context focuses on whether "the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

While the *Aronson* and *Rales* tests might appear different at first blush, the "singular inquiry" of *Rales* "makes germane all of the concerns relevant to both the first and second prongs of *Aronson*." *Guttman* v. *Huang*, 823 A.2d 492, 501 (Del. Ch. 2003). Where, as here, a shareholder alleges that a majority of the board acted wrongfully, "the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*," and dismissal is required unless plaintiffs plead particularized facts showing that the directors face a "substantial likelihood" of personal liability. *Id.*

A "substantial likelihood" of director liability exists only in "rare cases" where plaintiffs can plead particularized facts that overcome the presumption that directors have acted in good faith. *Aronson*, 473 A.2d at 815; *accord Gordon* v. *Goodyear*, 2012 WL 2885695, at *8 (N.D. Ill. July 13, 2012). The "mere threat of personal liability" does not suffice. *Id.* A derivative plaintiff thus cannot avoid the demand requirement merely by naming the directors as defendants: The "bootstrap argument" that "directors could not be expected to sue themselves . . . raises no legally cognizable issue," because "[i]ts acceptance would effectively abrogate [the demand requirement] and weaken the managerial power of directors." *Id.* at 818; *accord Gordon*, 2012 WL 2885695, at *8.

**C.    To establish a substantial likelihood of liability, plaintiffs must allege particularized facts establishing bad faith.**

The Walgreens charter, like the charters of virtually all major public corporations, includes a standard exculpatory provision clearly stating that its directors are fully immunized from monetary liability for breaches of the duty of care, including gross negligence. ¶ 44. As the charter provides:

> The Directors of the Corporation shall not be liable to the Corporation or to the shareholders of the Corporation for monetary damages for breach of fiduciary duties as a Director, provided that this provision shall not eliminate or limit the liability of the Director (i) for any breach of the Director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of the law, . . . or (iv) for any transaction from which the Director derived an improper personal benefit.

Walgreens Articles of Incorporation at 6 (Exhibit F). Such provisions are expressly authorized by 805 ILL. COMP. STAT. ANN. 5/2.10(b)(3). *See also* DEL. GEN. CORP. L. § 102(b)(7).

Thus, to establish that the Walgreens directors face a "substantial likelihood" of liability, plaintiffs must plead particularized facts showing that the conduct of the directors falls within one of the enumerated carve outs to exculpation — that is, that they breached their duties of loyalty, intentionally violated the law, or otherwise acted in a manner that was not in good faith. *In re Biosante Pharm., Inc.*, 2013 WL 4829122 (N.D. Ill. Sept. 11, 2013) (considering exculpatory provision in dismissing derivative action for failure to make pre-suit demand); *see also Wood* v. *Baum*, 953 A.2d 136, 141 (Del. 2008) ("Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." (quotation marks omitted)).

Derivative plaintiffs seeking to challenge the good faith of a board of directors following an adverse regulatory action cannot simply "equate a bad outcome with bad faith."

*Stone* v. *Ritter*, 911 A.2d 362, 373 (Del. 2006). As courts have repeatedly recognized, "even the most diligent board cannot guarantee that an entire organization will always comply with the law." *See In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 653 (Del. Ch. 2008). Thus, to establish bad faith, plaintiffs are required to plead particularized facts showing that the directors engaged in an "intentional dereliction of duty," *In re Walt Disney*, 906 A.2d 27, 66 (Del. 2006), or "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [their] duties," *Stone*, 911 A.2d at 369.

Where a board was *unaware* of the events leading to corporate liability, the standard for establishing bad faith is set forth in *In re Caremark* and *Stone*. To make this showing, plaintiffs must plead particularized facts showing that matters failed to come to the board's attention due to "a *sustained or systematic* failure of the board to exercise oversight — such as an *utter failure* to attempt to assure a reasonable information and reporting system exists." *In re Caremark*, 698 A.2d 959, 971 (Del. Ch. 1996) (emphasis added). Such a claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone*, 911 A.2d at 372. To satisfy this standard, plaintiffs must allege that the directors' dereliction of duty was extreme — "that their indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance." *Desimone* v. *Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007).

In the face of this stringent standard, derivative plaintiffs often conclusorily allege that directors "knew" of underlying misconduct within the interior of the corporation yet consciously chose not to correct it. When plaintiffs frame their demand excusal argument in these terms, however, plaintiffs must substantiate their allegation of bad faith with particularized

facts showing that the directors actually knew of the underlying misconduct and deliberately refrained from taking steps to remedy the situation. The courts will not excuse demand simply because a corporation suffered an adverse regulatory outcome. *See, e.g.*, *In re Google, Inc. Shareholder Derivative Litig.*, 2012 WL 1611064, at *2, *11 (N.D. Ca. May 8, 2012) (dismissing derivative action based on conclusory allegations that directors disregarded conduct that led to $500 million fine by the DOJ and a non-prosecution agreement); *In re Goldman Sachs Group, Inc. Shareholder Litig.*, 2011 WL 4826104, at *5, *20-21 (Del. Ch. Oct. 12, 2011) (dismissing derivative action based on conclusory allegations that directors disregarded conduct resulting in imposition of a $535 million civil penalty by the SEC); *King* v. *Baldino*, 648 F. Supp. 2d 609, 620, 623-624 (D. Del. 2009) (dismissing derivative action based on conclusory allegations that directors disregarded conduct resulting in $425 million penalty by the DOJ).

As courts in this district have repeatedly confirmed, "[t]o the extent intent, knowledge, or scienter is necessary to support [plaintiffs' allegations of] demand futility . . . , facts supporting such an inference must be alleged with particularity." *Fojas* v. *Ackerman*, No. 08-0423, at 3 (N.D. Ill. Aug. 21, 2008) (Exhibit G); *see also In re Biosante Pharm., Inc.*, 2013 WL 4829122, at *7 (N.D. Ill. Sept. 11, 2013) (rejecting conclusory allegations that the board "must have known" that disclosures were misleading); *Oakland County Employees' Retirement System* v. *Massaro*, 772 F. Supp. 2d 973, 975 (N.D. Ill. 2011) (rejecting "carefully worded" allegations that failed to include particularized facts establishing actual knowledge); *Waber* v. *Dorman*, 2011 WL 814992, at *7 (N.D. Ill. Feb. 23, 2011) (refusing to excuse demand where plaintiff failed to "provide the particulars for what the board knew, how they learned it, or when they learned it"); *Garza* v. *Belton*, 2010 WL 3324881, at *5-6 (N.D. Ill. Aug. 13, 2010) (finding

conclusory allegations that directors "knew" of accounting violations insufficient to excuse demand).[7]

Very recently, for example, in *Marvin H. Maurras Revocable Trust* v. *Bronfman*, 2013 WL 5348357, at *14 (N.D. Ill. Sept. 24, 2013), Judge Feinerman held that demand was not excused in a suit alleging that the directors breached their fiduciary duties by "knowingly causing or permitting Accretive to violate various state and federal laws," leading to a more than *40% decline* in the company's stock price. The plaintiffs alleged that the Accretive directors must have had knowledge of wrongdoing because, *inter alia*, the company previously had settled a large number of civil suits related to the same legal violations, and the company had failed to obtain a license necessary for one of its core areas of service. *Id.* at *6-7. The court rejected plaintiffs' conclusory allegations of knowledge, finding that "nothing in . . . the complaint as a whole raises the reasonable inference that [the directors] actually *knew* of Accretive's unlawful practices, as opposed to being simply ignorant of these practices." *Id.* at *9.

---

[7]    By contrast, cases that have excused demand have contained particularized facts demonstrating that the directors had knowledge of the misconduct and failed to take any action. For example, in *In re Abbott Labs.*, 325 F.3d 795 (7th Cir. 2003), the Seventh Circuit held that plaintiffs had pled "conscious inaction" by the board in the face of repeated violations of FDA regulations over a six-year period, where: (1) at least ten meetings were held between the FDA and senior Abbott Labs executives, including a member of the board of directors; (2) no fewer than three FDA Warning Letters detailing regulatory violations were sent to two different chairmen of the board of directors, in their capacity as chairmen, over a six-year period; (3) national news outlets, including the *Wall Street Journal* and *Bloomberg News* reported on Abbott Labs' FDA problems and publicly disclosed one of the FDA Warning Letters; (4) Abbott Labs entered into a consent decree with the FDA that required it to pay a $100 million civil fine and destroy and suspend products that accounted for approximately $250 million in annual revenue; and (5) Abbott Labs had put out a press release and made SEC filings disclosing the regulatory issues. *Id.*

**D.** **Courts have dismissed similar derivative suits against the boards of Cardinal Health and CVS arising out of oxycodone sales in Florida.**

In applying these same principles, courts have recently dismissed derivative suits brought against the boards of Cardinal Health and CVS in connection with DEA sanctions relating to the dispensing of oxycodone in Florida after the 2010 change in Florida law. In each of these cases, the court held that pre-suit demand was not excused.

On May 15, 2012, Cardinal Health announced that it had entered into a memorandum of agreement with the DEA to resolve the agency's investigation of its distribution center in Lakeland, Florida as a result of a spike in oxycodone distribution. *Stanley* v. *Arnold*, 2012 WL 5269147, at *3 (S.D. Oh. Oct. 23, 2012), *aff'd*, 2013 WL 4105646 (6th Cir. Aug. 14, 2013). Shortly thereafter, a shareholder sued the company's board of directors for "'knowingly and consciously presid[ing] over the Company's systemic violations' of federal regulations" in connection with the dispensing of oxycodone in Florida. *Id.* at *5. The shareholder argued that the board was faced with numerous "red flags" that should have alerted the directors to misconduct, including that Cardinal Health had previously been required to pay a "record breaking" $34 million fine to the DEA in connection with the improper distribution of hydrocodone at the Lakeland facility — the same facility that was the subject of the DEA's investigation. *Id.* at *5-6.

The district court rejected these arguments, and dismissed the shareholder's suit for failure to adequately allege demand futility. Although Cardinal Health is an Ohio corporation, Ohio law looks to Delaware law and the court applied the *Rales* test in concluding that the plaintiff had failed to establish that a majority of the board faced a substantial likelihood of liability. As the court explained: "Alleging the 'presence' of supposed red flags, and asserting that the Board 'had to be aware of the red flags,' cannot serve as a basis for liability.

Mere allegations that the individual Defendants knew about the alleged wrongdoings because they were directors and did 'director-type' things . . . would circumvent the demand requirement in almost any derivative suit . . . ." *Id.* at *6. A unanimous Sixth Circuit panel affirmed the district court's "well-reasoned" opinion. *Stanley* v. *Arnold*, 2013 WL 4105646, at *2 (6th Cir. Aug. 14, 2013). In particular, the Sixth Circuit held that prior action by the DEA was an insufficient basis for inferring "that the directors knew or had reason to know of continuing problems at the Lakeland facility prior to" the 2012 ISO. *Id.* at *1.

A shareholder of CVS likewise brought a similar derivative suit against the company's directors after the DEA took action against CVS pharmacies in connection with increased dispensing of oxycodone after the change in Florida law. The plaintiff alleged that "a majority of the Board [had] actual knowledge of the illegal wrongdoing and the Board consciously decided not to act" to prevent the misconduct. *Gordon* v. *Ryan*, 2013 R.I. Super. LEXIS 180, at *9 (R.I. Super. Oct. 1, 2013). Once again, however, the court dismissed for failure to make pre-suit demand. The court applied the *Rales* test, finding that the plaintiff had "fail[ed] to plead . . . direct knowledge on the part of the Board to form the basis of a conscious decision." *Id.* at *10. Because the plaintiff had failed to allege particularized facts supporting demand futility, the court dismissed. *Id.* at *21-22.

# POINT II

## THE COMPLAINT MUST BE DISMISSED FOR
## FAILURE TO ALLEGE PARTICULARIZED FACTS
## ESTABLISHING THAT DEMAND WAS EXCUSED

Plaintiffs concede that the overwhelming majority of the Walgreens board is independent. Their demand excusal argument, therefore, depends on whether the complaint contains particularized allegations showing that a majority of the board faces a substantial likelihood of liability for acting in bad faith. Plaintiffs make no effort to plead a failure of oversight claim by trying to establish that the board "utterly failed" to maintain a system of information and reporting. They readily concede, for example, that Walgreens had and has a legal and compliance function and an Audit Committee that has met regularly over the years. Rather, the essence of plaintiffs' demand excusal argument is that the Walgreens directors face a substantial likelihood of liability because they were supposedly aware of the short-term increase in oxycodone dispensing in Florida some time before the DEA commenced its investigation in April 2012 and consciously disregarded their obligations to address and fix those problems. ¶¶ 220-244. Neither of those assertions withstands scrutiny.[8]

---

[8] Although ultimately irrelevant, plaintiffs' arguments contesting the independence of Messrs. Wasson, Murphy, and Pessina lack merit. Plaintiffs conflate the standard for independence in a proxy statement with the standard for independence for purposes of demand futility. In the context of derivative litigation, directors are *presumed* to be independent. *In re Paxson Commc'n Corp. Shareholders Litig.*, 2001 WL 812028, at *9 (Del. Ch. July 12, 2001). And Mr. Wasson's status as an officer standing alone is insufficient to show that he lacks independence. *See, e.g., Ji* v. *Van Heyningen*, 2006 WL 2521440, at *7 (D.R.I. Aug. 29, 2006) ("Mere allegations of dual director and officer status do not amount to particularized fact allegations showing interest or lack of independence."). Similarly, the business relationships between Messrs. Murphy's and Pessina's respective employers and Walgreens are insufficient to overcome the presumption that they are independent. *See Stiegele ex rel. Viisage Tech., Inc.* v. *Bailey*, 2007 WL 4197496, at *7 (D. Mass. Aug. 23, 2007).

**A.      The complaint contains no particularized allegations showing that the directors were aware of the issues in Florida.**

Here, as in *Cardinal Health* and *CVS*, plaintiffs do not substantiate their claims of board knowledge with *any* particularized facts showing that the directors became aware of the problems in Florida in time to avoid a regulatory sanction. In fact, plaintiffs do not plead the substance of a single board meeting before or after the DEA warrants issued in April 2012. Nor do they plead the substance of any board-level presentation. The complaint sheds absolutely no light on what the board was actually told about anything of relevance. Instead, every allegation in the complaint relating to the directors' purported knowledge is qualified by what the directors "knew or should have known" or what is "reasonable to infer."[9]

Such "cursory contentions of wrongdoing" are not a substitute for pleading particularized facts. *Desimone* v. *Barrows*, 924 A.2d 908, 928, 939 (Del. Ch. 2007). As this Court has stated, "[a]llegations that directors knew or should have known of, and failed to stop, illegal conduct are insufficient to excuse demand where the complaint fails to show with particularity that a majority of the board was . . . aware of the wrongdoing and deliberately looked the other way." *Shields* v. *Erickson*, 710 F. Supp. 686, 692 (N.D. Ill. 1989); *In re Xethanol Corp. Derivative Litig.*, 2007 WL 2331975, at *4 (S.D.N.Y. Aug. 16, 2007) ("Mere

---

[9]      *See* ¶ 13 ("[T]he Board either knew or should have known about the Jupiter Center's manager's concerns."); ¶ 14 ("[T]he Board knew or should have known of the possible instances of diversion."); ¶ 106 ("[T]he Board knew or should have known about [Chief Chudnow's concerns].""); ¶ 113 ("[T]he Individual Defendants knew or should have known that . . . the Jupiter Center shipped 145,300 oxycodone pills to the Oviedo pharmacy in July 2011."); ¶ 127 ("[T]he Board knew or should have known that [the August 19, 2011 DEA] meeting was taking or took place and of the substance of the discussions."); ¶ 132 ("[T]he Board knew or should have known [about issues with the suspicious order reporting] policies and reporting systems."); ¶ 133 ("[I]t is reasonable to infer that the Board knew or should have known that the Company was violating the applicable provisions of the CSA.").

conclusory allegations . . . that the directors 'knew or should have known' about . . . misconduct are, as a matter of law, insufficient to excuse demand.").

It is easy to see what is wrong with plaintiffs' "knew or should have known" formulation. In pleading this way, plaintiffs are conceding that they do not actually know whether the board learned a particular fact or not. That is reason enough to dismiss the complaint. What is more, through reliance on the "should have known" component of the allegation, plaintiffs cannot even say that the *directors themselves* are at fault for not knowing a particular fact. Even if the Court were to conclude that Walgreens management "should have" brought an issue to the board's attention, that is no basis to blame the *directors*, let alone conclude that they acted in bad faith. *In re Citigroup Inc.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) ("How, exactly, a member of the . . . board of directors was supposed to be put on inquiry notice by something he or she never saw or heard of is not explained.").

Plaintiffs' reliance on "knew or should have known" allegations is especially egregious in this case because plaintiffs asked for and received the Walgreens board minutes and presentations related to the DEA investigation. Courts have repeatedly instructed plaintiffs to pursue books and records requests to gather the information necessary to substantiate their derivative claims with particularized facts. *E.g.*, *Beam* v. *Stewart*, 845 A.2d 1040, 1056 (Del. 2004). Yet notwithstanding the plaintiffs' receipt of these documents, the complaint is tellingly devoid of any particularized allegation demonstrating that board members had knowledge of the events giving rise to the DEA action. *See Tierney* v. *Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (Posner, J.) (A plaintiff cannot "evade dismissal . . . simply by failing to attach to his complaint a document that proved that his claim had no merit.").

Complaints that have successfully pled demand futility have relied not on conclusory allegations like those leveled here, but rather on particularized factual allegations about what the board was told and what it did. For example, in *Westmoreland County Employee Retirement System* v. *Parkinson*, 727 F.3d 719 (7th Cir. 2013), the Seventh Circuit held that the plaintiffs had successfully pled that the board of Baxter was aware of violations of FDA regulations over a six-year period, where: (1) company records showed that the board discussed the faulty products at least 28 times over a four-year period; (2) the board's Audit Committee reviewed matters related to the faulty products at least 19 times; (3) the board's Public Policy Committee reviewed matters related to the faulty products at least 13 times; and (4) "repeated warnings from the FDA . . . were directly communicated to [the] CEO . . . and passed along to the board of directors." *Id.* at 722, 726.

In this case, by contrast, there are no specific factual allegations about what the directors actually discussed at *any* board or committee meetings. Instead, plaintiffs repeatedly claim — without any supporting factual allegations — that the Court should infer that the short-term increase in demand for a single drug at a handful of stores in a single state must have been discussed at some time or other. None of these allegations suffice.

The Chudnow letters. The *only* communications involving board members that are even referenced in the complaint are two letters that the Oviedo Chief of Police, Jeffrey Chudnow, sent to then-Chairman Alan McNally and CEO Greg Wasson. Those letters stated that a number of drug-related arrests had been made in the parking lots of the two Walgreens pharmacies in the City of Oviedo, Florida. ¶ 108. They do not purport to warn about a widespread increase in oxycodone dispensing in Florida, nor do they reference any incidents outside of Oviedo. Far from raising an issue requiring attention by Walgreens' full board, on their face,

the letters appear to relate to local law enforcement concerns at two pharmacies in one city in Florida, out of the more than 8,000 pharmacies that Walgreens was operating nationwide.

The complaint, moreover, does not explain what happened to the Chudnow letters after they were allegedly sent. The complaint does not allege that the letters were ever actually received by McNally or Wasson, nor does it allege that the letters were shared with the rest of the board. Nevertheless, without *any* factual support, plaintiffs advance the meritless claim that the letters sent to McNally and Wasson put "the entire Board on notice of substantial wrongdoing." ¶ 113. But absent a particularized allegation that the letters were, in fact, shared or discussed with the rest of the board, plaintiffs' conclusory allegation is plainly defective. Indeed, courts have squarely rejected the "contention that knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service." *Desimone* v. *Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007); *accord Marvin H. Maurras Revocable Trust* v. *Bronfman*, 2013 WL at 5348357, at *8 (N.D. Ill. Sept. 24, 2013) (refusing to infer that CEO shared information with other directors); *In re Google, Inc. Shareholder Derivative Litigation*, 2012 WL 1611064, at *7 (N.D. Ca. May 8, 2012) (refusing to infer that information in letter sent to one director was conveyed to other directors).

The August 2011 DEA meeting. Plaintiffs also allege that "it is reasonable to infer" that "the Board knew or should have known that [the August 19, 2011] meeting [with the DEA] was taking or took place and of the substance of the discussions" because there were "high-level attendees" at that meeting. ¶ 127. Once again, plaintiffs' "knew or should have known" formulation underscores the fact that they are unable to allege that the August 2011 meeting was actually reported to the board. Nor is there any reason to "infer" that it was. There is no allegation that the participants at this meeting ever attended a board meeting or spoke to the

directors, and there is no allegation that anyone from Walgreens left the meeting believing that the problems in Florida would not be addressed at the management level or that regulatory action by the DEA was being contemplated. *In re Caremark*, 698 A.2d 959, 968 (Del. Ch. 1996) ("Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.").

The 2008 Corporate Integrity Agreement. Plaintiffs also rely on a 2008 Corporate Integrity Agreement ("CIA") between Walgreens and the Department of Health and Human Services. Based on that agreement, plaintiffs argue that it is "reasonable to infer" that virtually every event taking place at Walgreens was reported to the board. ¶¶ 13, 106. This agreement, however, had nothing to do with controlled substances; rather, it settled claims related to the alleged substitution of different forms of medication delivery in connection with Medicaid reimbursement claims. CIA Press Release at 1 (Exhibit H). The conduct at issue ended in 2005. *Id.* And, as the agreement itself states, it was designed "to enhance Walgreen Co.'s compliance with the statutes, regulations, and written directives *of Medicare, Medicaid, and all other Federal health care programs* (as defined in 42 U.S.C. § 1320a-7b(f))." CIA at 1 (Exhibit I). Notably, neither the DEA nor the OIG accused Walgreens of violating the CIA, and it is not mentioned in any of the orders to show cause or the pre-hearing statements. Compl. Ex. 1.[10]

---

[10]     Plaintiffs' reference to the CIA appears to be a misguided attempt to liken this case to Judge Kendall's decision in *In re Abbott Depakote*, 2013 WL 2451152 (N.D. Ill. June 5, 2013). In *Abbott Depakote*, shareholders of Abbott Labs brought a derivative suit against the board of directors after Abbott Labs pleaded guilty to a criminal charge and agreed to pay *$1.6 billion* in connection with the improper marketing of Depakote. *Id.* at *2. In determining whether the board had knowledge of the alleged misconduct, the district court considered, among other things, that Abbott Labs had previously entered into a CIA *for the improper marketing of another prescription drug* and that that agreement had put in place policies and controls designed to bring this type of misconduct to the attention of the board.

Other prior regulatory settlements.  Apart from the CIA, plaintiffs also cite to five regulatory matters involving individual Walgreens pharmacies in five different states over the last 8 years.  ¶¶ 182-192.  None involved the issues in Florida, and plaintiffs do not even allege that they involved the dispensing of oxycodone.  There is no allegation, moreover, that these unrelated, one-off settlements were ever discussed with the board or otherwise could have alerted the directors to the increase in oxycodone dispensing following the change in Florida law.[11]

Standing board committees.  Plaintiffs also allege that the mere existence of standing board committees, including the Audit and Governance Committees, suggests that the directors "should have" been aware of the increase in oxycodone dispensing in Florida.  Courts have routinely rejected such allegations, which would serve as an end run around the demand requirement in virtually every case.  *E.g.*, *Garza* v. *Belton*, 2010 WL 3324881, at *9 (N.D. Ill. Aug. 13, 2010) (holding allegations that defendant directors were members of a corporation's audit committee to be insufficient to plead "conscious inaction"); *Wood* v. *Baum*, 953 A.2d 136, 142-143 (Del. 2008) (Plaintiffs' "assert[ion] that membership on the Audit Committee is a sufficient basis to infer the requisite scienter . . . is contrary to well-settled Delaware law.").

Newspaper stories.  Plaintiffs also attempt to impute notice to the board by pointing to 203 newspaper articles over a 26-year period from local press around the nation.  Plaintiffs do not attach the articles to their complaint or allege that the board members read any of them.  A review of the articles shows why.  Virtually all of them describe misconduct, not by

---

[11]     As plaintiffs acknowledge, in connection with an April 2011 agreement relating to a single San Diego pharmacy, Walgreens pledged to maintain a compliance program at all of its retail pharmacies.  ¶ 189.  This agreement came well after the change in Florida law and coincided with Walgreens' efforts to combat the growth of oxycodone dispensing in Florida. Although the complaint is void of any factual allegations relating to what efforts Walgreens made to implement the agreement, shortly after the agreement was signed the volume of oxycodone dispensing in Florida declined dramatically.  ¶ 84.

Walgreens, but by Walgreens *customers*. Compl. Ex. 2. The incidents discussed in the articles include, for example, a report in the *Hartford Courant* that a couple was arrested after attempting to fill a false prescription for Percocet at a Walgreens pharmacy in 2007. Plaintiffs fail to allege that the directors read any of the articles, and the complaint provides no basis whatsoever for a conclusion that the local press coverage of these various incidents over a 26-year period put the board on notice of the regulatory issues in Florida that led to the DEA settlement.

Confidential sources. Plaintiffs' allegations based on their confidential witnesses also fail to establish knowledge on the part of the board. ¶¶ 193-204. None of the confidential sources are alleged to have interacted with the directors or to have any personal knowledge about what the directors were told. Thus, even if taken at face value, the statements made by plaintiffs' confidential witnesses amount to nothing. The only allegation made by any of plaintiffs' witnesses that is in any way tied to the board is the unremarkable allegation that "some" board members may have had "access to" a Walgreens system that, among other things, can be used to track store-to-store prescription filling. ¶¶ 196-197. Apparently, plaintiffs wish to intimate from this observation that perhaps "some" board member "could have" searched among the countless prescriptions for myriad drugs being filled across Walgreens' more than 8,000 pharmacies and spotted the short-lived trend of increased oxycodone dispensing at six Florida pharmacies. Such an allegation pleads nothing to establish any board member's awareness of a potential regulatory issue in Florida. *See Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' . . . . Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

*          *          *

Plaintiffs' allegations regarding the directors' supposed knowledge of the problems in Florida are no different than the allegations brought against the boards of Cardinal Health and CVS — allegations that were deemed insufficient to excuse demand. "Alleging the 'presence' of supposed red flags, and asserting that the Board 'had to be aware of the red flags,' cannot serve as a basis for liability." *Stanley* v. *Arnold*, 2012 WL 5269147, at *6 (S.D. Oh. Oct. 23, 2012), *aff'd*, 2013 WL 4105646 (6th Cir. Aug. 14, 2013); *Gordon* v. *Ryan*, 2013 R.I. Super. LEXIS 180 (R.I. Super. Oct. 1, 2013).

**B.    Plaintiffs' "scheme" theory is frivolous and fails to establish that the directors acted in bad faith.**

Even if plaintiffs could allege particularized facts showing that the directors were "aware" of the problems in Florida, such knowledge would not, standing alone, demonstrate director bad faith. Instead, in order to plead bad faith, the plaintiffs would also have to allege particularized facts showing that the directors either consciously disregarded their duties to address the issue or deliberately allowed the company to violate the law. But the complaint not only says nothing about *when* the board supposedly learned about the problems in Florida, it also says nothing about *how the board responded* to whatever information it supposedly obtained. Plaintiffs instead ask this Court to *infer* that the directors were aware of the issues occurring in Florida and then *presume* that they willfully turned a blind eye to these problems. There is, of course, no basis for such a presumption of director wrongdoing. To the contrary, "directors are entitled to a presumption that they were faithful to their fiduciary duties." *Beam* v. *Stewart*, 845 A.2d 1040, 1048 (Del. 2004). And where, as here, "a majority of the directors are independent or outside directors . . . , the presumption of good faith is heightened." *Bronstein* v. *Austin*, 2008 WL 4735230 (N.D. Ill. May 30, 2008).

Plaintiffs are forced to confront their failure to allege facts that would demonstrate bad faith by the board in the portion of their complaint that purports to explain why demand would have been futile. In an attempt to make the showing of bad faith necessary to establish demand futility, plaintiffs advance the facially absurd theory that the directors participated in a "Company-wide scheme" to illegitimately "pump sales" of oxycodone and "channel[]" controlled substances onto the "black market." ¶¶ 90, 224, 243. Although allegations relating to the board are conspicuously absent from the entirety of plaintiffs' complaint, in claiming that demand was excused they ask this Court to agree that "the heart" of their case is the board's "direct facilitation of illegal activity" as part of "an intentional business strategy" based on "deliberate and widespread violations of law." ¶¶ 221, 223.

Plaintiffs, of course, offer no factual allegations to support the existence of such a board-level scheme, nor do they put forward any creditable explanation for the Walgreens directors' alleged decision to imperil the company and their own hard-earned reputations in order to push sales of a single controlled substance at a few stores in one state. Nor could there be any conceivable motive (economic or otherwise) for such a plot. As plaintiffs acknowledge, Walgreens has more than 8,000 pharmacies across the nation. And as plaintiffs also acknowledge, all prescription drug sales account for 63% of Walgreens' approximately $72 billion of net sales. The incremental sales of one drug at a small number of stores in one state account for a miniscule percentage of the company's worldwide revenues. *See White* v. *Panic*, 793 A.2d 356, 368 (Del. Ch. 2000) (finding "conclusory allegation" that the directors engaged in a "scheme" to be "wholly insufficient" to excuse demand).

Contrary to plaintiffs' "scheme" assertions, the complaint itself demonstrates that the surge in oxycodone prescriptions was due to factors beyond the company's control and that

Walgreens attempted to deal with the Florida issues in a timely manner and did so with some degree of success. As detailed in the complaint, after the change in Florida law, Walgreens personnel took various steps to address the increase in oxycodone dispensing, including implementing Oxycodone Action Plans, meeting with the DEA, and instituting a statewide Focus on Compliance review. ¶¶ 124-125, 127-128. The DEA itself acknowledged that "in mid to late 2011 and continuing into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing and did, in fact, achieve a relatively significant reduction in Schedule II dispensing at these stores." Compl. Ex. 1, App. B(i) at 11.[12] And the charts submitted by plaintiffs show that by early 2012, the level of oxycodone sales at the Florida stores had already fallen to early 2010 levels. ¶ 84.[13]

Although plaintiffs level various criticisms of management's response to the problems in Florida, those criticisms say nothing about the directors and in no way suggest the existence of a board-level "scheme" to pump oxycodone sales at a few Florida stores or channel oxycodone onto the "black market."

First, plaintiffs claim that a July 2010 email sent from one Walgreens employee to another listing the volume of oxycodone dispensing at Florida stores was somehow a "message" to "pump sales." ¶¶ 90-91. This claim is based on a gross distortion of the email, which merely

---

[12]     This finding by the DEA is entirely inconsistent with plaintiffs' theory of a board-led scheme to pump oxycodone sales. To the extent plaintiffs attempt to suggest that the DEA faulted the *directors* in any respect for the issues in Florida, *see* ¶ 101, such a suggestion is entirely unsubstantiated and finds no support in the MOA or the DEA's allegations.

[13]     This case is thus readily distinguishable from cases in which regulatory problems persisted for years or even decades. For example, in *Westmoreland County Employee Retirement System* v. *Parkinson*, plaintiffs alleged "particularized facts (*e.g.*, meeting dates and minutes) indicating that the directors were" aware of ongoing problems for years, failed to fix them after years of trying, and ultimately chose to "thr[o]w in the towel," thus leading the company to lose more than $550 million. *Id.* at 726-729.

states that Walgreens needed to ensure that "*legitimate*" prescriptions were not being turned away as stores grappled with the influx of new prescriptions. ¶ 90 (emphasis added). Far from suggesting that pharmacists should fill questionable prescriptions, the employee points out that some stores were dispensing little or no oxycodone and expresses a very valid concern about whether honest patients who had been prescribed pain medication for real medical needs were being turned away.

Second, plaintiffs criticize management's effort to address the increase in oxycodone dispensing in Florida by instituting a Focus on Compliance review in May 2011 — nearly a year before the DEA initiated its investigation — to combat the increased volume of oxycodone prescriptions in light of the change in Florida law. Plaintiffs do not allege that the board was involved in the initiative, but they quibble with the fact that management changed the title of the review from "Focus on Profit" to "Focus on Compliance." ¶ 124. It is difficult to understand why plaintiffs think this edit reflects poorly on the board. Plaintiffs also question the fact that a corporate attorney removed two questions from a related survey of Florida pharmacies. ¶¶ 125-126. But the lawyer's modification did not change the focus of the review, which was clearly designed to counteract the increase in oxycodone volume. *See* Exhibit C. And in any event, the lawyer's revisions do not suggest bad faith by the directors, who cannot be charged with knowing the line edits that an individual Walgreens lawyer might be making to the thousands of documents that are under review at any given time.

Third, plaintiffs contend that the Walgreens bonus program, which tied pharmacist bonuses to the number of prescriptions filled at the pharmacy, was part of a corporate directive to impermissibly "pump sales" of oxycodone. ¶¶ 89-90. But plaintiffs make no effort to describe the economics of how the bonus plan worked or provide any basis to conclude that

the program was distorting pharmacist decisions. Nor do they say anything about what the board was told about the bonus program or suggest that the board had any reason to believe that the program was flawed or contributing to the problems at a few stores in Florida.

Fourth, plaintiffs point to the unremarkable fact that a portion of the CEO's bonus was tied in part to the profitability of the company. Plaintiffs undertake a calculation of his annual bonus for the year ended August 2012 and allege that, because the company achieved certain profitability thresholds, the CEO made an additional $900,000. Plaintiffs then speculate that this might have created some sort of sinister incentive. Of course, plaintiffs do not allege any *facts* about the CEO's involvement with the events in Florida, or allege that the incremental sales of one drug at a handful of Florida stores actually caused Walgreens to achieve the profitability thresholds, or explain why the CEO would put himself and his company at risk to make an additional $900,000. Indeed, if there were any substance to plaintiffs' theory, one would have expected to see an elevated level of oxycodone sales in Florida through the fiscal year end of August 2012. But the opposite was true. As noted above, by early 2012, sales of oxycodone at the problem stores had already fallen to early 2010 levels.

*   *   *

Plaintiffs have utterly failed to show that the Walgreens board acted with the bad faith necessary to establish a substantial likelihood of personal liability. The complaint does no more than rehash the DEA's allegations that there were control weaknesses at the Jupiter Distribution Center and a small number of Florida pharmacies notwithstanding the company's efforts to combat the problems in the months following the change in Florida law. The complaint does not allege particularized facts to show that the directors were even aware of these regulatory issues before the DEA commenced its investigation in April 2012. And it certainly

does not allege particularized facts to support the absurd theory that the reputable men and women who serve on the Walgreens board consciously ignored such knowledge as part of a "scheme" to "pump sales" of oxycodone onto the "black market."

## CONCLUSION

For all of the foregoing reasons, the complaint should be dismissed in its entirety with prejudice for failure to make a pre-suit demand on Walgreens' board of directors as required by Federal Rule 23.1 and Illinois law. Plaintiffs may not initiate a lawsuit on Walgreens' behalf without first making a demand on the board of directors and allowing the board an opportunity to consider their claims.

Respectfully submitted,

OF COUNSEL:

Stephen R. DiPrima
Benjamin D. Klein
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
SRDiPrima@wlrk.com
BDKlein@wlrk.com

*Attorneys for the Director Defendants*

By:  /s/ Thomas B. Quinn
Thomas B. Quinn
Virginia O. Hancock
SCHIFF HARDIN LLP
233 South Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
TQuinn@schiffhardin.com
GHancock@schiffhardin.com

*Attorneys for the Director Defendants*

By:  /s/ Walter C. Carlson
Walter C. Carlson
Kristen R. Seeger
Nilofer I. Umar
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
WCarlson@sidley.com
KSeeger@sidley.com
NUmar@sidley.com

*Attorneys for nominal defendant Walgreen Co.*

Dated:  December 3, 2013

## CERTIFICATE OF SERVICE

I, Thomas B. Quinn, attorney for the Individual Defendants, hereby certify that on December 3, 2013, I caused a true and correct copy of the foregoing Memorandum of Law in Support of the Motion to Dismiss the Derivative Complaint to be served via the Court's ECF system on the following attorneys of record:

Christine Azar
Iona Evans
Labaton Sucharow LLP
300 Delaware Avenue
Suit 1225
Wilmington, DE 19801
Telephone: (302) 573-2540
Facsimile: (302) 573-2529

Carol V. Gilden
Cohen Milstein Sellers & Toll PLLC
190 S. LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile: (312) 357-0369

Gregg S. Levin
Lance V. Oliver
William S. Norton
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

George C. Aguilar
Gregory Del Gaizo
Robbins Arroyo LLP
600 B Street
Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

 /s/ Thomas B. Quinn   
Thomas B. Quinn